# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

RABBI MARA NATHAN, on behalf of herself and on behalf of her minor child, M.N.; VIRGINIA GALAVIZ EISENBERG and RON EISENBERG, on behalf of themselves and on behalf of their minor child, R.E.; CANTOR SETH ETTINGER and SARAH ETTINGER, on behalf of themselves and on behalf of their minor child, R.E.; ELIZABETH LEMASTER, on behalf of herself and on behalf of her minor children, K.L. and L.L.; CARAH HELWIG, on behalf of herself and on behalf of her minor children, J.P. and T.P.; ALYSSA MARTIN and CODY BARKER, on behalf of themselves and on behalf of their minor child, H.B.M.; LAUREN ERWIN, on behalf of herself and on behalf of her minor child, M.E.; PASTOR JAMES GRIFFIN MARTIN and ABIGAIL MARTIN, on behalf of themselves and on behalf of their minor children, J.M. and B.M.; REBEKAH LOWE and THEODORE LOWE, on behalf of themselves and on behalf of their minor children, E.R.L. and E.M.L.; MARISSA NORDEN and WILEY NORDEN, on behalf of themselves and on behalf of their minor children, E.N. and A.N.; RABBI JOSHUA FIXLER, on behalf of himself and on behalf of his minor children, D.F., E.F., and F.F.; REVEREND CYNTHIA MOOD, on behalf of herself and on behalf of her minor children, L.M. and C.M.; CHERYL REBECCA SMITH, on behalf of herself and on behalf of her minor child, L.P.J.; ARVIND CHANDRAKANTAN, on behalf of himself and on behalf of his minor children, V.C., M.C., and A.C.; ALLISON FITZPATRICK, on behalf of herself and on behalf of her minor children, C.F. and H.F.; and MARA RICHARDS BIM, on behalf of herself and on behalf of her minor child, H.B.,

     Plaintiffs,

     v.

ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT; NORTH EAST INDEPENDENT SCHOOL DISTRICT; LACKLAND INDEPENDENT

CIVIL ACTION NO. 5:25-cv-00756

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

SCHOOL DISTRICT; NORTHSIDE INDEPENDENT
SCHOOL DISTRICT; AUSTIN INDEPENDENT
SCHOOL DISTRICT; LAKE TRAVIS
INDEPENDENT SCHOOL DISTRICT; DRIPPING
SPRINGS INDEPENDENT SCHOOL DISTRICT;
HOUSTON INDEPENDENT SCHOOL DISTRICT;
FORT BEND INDEPENDENT SCHOOL DISTRICT;
CYPRESS FAIRBANKS INDEPENDENT SCHOOL
DISTRICT; and PLANO INDEPENDENT SCHOOL
DISTRICT,

          Defendants.

## **COMPLAINT**

1.      Consistent with Texas law requiring parents to send their minor children to school, upwards of 5.5 million students are enrolled in more than 9,000 public elementary and secondary schools across the state. These children and their families adhere to an array of faiths, and many do not practice any religion at all. Nevertheless, because of Senate Bill No. 10 ("S.B. 10" or "the Act"), which requires public schools to post a state-approved, Protestant version of the Ten Commandments in a "conspicuous place" in every classroom, all of these students will be forcibly subjected to scriptural dictates, day in and day out, including: "I AM the LORD thy God"; "Thou shalt have no other gods before me"; "Thou shalt not make to thyself any graven images"; "Thou shalt not take the Name of the Lord thy God in vain"; "Remember the Sabbath day, to keep it holy"; and "Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee." This simply cannot be reconciled with the fundamental religious-freedom principles that animated the Founding of our nation.

2.      These Founding principles are reflected in a long line of Supreme Court jurisprudence that prohibits public schools from imposing religious doctrine and practice on

students. Indeed, for nearly half a century, it has been well settled that the First Amendment forbids public schools from permanently posting the Ten Commandments in this manner. In *Stone v. Graham*, 449 U.S. 39, 42 (1980), the Supreme Court struck down a Kentucky law mandating classroom displays of the Ten Commandments, holding that such displays would unconstitutionally "induce [ ] schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments."

3.     Last year, a federal district court ruled that a Louisiana law similar to S.B.10 violated the Establishment and Free Exercise Clauses of the First Amendment. *Roake v. Brumley*, 756 F. Supp. 3d 93, 116, 118, 219 (M.D. La. 2024). The U.S. Court of Appeals for the Fifth Circuit affirmed that ruling under the Establishment Clause last month. *Roake v. Brumley*, No. 24-30706, 2025 WL 1719978 (5th Cir. June 20, 2025). And just last week, the U.S. Supreme Court ruled that, under the Free Exercise Clause, public schools may not condition students' access to a public education on families' acceptance of instruction that "substantially interferes with the religious development of [a] child or pose[s] a very real threat of undermining the religious beliefs and practices the parent wishes to instill in the child." *Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *18 (June 27, 2025) (cleaned up).

4.     Under this precedent, permanently posting the Ten Commandments in every Texas public-school classroom—rendering them unavoidable—is plainly unconstitutional. The displays will pressure students, including the minor-child Plaintiffs, into religious observance, veneration, and adoption of the state's favored religious scripture. The displays will also send the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that S. B. 10 requires—do not belong in their own school community, pressuring them to refrain from expressing any faith

practices or beliefs that are not aligned with the state's religious preferences. And the displays will substantially interfere with and burden the right of the parents-Plaintiffs, who are Jewish, Christian, Unitarian Universalist, Hindu, or nonreligious, to direct their children's education and upbringing when it comes to religious questions and matters.

5.      The state's main interest in displaying the Ten Commandments in public schools under S.B. 10 is to impose religious beliefs on public-school children, in disregard for the numerous objections from Texas families and faith leaders from across the religious spectrum. As Lt. Gov. Dan Patrick, who presides over the Texas Senate, put it: Because of S.B. 10, students "in every classroom in Texas, they are going to see the Ten Commandments, and they are going to know about God." Sen. Phil King, S.B. 10's lead Senate sponsor and author, echoed the sentiment, explaining: "[W]e want every kid, [pre-k] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words that [] God says because we want them to understand how important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."

6.      For these reasons, Plaintiffs seek a declaratory judgment that S.B. 10 is unconstitutional. Plaintiffs also seek preliminary and permanent injunctive relief to prevent Defendants from complying with the Act.

## JURISDICTION & VENUE

7.      Plaintiffs bring this matter under 42 U.S.C. § 1983, for violations of civil rights under the First and Fourteenth Amendments to the U.S. Constitution. Because this action arises under the U.S. Constitution and the laws of the United States, it presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28 U.S.C. § 1331. In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

8.      The Court is authorized to award the declaratory and injunctive relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202.

9.      Pursuant to 28 U.S.C. § 1391, venue is proper in the Western District of Texas. Plaintiffs Rabbi Mara Nathan, Virginia Galaviz Eisenberg and Ron Eisenberg, Cantor Seth Ettinger and Sarah Ettinger, Elizabeth Lemaster, Carah Helwig, Alyssa Martin and Cody Barker, Lauren Erwin, Pastor James Griffin Martin and Abigail Martin, Rebekah and Theodore Lowe, and Marissa Norden and Wiley Norden reside in this district, and their minor children attend public schools in this district. Further, Defendants Alamo Heights Independent School District, North East Independent School District; Lackland Independent School District; Northside Independent School District; Austin Independent School District, Lake Travis Independent School District, and Dripping Springs Independent School District are located within this district. Accordingly, the actions to administer, implement, and enforce S.B. 10 by the Defendants that give rise to the claims herein will necessarily occur in large part within this district.

## PARTIES

10.     Plaintiff Rabbi Mara Nathan brings this suit on behalf of herself and on behalf of her minor child, M.N.[1] The family is domiciled in San Antonio, Texas. M.N. is enrolled in and will attend a public school in the Alamo Heights Independent School District during the 2025-2026 school year.

11.     Plaintiffs Virginia Galaviz Eisenberg and Ron Eisenberg bring this suit on behalf of themselves and on behalf of their minor child, R.E. The family is domiciled in San Antonio

---

[1] In accordance with Federal Rule of Civil Procedure 5.2(a)(3), all minor-child Plaintiffs are identified by their initials.

Texas. R.E. is enrolled in and will attend a public school in the Alamo Heights Independent School District during the 2025-2026 school year.

12.    Plaintiffs Cantor Seth Ettinger and Sarah Ettinger bring this suit on behalf of themselves and on behalf of their minor child, R.E. The family is domiciled in San Antonio, Texas. R.E. is enrolled in and will attend a public elementary school in the North East Independent School District during the 2025-2026 school year.

13.    Plaintiff Elizabeth Lemaster brings this suit on behalf of herself and on behalf of her minor children, K.L. and L.L. The family is domiciled in San Antonio, Texas. K.L. and L.L. are enrolled in and will attend a public elementary school in the North East Independent School District during the 2025-2026 school year.

14.    Plaintiff Carah Helwig brings this suit on behalf of herself and on behalf of her minor children, J.P. and T.P. The family is domiciled in San Antonio, Texas. T.P. is enrolled in and will attend a public elementary the North East Independent School District during the 2025-2026 school year. J.P. is enrolled in and will attend a public high school in the same district in the upcoming school year.

15.    Plaintiffs Alyssa Martin and Cody Barker bring this suit on behalf of themselves and on behalf of their minor child, H.B.M. The family lives near San Antonio, Texas. H.B.M. is enrolled in and will attend a public school in the Lackland Independent School District during the 2025-2026 school year.

16.    Plaintiff Lauren Erwin brings this suit on behalf of herself and on behalf of her minor child, M.E. The family is domiciled in San Antonio, Texas. M.E. is enrolled in and will attend a public elementary school in the Northside Independent School District during the 2025-2026 school year.

17.     Plaintiffs Pastor James Griffin Martin and Abigail Martin bring this suit on behalf of themselves and on behalf of their minor children, J.M. and B.M. The family is domiciled in Austin, Texas. J.M. is enrolled in and will attend a public middle school in the Austin Independent School District during the 2025-2026 school year. B.M. is enrolled in and will attend a public high school in the same district in the upcoming school year.

18.     Plaintiffs Rebekah and Theodore Lowe bring this suit on behalf of themselves and on behalf of their minor children, E.R.L. and E.M.L. The family is domiciled in Spicewood, Texas. E.R.L. and E.M.L. are enrolled in and will attend public elementary and middle schools in the Lake Travis Independent School District during the 2025-2026 school year.

19.     Plaintiffs Marissa Norden and Wiley Norden bring this suit on behalf of themselves and on behalf of their minor children, A.N. and E.N. The family is domiciled in Austin, Texas. A.N. is enrolled in and will attend a public elementary school in the Dripping Springs Independent School District during the 2025-2026 school year. E.N. is enrolled in and will attend a public middle school in the same district in the upcoming school year.

20.     Plaintiff Rabbi Joshua Fixler brings this suit on behalf of himself and on behalf of his minor children, D.F., E.F., and F.F. The family is domiciled in Bellaire, Texas. D.F., E.F., and F.F are enrolled in and will attend a public elementary school in the Houston Independent School District during the 2025-2026 school year.

21.     Plaintiff Reverend Cynthia Mood brings this suit on behalf of herself and on behalf of her minor children, L.M and C.M. The family is domiciled in Houston, Texas. L.M. and C.M. are enrolled in and will attend a public elementary school in the Houston Independent School District during the 2025-2026 school year.

22.     Plaintiff Cheryl Rebecca Smith brings this suit on behalf of herself and on behalf of her minor child, L.P.J. The family is domiciled in Houston, Texas. L.P.J. is enrolled in and will attend a public elementary school in the Houston Independent School District during the 2025-2026 school year.

23.     Plaintiff Arvind Chandrakantan brings this suit on behalf of himself and on behalf of his minor children, V.C., M.C., and A.C. The family is domiciled in Sugar Land, Texas. A.C., M.C., and V.C. will attend a public elementary school, middle school, and high school, respectively, in the Fort Bend Independent School District during the 2025-2026 school year.

24.     Plaintiff Allison Fitzpatrick brings this suit on behalf of herself and on behalf of her minor children, C.F. and H.F. The family is domiciled in Cypress, Texas. C.F. and H.F. are enrolled in and will attend a public middle school in the Cypress Fairbanks Independent School District during the 2025-2026 school year.

25.     Plaintiff Mara Richards Bim brings this suit on behalf of herself and on behalf of her minor child, H.B. The family is domiciled in Plano, Texas. H.B. is enrolled in and will attend a public elementary school in the Plano Independent School District during the 2025-2026 school year.

26.     Defendant Alamo Heights Independent School District is a public school district located in San Antonio, Texas.

27.     Defendant North East Independent School District is a public school district located in San Antonio, Texas.

28.     Defendant Lackland Independent School District is a public school district located near San Antonio, Texas.

29.    Defendant Northside Independent School District is a public school district located in San Antonio, Texas.

30.    Defendant Austin Independent School District is a public school district located in in Austin, Texas.

31.    Defendant Lake Travis Independent School District is a public school district located in in Austin, Texas.

32.    Defendant Dripping Springs Independent School District is a public school district located in Dripping Springs, Texas.

33.    Defendant Houston Independent School District is a public school district located in Houston, Texas.

34.    Defendant Fort Bend Independent School District is a public school district located in Sugar Land, Texas.

35.    Defendant Cypress Fairbanks Independent School District is a public school district located in Cypress, Texas.

36.    Defendant Plano Independent School District is a public school district located in Plano, Texas.

## FACTUAL ALLEGATIONS

37.    On June 20, 2025, Texas Governor Greg Abbott signed into law S.B. 10, which provides that every public elementary and secondary school in the state "shall display in a conspicuous place in each classroom of the school a durable poster or framed copy of the Ten Commandments[.]" The Act will take effect on September 1, 2025.

38.    Under the Act, the poster or framed copy "must . . . include only the text of the Ten Commandments as provided by Subsection (c)," which states:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the
land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor
his maidservant, nor his cattle, nor anything that is thy
neighbor's.

39.    As alleged further below, *infra* ¶¶ 48–60, this version of the Ten Commandments is associated with certain Protestant faiths and conflicts with the version of the Ten Commandments followed by many Jews and Catholics.

40.    The Act further requires that each poster or copy of the Ten Commandments "be at least" sixteen inches by twenty inches in size and that the text of the Ten Commandments be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

10

41.     Under the Act, the required displays will be donated to schools. A school lacking compliant displays in each classroom also "may, but is not required to, purchase posters or copies . . . using district funds."

42.     The displays will be permanent and year-round; the Act does not provide for a time limit on the displays.

43.     The Act requires that the displays of the Ten Commandments be posted in classrooms without regard to the grade level or literacy comprehension of students. For example, the Act requires the Ten Commandments displays to be hung in both kindergarten and high school classrooms.

44.     The Act requires the displays to be placed in every classroom, regardless of the subject matter taught. For example, the Act requires the state-approved version of the Ten Commandments to be posted in math and science classrooms. Thus, all students, including those who move classrooms during the school day and those who stay in the same classroom for much of the school day, will be subjected the displays at all times they are in class, no matter the topic or instruction at hand.

45.     While the Kentucky statute struck down in *Stone* and the Louisiana law held unconstitutional in *Roake* each required an accompanying context statement that purported to explain the historical relevance and use of the Ten Commandments, S.B. 10 does not include a similar provision.

46.     In fact, this nation's core founding documents—the Declaration of Independence, the United States Constitution, and the Bill of Rights—were not based on the Ten Commandments, and there is no longstanding history or tradition of prominently and permanently displaying the Ten Commandments in public-school classrooms.

47.     As evinced by the Act's minimum requirements for the classroom displays and comments made by various lawmakers, *see infra* ¶¶ 73–81, the state's main interest in enacting S.B. 10 is the imposition of religious beliefs and tenets on public-school children.

**The Act Officially Approves and Prescribes One Particular Version of the Ten Commandments, to Which Many People Do Not Subscribe.**

48.     S.B. 10 is not neutral with respect to religion. By design, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom. It also requires that schools post a specific, state-approved version of that scripture that is associated with certain Protestant faiths, taking sides on theological questions regarding the correct content and meaning of the Ten Commandments and enshrining in state law an official denominational preference.

49.     Numerous Texans do not subscribe to the specific text of the Ten Commandments that is mandated by S.B. 10.

50.     Many people in Texas are nonreligious and do not adhere to the religious tenets set forth in any version of the Ten Commandments, including the one mandated by S.B. 10.

51.     There are many faith traditions that do not teach, recognize, or reference the Ten Commandments at all. For example, followers of Hinduism, Buddhism, Sikhism, and Taoism generally do not consider the Ten Commandments to be part of their belief system.

52.     Some Christians, including Jehovah's Witnesses, reject the proposition that the Ten Commandments are authoritative or binding.

53.     Some faith traditions, including some Christian denominations, consider the Ten Commandments to be part of their theology and authoritative but do not believe in elevating the Commandments set forth in S.B. 10 over other biblical teachings.

54.     Even for faith traditions that view the Ten Commandments as authoritative and important, there are many different versions, depending on religious denomination and biblical translation.

55.     Among those who may believe in some version of the Ten Commandments, the particular text they follow can differ by religious denomination or tradition. For instance, Catholics, Jews, and many Protestants differ in the way that they number, organize, and translate the Ten Commandments from Hebrew to English.

56.     The text of the Ten Commandments mandated by S.B. 10 is a Protestant version.

57.     The version of the Ten Commandments mandated by the Act does not match any version or translation found in the Jewish tradition.

58.     The version of the Ten Commandments mandated by S.B. 10 omits key language and context that is included in the version set forth in the Torah. For example, it is missing the important message in the Jewish story about God bringing the Israelites out of Egyptian slavery to freedom. It also states "[t]hou shalt not kill," whereas the translated version followed by most Jews prohibits "murder." The different language reflects deep theological differences as to the Ten Commandments' meaning and scope.

59.     The version of the Ten Commandments mandated by S.B. 10 does not match the version followed by most Catholics. For example, the Catholic version does not include the language prohibiting "graven images." Indeed, given how common iconography, sculpture, and other artwork is in the Catholic faith, this prohibition conflicts with how many Catholics practice their faith.

60.     Although the version of the Ten Commandments mandated by S.B. 10 is Protestant and is drawn from the King James Bible, the specific text and wording of the Commandments

required under S.B. 10 is religiously objectionable even to some adherents of certain Protestant denominations.

**The Displays Mandated By S.B. 10 Will Coerce Students, Including the Minor-Child Plaintiffs, into Religious Observance, Veneration, and Adoption of the State's Official Religious Scripture.**

61.     Under Texas law, minor children are required to "attend school each school day for the entire period" that instructional programming is provided. Tex. Educ. Code § 25.085(a).

62.     When a student exceeds the number of allowable unexcused absences from school, students and parents may be subject to educational and legal penalties, including civil prosecution in court. *See* Tex. Fam. Code § 65.003(b); Tex. Educ. Code § 25.093(a). Other possible penalties include a "behavior improvement plan," "school-based community service," or a referral to "counseling, mediation, mentoring, a teen court program, community-based services, or other in-school or out-of-school services aimed at addressing the student's truancy." Tex. Educ. Code § 25.0915(a-1)(1)-(2).

63.     Further, if a school issues the required attendance warning and the parent, acting with criminal negligence, "fails to require the child to attend school as required by law, and the child has [excessive unexcused] absences . . . the parent commits an offense." *Id.* § 25.093(a). "The attendance officer or other appropriate school official *shall* file a complaint against the parent" in the appropriate court. *Id.* § 25.093(b) (emphasis added).

64.     The offense is classified as a misdemeanor punishable by a fine not to exceed $100 "for a first offense," and up to $500 for a "fifth or subsequent offense." *Id.* § 25.093(c). "Each day the child remains out of school may constitute a separate offense." *Id*. § 25.093(c-1). The court also "may order the defendant to attend a program for parents of students with unexcused absences that provides instruction designed to assist those parents in identifying problems that contribute to

the students' unexcused absences[.]" *Id.* § 25.093(f). If "a parent refuses to obey a court order . . . the court may punish the parent for contempt of court[.]" *Id.* § 25.093(g) (citing Tex. Gov't Code § 21.002, which authorizes a fine or confinement in jail for contempt of court).

65.    Consistent with Texas's compulsory education law, more than 5.5 million children are enrolled in more than 9,000 public schools across the state.[2]

66.    These children and their families practice a wide array of faiths. And within these faith systems, students and families adhere to a variety of denominations, branches, and sects.

67.    Many public-school children and families in Texas, including some of the Plaintiffs, do not adhere to any faith and cherish their right to be nonreligious to the same extent that people of faith cherish their right to religious belief and exercise. *See infra* ¶¶ 124–35, 206–12.

68.    Given the religious diversity present in Texas's public schools, many students and families, including some of the Plaintiffs, do not subscribe to any version of the Ten Commandments. *See infra* ¶¶ 124–35, 191–99, 206–12.

69.    Many other public-school students and their families who believe in their faith's version of the Ten Commandments, including some of the Jewish and Christian Plaintiffs, do not subscribe to the specific state-selected, mandatory version set forth in S.B. 10. *See infra* ¶¶ 85–123, 136-90, 200-05, 213-25.

70.    Under the Act, all of these students will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school.

---

[2]    *See 2024-2025 Student Enrollment*, Tex. Educ. Agency, https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.addispatch.sas&major=st&minor=e&charsln=120&linespg=60&loop=1&countykey=&oldnew=new&_debug=0&endyear=25&selsumm=ss&key=TYPE+HERE&grouping=e+&format=W (last visited July 1, 2025); Tex. Pub. Sch. Explorer, Tex. Tribune (Apr. 2025), https://schools.texastribune.org.

71.    Texas public schools must operate for at least 75,600 minutes (an equivalent of 1,260 hours) each school year, "including time allocated for instruction, intermissions, and recesses for students." Tex. Educ. Code § 25.081(a). Thus, for students entering the Texas public-school system in kindergarten, S.B. 10 will subject them to the state's preferred religious dogma for up to 16,380 hours across thirteen academic years.

72.    As alleged above, the Act requires that public schools display the Ten Commandments in "a conspicuous place" in every classroom—with no exceptions. The poster or framed copy may include "only the text of the Ten Commandments as provided" in S.B. 10 and must be at least sixteen inches by twenty inches in size. Further, the text of the Commandments must be printed "in a size and typeface that is legible to a person with average vision from anywhere in the classroom[.]"

73.    These minimum requirements of the Act are designed to, and will, ensure that students are more likely to observe, absorb, accept, follow, and live by the religious directives in the Ten Commandments. For example, Lt. Gov. Dan Patrick has touted S.B. 10 by boasting that, "in every classroom in Texas, [students] are going to see the Ten Commandments, and they are going to know about God."[3]

74.    Sen. Phil King, S.B. 10's lead Senate sponsor and author, has similarly stated, "[W]e want every kid, [pre-K] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words [] that God says because we want them to understand how

---

[3] *Washington Watch with Tony Perkins*, Tony Perkins, at 11:05–11:10 (May 27, 2025), https://www.tonyperkins.com/get.cfm?i=LR25E20#gsc.tab=0.

important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."[4]

75.    And, responding to another lawmaker's suggestion that "the members of the legislature should focus more on trying to follow the Ten Commandments rather than telling others to follow them," Rep. Candy Noble, the lead House sponsor and author of S.B. 10, proclaimed during the legislative debates that "it is incumbent on all of us to follow God's law, and I think that we would be better off if we did."[5] Asked whether "our public schools are missing God's law," she responded, "In some instances, yeah," but went on to praise "some amazing teachers out there that are showing an awful lot of Christian behavior and love and concern to their students."[6]

76.    Other lawmakers have likewise made clear the intended religious impact of S.B. 10. Thanking Rep. Noble for introducing the bill, Rep. Harold Dutton, Jr. announced during the floor debate, "I appreciate her bringing this to us because I think, again, to teach our children to better their behavior and that there is something in all of us that God has placed in each and every one of us. And the only way to get that out is to follow His commands. And His commands, the Ten Commandments set that out. And the best way to teach children is to find a means in which they are willing to learn."[7]

77.    During a legislative hearing, Sen. Donna Campbell, a primary author of S.B. 10, also emphasized the importance of introducing schoolchildren to scripture: "God tells us in Joshua

---

[4] Kimberly Watts, *king audio 20250618toddstarnes*, YouTube, at 3:40–4:14 (June 21, 2025), https://www.youtube.com/watch?v=Kbll35APGTs (video directly linked from Sen. King's official website in *Action on Iran; New Laws for Securing Borders, Texas Land, Our Citizens and Elections*, https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borders-texas-land-our-citizens-and-elections/ (June 23, 2025)).

[5] *S.B. 10 H. Floor Debate*, 2025 Leg., 89th Reg. Sess. 5:06:43–5:06:49 (May 24, 2025), https://house.texas.gov/videos/22257 (statement of Rep. Noble).

[6] *Id.* at 5:07:15–5:07:37 (statement of Rep. Noble).

[7] *Id.* at 5:56:28–5:56:57 (statement of Rep. Dutton).

1:9 to be strong and courageous. Don't be afraid. Don't be discouraged, because the Lord, thy God is with us throughout our life. There is an afterlife. There is eternal life. And if we don't expose— or introduce is a better word—our children and others to that, when they die, they had one birth, two deaths, because they will know nothing about the afterlife, the eternity with God. But exposing them or introducing them to Ten Commandments [and] prayer, it asks other questions, and they then have a choice in their future. Two births, and one death. And this is what we're doing. Prayer gives us our faith. The Ten Commandments, while they are laws, actually expand our freedoms. That's what we're about."[8]

78.    During the same hearing, Sen. Campbell also chastised a Baptist reverend who testified against a separate bill that would authorize public schools to institute official periods of prayer, warning the minister: "Perhaps the nationally accredited chaplaincy provides you the foundation for your beliefs in your testimony here, but the Baptist doctrine is Christ-centered. Its purpose is not to go around trying to defend this or that. It is to be a disciple and a witness for Christ. That includes the Ten Commandments, that's prayer in schools. It is not a fight for separation between church and state."[9]

79.    Reacting to testimony supporting S.B. 10 and the school-prayer bill, Sen. Tan Parker, another primary author of S.B. 10, revealed: "I'm in shock . . . that only twenty-five percent of our kids today in schools have been in a church. That should make everybody listening absolutely scared to death. I mean, obviously, only the Lord can save us, and we need to engage

---

[8] *S.B. 10 Hearing Before S. Comm. on Educ. K-16*, 2025 Leg., 89th Reg. Sess. 2:11:53– 2:13:12 (Mar. 4, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21245&lang=en (statement of Sen. Campbell).

[9] *Id.* at 2:47:00–2:47:27 (statement of Sen. Campbell).

in prayer. But to realize only twenty-five percent of our kids in schools today have been in a church is absolutely horrific and something we all need to work on to address."[10]

80.    In considering S.B. 10, lawmakers repeatedly rejected proposed amendments that would have required parental consent for the Ten Commandments displays or that would have required the simultaneous display of religious texts and tenets from other faiths. Lawmakers also dismissed concerns that S.B. 10 would spiritually burden non-Christian students. For example, during the Senate discussion of the bill, primary S.B. 10 author Sen. Brent Hagenbuch explained: "Christians have been intimidated and afraid to talk about or express their faith at work and in school in this country. Christians are the majority, pretty clearly. We, with our faith, but more importantly in this context as Texans, the majority needs to look out for the minority, I understand, and be careful not to trample them. *But we've gone too far there* . . . So, I think it's important that we're able to have the freedom to express our faith . . . through the Ten Commandments . . .."[11]

81.    After one legislator pointed to "Muslim students that are being bullied in Texas public schools" and "Jewish students being bullied" as a reason to avoid imposing Christian scripture in classrooms, Rep. Noble doubled down, declaring, "Oh, then we really need the Ten Commandments in there on how to treat others kindly."[12] And after being advised that Texas public "schools also serve students of other faith backgrounds," including "Muslim students, Hindu students, Buddhist students, Sikh students, [and] atheist students"—and asked how it will make "a Hindu student feel to have a poster in every classroom that says, 'thou shalt not worship any God

---

[10] *Id.* at 2:02:23–2:02:50 (statement of Sen. Parker).
[11] *S.B. 10 S. Debate*, 2025 Leg., 89th Reg. Sess. 25:48–26:36 (Mar. 19, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21416&lang=en (statement of Sen. Hagenbuch) (emphasis added).
[12] *S.B. 10 Hearing Before H. Comm. on Pub. Educ.*, 2025 Leg., 89th Reg. Sess. 6:41:41–6:41:45 (Apr. 29, 2025) https://house.texas.gov/videos/21958 (statement of Rep. Noble).

before me?'" —Noble replied: "I don't know. I haven't asked one. Have you?"[13] She went on to imply that these students are interlopers, stating, "I assume they're Americans now? I think that they would find it interesting to see what was important and foundational to our forefathers that made this nation a place that they wanted to come and live and raise a family and be part of it."[14]

82.     As a result of the displays mandated by S.B. 10, students who do not subscribe to the state's official version of the Ten Commandments or whose faith tenets and values are otherwise contradicted by the displays—including the minor-child Plaintiffs—will be pressured into religious observance, veneration, and adoption of this religious scripture.

83.     As a result of the displays mandated by S.B. 10, students who do not subscribe to the state's official version of the Ten Commandments or whose faith tenets and values are otherwise contradicted by the display—including the minor-child Plaintiffs—will also be pressured to suppress expression or practice of their own faiths and religious beliefs or nonreligious beliefs in view of their peers, teachers, and other school staff.

**<u>Plaintiffs Will Be Harmed by the Religious Displays Mandated S.B. 10.</u>**

84.     As set forth further below, the displays mandated by S.B. 10 will harm the Plaintiffs in a variety of ways. Principal among these harms, the displays will: (1) forcibly subject the minor-child Plaintiffs to religious doctrine and beliefs in a manner that conflicts with their families' religious and nonreligious beliefs and practices; (2) send a marginalizing message to the minor-child Plaintiffs and their families that they do not belong in their own school community because they do not subscribe to the state's preferred religious text; (3) religiously coerce the minor-child Plaintiffs by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text, and by pressuring them to suppress expression of their own religious or nonreligious

---

[13] *Id.* at 6:40:31–6:40:44 (statement of Rep. Noble).
[14] *Id.* at 6:40:51–6:41:05. (statement of Rep. Noble).

beliefs and backgrounds at school; and (4) substantially interfere with the religious development of the minor-child Plaintiffs and threaten to undermine the beliefs, practices, and values regarding matters of faith that the parent-Plaintiffs wish to instill in their children, thereby usurping the parents' authority to direct their children's religious education and religious or nonreligious upbringing.

### Rabbi Mara Nathan and her minor child

85.     Plaintiff Mara Nathan is Jewish. She is the rabbi at a San Antonio temple.

86.     Rabbi Nathan and her husband are raising their minor child, M.N., in the Jewish faith.

87.     On behalf of herself and on behalf of M.N., Rabbi Nathan objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on M.N. a specific version of the Ten Commandments to which the family does not subscribe, in a manner that is contrary to Jewish teachings and the family's faith.

88.     While the Ten Commandments are a sacred Jewish text, the version required by S.B. 10 does not align with the family's Jewish belief and tradition. In Judaism, the Ten Commandments are found in two places in the Torah: Exodus chapter 20 and Deuteronomy chapter 5. The text required under S.B. 10 is not any found in Jewish tradition. It is a Christianized version of the Commandments that omits explicitly Jewish aspects of scripture. For example, in Judaism, the sacredness of the Commandments is rooted in the Jewish belief that, at Mount Sinai, Moses entered into a covenant with God on behalf of the children of Israel after they were freed from slavery. The Ten Commandments are a sign of the covenant between God and the Jewish people. The text of the first Commandment required by S.B. 10, however, erases this foundational Jewish tenet and historical context.

89.     By directing, "I AM the LORD thy God," the first Commandment set forth in S.B. 10 also conflicts with the family's Jewish belief that God has no gender. As a religious practice, and in accordance with the original Hebrew in the Torah, they refer to God as "Adonai," and they try to avoid patriarchal, gender-specific language, such as "Lord."

90.     By omitting key text from the Torah that lays out the specific rules that pertain to observing the Sabbath, the fifth Commandment set forth in S.B. 10 provides another example of the Act's erasure of Jewish belief and practice. Rabbi Nathan's faith teaches that it is vital to receive and understand scripture within the context presented in the Torah, as well as through the lens of rabbinic commentary and centuries of teaching and interpretation. By summarizing some Commandments instead of including the text as found in the Torah in its entirety, S.B. 10's displays will present a truncated, decontextualized, and inaccurate version of scripture.

91.     The displays mandated by S.B. 10 also conflict with Jewish teachings that oppose proselytizing. Rabbi Nathan's faith tradition teaches that everyone should be respectful of other people's religion. Forcing Christian beliefs and doctrine on M.N. and other non-Christian students, day in and day out, will violate this tenet.

92.     The minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for M.N., ensuring that M.N. will be subjected to the Ten Commandments every day, in every classroom, throughout M.N.'s public-school education.

93.     By imposing on M.N. a Christian-centric version of the Ten Commandments for nearly every hour of the school day, the displays mandated by S.B. 10 will substantially interfere with M.N.'s religious development and threaten to undermine the religious beliefs, values, and practices that Rabbi Nathan and her husband seek to instill in M.N. Specifically, the displays will present belief in S.B. 10's version of the Ten Commandments as a fait accompli. The displays will

send the message that this version is authoritative, that the classroom and school facilities more generally are Christian spaces, and that M.N., as a Jewish student who does not adhere to this version of scripture, is unwelcome and an outsider in the school community. As a result, the displays mandated by S.B. 10 will pressure M.N. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

94.     Furthermore, although M.N. has a strong Jewish identity, by conveying that Christianity is the only acceptable religion in school, the displays will pressure M.N. to suppress expression of this religious identity at school to avoid potential disfavor from school officials or peers. At the same time, and ironically, the displays are likely to place M.N., who is one of only a few Jewish students in the school, in the position of defending the Jewish faith's departure from the Christian beliefs and practices promoted by the displays. In fact, M.N. has previously been singled out at school to explain Jewish practices or to give a "Jewish" opinion. For example, school staff inappropriately asked M.N. which Hanukkah song the school band should play at the Christmas concert. Placing M.N. or other minority-faith students in the position of defending or explaining their non-Christian beliefs and practices imposes an undue burden on them. It not only treats them as outsiders, but it also pressures them to be experts in, and ambassadors for, their own faith in a way not required of their Christian peers.

95.     The responsibility to guide M.N. in the development of M.N.'s Jewish faith, including M.N.'s understanding of the text and meaning of the Ten Commandments, is an essential aspect of Rabbi Nathan's religious exercise. Because forcibly imposing on M.N. a Christian version of the Ten Commandments for nearly every hour of the school day, in accordance with S.B. 10, will interfere with M.N.'s religious development and threaten to undermine the religious beliefs, values, and practices Rabbi Nathan seeks to instill in M.N., the displays will also

directly interfere with and substantially burden Rabbi Nathan's ability to carry out this religious exercise.

### *Virginia Galaviz Eisenberg, Ron Eisenberg, and their minor child*

96.     Plaintiffs Virginia Galaviz Eisenberg and Ron Eisenberg are Jewish and are raising their minor child, R.E., in the Jewish faith tradition. They are members of a local temple, where R.E. has attended religious school and participates in various other religious educational events and activities.

97.     On behalf of themselves and R.E., the Eisenbergs object to the school displays mandated by S.B. 10. The minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for R.E., ensuring that R.E. will be subjected to the Ten Commandments every day, in every classroom, throughout R.E.'s public-school education. The displays will impose on R.E. a Christian version of the Ten Commandments in which the family does not believe.

98.     Jewish translations of the Ten Commandments preserve nuances that reflect Jewish theology and interpretation. The text of the Ten Commandments that will appear in the classroom displays, however, omits specifically Jewish references and does not, therefore, comport with the family's religious beliefs. For example, the displays' first Commandment, "I AM the LORD thy God," eliminates an important part of the Hebrew text, which acknowledges God freeing the Israelites from slavery and the Commandments as a covenant between God and the Jewish people. This covenant is core to Jewish practice, and deleting it is deeply offensive to the Eisenbergs because it erases the Commandments' Jewish significance. Moreover, the Christian version of this text, as mandated by S.B. 10, assigns patriarchal gender to God by using the word "Lord." As

Reform Jews, the Eisenbergs do not attribute a gender to God and believe that doing so is antithetical to Jewish values of egalitarianism and gender equality.

99.    As another example, S.B. 10's Commandment pertaining to the Sabbath leaves out Torah text that, the Eisenbergs believe, compels Jews to observe the Sabbath (Shabbat) from Friday evening through Saturday evening. This is a central Commandment for the family, and the version required by S.B. 10 misrepresents it.

100.    Even if the text mandated by S.B. 10 were not distinctly Christian and did not intentionally excise and obscure the Commandments' Jewish history and significance, S.B. 10's required displays would nevertheless conflict with the Eisenbergs' Jewish beliefs and values. Their faith tenets oppose proselytizing, and Judaism teaches that religion should not be imposed by government. This is especially important for Jews, who have suffered persecution under governments that endorsed a dominant religion.

101.    Relatedly, the displays mandated by S.B. 10 also contradict the family's Jewish values that promote respect for all faiths by sending a message to students, including R.E., that Christian beliefs are normative and supreme and that those who do not adhere to those beliefs are abnormal and disfavored within the school community and the community at large.

102.    Being Jewish is important to R.E., and R.E. is proud to be Jewish. However, as one of just a few Jewish students at school, R.E. has already had some troubling experiences. For example, some peers have flippantly made Nazi salutes or other jokes about the Holocaust in school, without any regard for R.E.'s discomfort. A few years ago, R.E.'s class went on a field trip to a Christian ranch, where R.E. was questioned about not believing in Jesus. By promoting Christian religious doctrine and conveying that Christians are superior to non-Christians, the displays mandated by S.B. 10 will further highlight R.E.'s religious differences and pressure R.E.

to follow the state's preferred religious doctrine. In addition, the displays will make it harder for R.E. to feel comfortable expressing R.E.'s Jewish identity at school.

103.    Because the displays mandated by S.B. 10 will impose on R.E. Christian religious doctrine, in a manner that conflicts with the Eisenbergs' Jewish faith, the displays will substantially interfere with R.E.'s religious development and threaten to undermine the religious beliefs, values, and practices the Eisenbergs seek to instill in R.E.

104.    Further, by interfering with R.E.'s religious development and threatening to undermine the Jewish beliefs, practices, and values the Eisenbergs seek to instill in R.E., the displays mandated by S.B. 10 will also substantially burden the Eisenbergs' religious exercise, which includes a religious obligation to guide R.E. in the development of R.E.'s Jewish faith and R.E.'s understanding of the text and meaning of the Ten Commandments.

### _Cantor Seth Ettinger, Sarah Ettinger, and their minor child_

105.    Plaintiffs Seth and Sarah Ettinger are Jewish and are and raising their minor child, R.E., in the Jewish faith tradition. Mr. Ettinger is the cantor at a synagogue in San Antonio.

106.    On behalf of themselves and R.E., the Ettingers object to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on R.E. a specific version of the Ten Commandments to which their family does not subscribe, in a manner that is contrary to Jewish teachings and the family's faith.

107.    Although the Ettingers believe that the Ten Commandments are a sacred Jewish text, the version required by S.B. 10 does not align with the family's Jewish belief and tradition and what the Ettingers teach R.E. It is a Christian version that does not track the Commandments set forth in the Torah and that implicitly dismisses or denigrates Jewish beliefs. For example, S.B. 10's mandatory version of the Ten Commandments directs: "Thou shalt have no other gods before

me." From a Jewish perspective, the use of the word "before" in this Commandment is highly problematic. In the Hebrew Bible, the translated text directs followers to "Have no other god *but* me." The Christian interpretation of this Commandment recited in S.B. 10 suggests that all gods recognized *before* Christianity's recognition of the Christian God—including the Jewish God of the Torah—are invalid.

108.    Another theologically significant example of differences in wording between the Torah's and S.B. 10's versions of the Ten Commandments can be found in S.B. 10's directive that "Thou shalt not kill." In Jewish doctrine, this Commandment centers on the concept of "murder," not killing. The Ettingers believe that the former speaks to intent and is a more nuanced understanding of what it means to cause a death in a manner that is religiously forbidden.

109.    S.B. 10's mandated version of the Ten Commandments also eliminates a key part of the Commandments, as they are set forth in the Torah: the proclamation at the start of the Ten Commandments recognizing that they represent the Jewish people's sacred covenant with God, formed after God freed them from slavery in Egypt. This part of the Hebrew Ten Commandments is a foundational aspect of Jewish identity and is frequently referenced during Jewish prayer services. Stripping it away to create and display in public schools a Christianized version of the Ten Commandments is deeply offensive to the Ettingers' faith.

110.    The Ettingers believe that the version of the Ten Commandments required under S.B. 10 has been made Christian-centric in myriad other ways. Not only does it use different wording with respect to particular Commandments, but it omits many other provisions in the Torah that accompany the Commandments. By summarizing some Commandments instead of including the text as found in the Torah in its entirety, S.B. 10's displays will present an inaccurate and decontextualized version of scripture.

111. Moreover, by using Old English terminology, such as "manservant" and "maidservant," S.B. 10's version of the Ten Commandments conflicts with the egalitarian Jewish values that the Ettingers follow and teach R.E. This language suggests an endorsement of slavery, while the text's prohibition on coveting "thy neighbor's *wife*" and its demand that students "honor thy mother and father" buy into discriminatory gender roles and exclude families that may have same-sex parents. It is precisely because outdated language and provisions in any version or translation of scripture could be misunderstood to convey messages antithetical to the present-day religious community that the Ettingers believe (and their religious practice requires) that R.E.'s religious education should occur at home and in their faith community, where they can contextualize and ground scriptural instruction in their core Jewish values. The Ettingers strongly believe that public schools are an inappropriate place for, and ill-equipped to handle, such sensitive religious instruction.

112. The minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for R.E., ensuring that R.E. will be subjected to the Ten Commandments every day, in every classroom, throughout R.E.'s public-school education. By imposing on R.E., for nearly every hour of the school day, a Christian-centric version of the Ten Commandments that conflicts with the family's Jewish beliefs and practices, the displays mandated by S.B. 10 will substantially interfere with R.E.'s religious development and threaten to undermine the religious beliefs, values, and practices the Ettingers seek to instill in R.E. To take one example, the displays will send a confusing message to R.E. that the Christian-centric Commandments, as depicted in the displays, are rules that R.E. must follow in the same way that R.E. would follow any rule set forth by a teacher or school authority figure. As a result, the displays will pressure R.E. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine, even though R.E. may

also recognize that the posted scripture does not comport with what R.E. has been taught at home and at synagogue regarding Jewish belief and practice.

113.    Further, as a student of a minority faith, R.E. is already grappling with R.E.'s religious differences from the majority of R.E.'s classmates. For example, R.E. has experienced proselytizing by peers and has experienced pressure to take part in activities surrounding Christian holidays. By sending a message to students, including R.E., that there is only one true faith, and that those who do not believe in the Commandments posted in the classroom are outsiders, the displays mandated by S.B. 10 will lead to an "us" ("Christians") vs. them ("non-Christians") mentality among R.E. and R.E.'s peers and will further accentuate R.E.'s religious differences. As a result, R.E. will feel isolated at school and pressured to suppress expression of R.E.'s Jewish identity.

114.    The displays mandated by S.B. 10 will also substantially burden the Ettingers' religious exercise. The responsibility to guide R.E. in the development of R.E.'s Jewish faith, including R.E.'s understanding of the text and meaning of the Ten Commandments, is a vital part of their religious practice. They seek to center R.E.'s religious education and upbringing on Jewish beliefs, doctrine, and practices. However, by foisting on R.E. a Christian version of the Ten Commandments for nearly every hour of the school day, the displays will create confusion for R.E. and will force the Ettingers to shift their focus from one that centers Judaism to one that is focused on countering the Christian beliefs that are promoted at school.

115.    Furthermore, the displays mandated by S.B. 10 will negatively affect Cantor Ettinger's religious exercise in his professional capacity as a faith leader. His work as a cantor focuses heavily on cultivating interfaith dialogue, ecumenical interaction, and respect for all

religions. But S.B. 10's displays are likely to sow religious divisiveness within the community, contrary to his Jewish values and his professional religious purpose.

116.    Cantor Ettinger's role as a religious tutor for sixth graders and seventh graders who are approaching bar and bat mitzvah age—including many who attend public school—will also be negatively affected by S.B. 10's displays. As a religious tutor, Cantor Ettinger not only helps students learn about Jewish religious belief but also counsels them about what it means to be a Jewish person in the world today, in an effort to ensure that they can move through the world comfortable in their Jewish identity. These efforts will be made much more difficult because of S.B. 10's displays, which will convey to these students (as to R.E.) that they are disfavored, less-valued members of the community simply because they are not Christians.

### *Elizabeth Lemaster and her minor children*

117.    Plaintiff Elizabeth Lemaster is Christian and is raising her minor children, K.L. and L.L., in a Christian household and tradition. Ms. Lemaster and her children regularly attend church, and K.L. and L.L. attend Sunday School classes. In addition, Ms. Lemaster and her husband provide K.L. and L.L. with religious education at home.

118.    On behalf of herself and on behalf of K.L. and L.L., Ms. Lemaster objects to the school displays mandated by S.B. 10 because the displays will forcibly subject K.L. and L.L. to religious instruction that she believes she and her husband should oversee and guide.

119.    The version and translation of the Ten Commandments that is mandated by S.B. 10 is not something that Ms. Lemaster wants to teach her children. Nevertheless, the minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for K.L. and L.L., ensuring that the children will be subjected to this specific version of the Ten Commandments for nearly every hour of the school day.

120.    Ms. Lemaster worries about how the Ten Commandments displays will be interpreted and explained to K.L. and L.L., and she is concerned about the appropriateness of the displays for her young children. For example, the displays will include references to "adultery" and "coveting" a neighbor's "manservant" or "maidservant." Ms. Lemaster believes that K.L. and L.L. are too young to understand what these references mean, and she does not want her children to be forcibly exposed to, or instructed on, these concepts at school. Rather, Ms. Lemaster and her husband want to teach K.L. and L.L. about these concepts according to their faith and when they believe the children are ready.

121.    Similarly, the displays' references to "manservants" and "maidservants" convey that people can be treated as property, which Ms. Lemaster and her husband strongly disagree with as a matter of faith. Ms. Lemaster believes, and is teaching K.L. and L.L., that all people are equal and should be treated as such. Ms. Lemaster does not want K.L. and L.L. subjected to contrary messaging or instruction in school.

122.    In addition, the displays will impose on K.L. and L.L. one set of religious values and beliefs over the family's values. Putting up the version of the Ten Commandments required by S.B. 10 will send a discriminatory and exclusionary message to students, including K.L. and L.L., who do not believe in the religious dictates that will be featured in the displays. The displays will signal to K.L. and L.L. that they are "bad" if they do not believe in and comply with the promoted religious beliefs. This, in turn, could lead to peer-to-peer harassment and proselytization of K.L. and L.L. because they hold different religious beliefs from the ones preferred by the state.

123.    Imposing on K.L. and L.L. a particular Christian version of the Ten Commandments for nearly every hour of the school day will substantially interfere with the children's religious development and threaten to undermine the beliefs, values, and practices Ms.

Lemaster seeks to instill in them as part of her Christian household. For example, the displays mandated by S.B. 10 will send a confusing message to K.L. and L.L. that the Ten Commandments, as depicted in the displays, are rules that K.L. and L.L. must follow in the same way that they would follow any rule set forth by a teacher or school authority figure. The displays will thus pressure K.L. and L.L. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

### *Carah Helwig and her minor children*

124.     Plaintiff Carah Helwig is agnostic and is raising her minor children, J.P. and T.P., with the space and autonomy to develop their own beliefs and views about religion. Ms. Helwig and her husband discuss religion generally if J.P. and T.P. ask questions, but the family does not consistently observe or adhere to any religious text, practice, or ritual.

125.     On behalf of herself and on behalf of J.P. and T.P., Ms. Helwig objects to S.B. 10 because the required displays will promote and forcibly subject J.P. and T.P. to religious scripture that the family does not believe in and that Ms. Helwig does not teach her children.

126.     The displays mandated by S.B. 10 will substantially interfere with J.P. and T.P.'s development when it comes to religious questions and matters. And the displays will substantially burden Ms. Helwig's ability to direct her children's education pertaining to religious questions or matters—threatening to undermine the beliefs, values, and practices that Ms. Helwig and her husband seek to instill in their children.

127.     Under the minimum requirements of S.B. 10, J.P. and T.P. will not be able to avoid the displays. By imposing a particular Christian version of the Ten Commandments on J.P. and T.P. for nearly every hour of the school day, the displays will communicate to them that the Ten Commandments are rules that they must follow, and that people who do not follow the

Commandments are less worthy or outsiders. This may lead to peer-on-peer harassment and proselytization of J.P. and T.P. because they are nonreligious.

128.    The displays will thus increase the pressure on J.P. and T.P. to suppress their nonreligious background and beliefs at school and will pressure J.P. and T.P. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

*Alyssa Martin, Cody Barker, and their minor child*

129.    Plaintiffs Alyssa Martin and Cody Barker are atheists and are raising their minor child, H.B.M., in a nonreligious household and tradition. Ms. Martin and Mr. Barker allow H.B.M. to independently develop decisions on religious matters and do not want H.B.M.'s public school to interfere with those decisions.

130.    On behalf of themselves and on behalf of H.B.M., Ms. Martin and Mr. Barker object to S.B. 10 because the required displays will promote and forcibly subject H.B.M. to religious scripture that their family does not subscribe to. Specifically, Ms. Martin and Mr. Barker believe that the displays will impose one set of religious values and beliefs on H.B.M. over their family's values, which include the importance of personal freedom in matters of religion.

131.    As a result of S.B. 10's minimum requirements, H.B.M. will not be able to avoid the displays. Imposing permanent, prominently placed displays of religious directives for nearly every hour that H.B.M. is in school will directly and substantially interfere with, burden, and undermine Ms. Martin and Mr. Barker's ability to raise H.B.M. in a nonreligious tradition.

132.    The displays mandated by S.B. 10 will send the message to H.B.M. that the government, as an institution of authority, favors Christianity—especially Protestantism—over other religious beliefs and nonbelief. For example, they believe that the phrase, "I am the Lord thy God," suggests that the Ten Commandments reflects the religion of all students, including H.B.M.

This proselytizing phrase will dictate to students, including H.B.M., what their religion is or should be. The displays will thus convey the harmful message that H.B.M. is an outsider because H.B.M. does not share the government's preferred religious beliefs, contradicting the values of personal freedom and doing no harm to others that Ms. Martin and Mr. Barker seek to teach H.B.M.

133.    The displays will also pressure H.B.M. to believe in a specific Christian God and to observe, meditate on, venerate, and adopt the state's favored religious doctrine. Ms. Martin and Mr. Barker allow H.B.M. to explore various religions and come to H.B.M.'s own decisions about religious matters. But the displays mandated by S.B. 10 would intrude on this exploration by placing pressure on H.B.M. to pretend believe in, or to actually subscribe to, a specific religion and take part in the practices of that religion. If H.B.M. decides to explore Christianity, Ms. Martin and Mr. Barker want to be sure that it is H.B.M.'s own choice to do so.

134.    Ms. Martin and Mr. Barker also believe that the displays will pressure H.B.M. to suppress H.B.M.'s nonreligious background, views, and identity at school. Because of H.B.M.'s moral and individual expression, H.B.M. has previously been singled out by peers. The placement of the Ten Commandments on classroom walls may further embolden H.B.M.'s peers or teachers to single H.B.M. out for being nonreligious. The displays mandated by S.B. 10 will create a school environment that "others" nonreligious students like H.B.M. and will further increase the risk of additional bullying, jeopardizing H.B.M.'s mental health and academic progress.

135.    In addition, Ms. Martin and Mr. Barker believe that the displays mandated by S.B. 10 will cause H.B.M. to feel resentful or dismissive towards religious people and religious traditions, contradicting the values they seek to instill in H.B.M., which promote respect and acceptance of people of faith.

*Lauren Erwin and her minor child*

136.    Plaintiff Lauren Erwin is Reform Jewish and is raising her minor child, M.E., in the same tradition. They are members and attenders of a local temple, where M.E. receives religious education. On behalf of herself and on behalf of M.E., Ms. Erwin objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on M.E. a Christian version of the Ten Commandments that does not align with the Jewish teachings and values she seeks to instill in M.E.

137.    The text of the Ten Commandments set forth in S.B. 10 does not match the text in the Torah. By tearing the Ten Commandments out of their original Jewish context, the displays will, from Ms. Erwin's perspective as a Jewish person, present an inaccurate and incomplete version of scripture. The version of the Commandments required by S.B. 10 also intentionally eliminates specifically Jewish beliefs. For example, it omits the Torah's reference to God saving the Jewish people from slavery in Egypt, a vital part of Jewish history and the Commandments.

138.    The minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for M.E., ensuring that M.E. will be subjected to the Ten Commandments every day, in every classroom, throughout M.E.'s public-school education.

139.    By imposing on M.E. a Christian version of the Ten Commandments for nearly every hour of the school day, the displays will substantially interfere with M.E.'s religious development and threaten to undermine the religious beliefs, values, and practices that Ms. Erwin seeks to instill in M.E.

140.    M.E. is proud to be Jewish but, like many children, seeks the approval of teachers and authority figures and wants to fit in with peers. M.E. is the only Jewish child in M.E.'s school, or is one of a small number of Jewish students. M.E. has already experienced some marginalizing

events as a result, including Christmas-themed activities at school and questions by peers regarding why M.E. does not attend church or believe in Jesus Christ. The displays mandated by S.B. 10 will further highlight M.E.'s religious differences and further marginalize M.E. by sending the message that students who do not adopt the Christian beliefs promoted in the displays are less worthy and unpopular in the community. As a result, the displays will create significant pressure for M.E. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine.

141.    By further highlighting M.E.'s religious differences and putting additional emphasis on the fact that M.E. does not follow the majority faith, the displays are also likely to put M.E. in the position of having to explain these religious differences and justify Jewish beliefs and practices, even as the displays also pressure M.E. to limit expression of M.E.'s Jewish identity at school.

142.    By interfering with M.E.'s religious development and threatening to undermine the Jewish beliefs, practices, and values that Ms. Erwin seeks to instill in M.E., the displays mandated by S.B. 10 will also substantially burden Ms. Erwin's religious exercise. The responsibility to guide M.E. in the development of M.E.'s Jewish faith, including M.E.'s understanding of the text and meaning of the Ten Commandments, is an essential aspect of Ms. Erwin's religious practice. She strongly believes, as a religious matter, that religious learning by M.E. should occur in the home or at the temple, not in public school, where teachings should remain secular.

*Pastor James Griffin Martin, Abigail Martin, and their minor children*

143.    Plaintiffs James Griffin Martin and Abigail Martin are Baptists and are raising their minor children, J.M. and B.M., in the Baptist tradition. Reverend Martin is Senior Pastor at a local Baptist church. J.M. and B.M.'s religious education in Christianity has occurred primarily through

the Martins, and through their church and faith community. J.M. and B.M. attend church weekly and attend youth camps through their church.

144.    On behalf of themselves, and on behalf of J.M. and B.M., the Martins object to the school displays mandated by S.B. 10 because the displays will: promote and will forcibly subject their children to religious doctrine in a manner that violates the family's religious beliefs and practices; usurp the Martins' parental role in directing their children's religious education, religious values, and religious upbringing; send an improper message to the Martins, their children, and their community that people of some religious denominations or faith systems are superior to others; and pressure their children to doubt and suppress their own religious beliefs.

145.    While the Ten Commandments are a sacred text in the Baptist faith, the version required by S.B. 10 does not align with the Baptist values that the Martins are teaching J.M. and B.M. For example, the text in the state-approved version of the Ten Commandments is antiquated, treats some people as property, and includes patriarchal and gendered language—all of which conflict with the Martins' Baptist beliefs, which value equality and respect for all people.

146.    Furthermore, the Ten Commandments on their own do not sum up the Martins' Baptist faith, and having them posted in a public school undermines what they are teaching their children about Christianity. The Martins believe that scripture, including the Ten Commandments, must be taught—especially to children—within the context of a family's church and particular faith tradition. Learning about and navigating scripture within the context of their faith is critical to ensuring that the children's understanding of religious texts aligns with the Martins' Baptist teachings, religious beliefs, and values. For example, one may think that the Commandment not to take the Lord's name in vain means to not say "God damn it." However, Pastor Martin's interpretation—and how he teaches this Commandment to his congregation—is that it is about

living a life that is centered on the values of God, such as welcoming the stranger, caring for the needy, feeding the hungry, healing the sick, sheltering the unhoused, sharing resources, and loving all. Displaying this and other Commandments in schools, in accordance with the baseline requirements of S.B. 10 and without any broader Baptist context, sends the wrong message to the Martins' children about the Commandments' meaning and interpretation. It is just one of the reasons why Baptist faith tenets oppose the imposition of religious doctrine in schools and counsel instead that it be taught at church and within the family. Indeed, separation of church and state is a core Baptist principle and one of the Four Fragile Freedoms of the Baptist tradition. The displays mandated by S.B. 10 will undermine this core principle of the Martins' faith and the religious beliefs they teach their children.

147.    The displays mandated by S.B. 10, which will be imposed on J.M. and B.M. for nearly every hour of the school day, also conflict with Baptist teachings that oppose elevating one religious belief over another belief or non-belief system. Baptist traditions teach that other people's religions, or lack thereof, must be respected, and that religious beliefs and practices should not be imposed on non-adherents. Forcing Christian beliefs and doctrine on public-school students violates this Baptist tenet.

148.    Relatedly, the school displays will also send a confusing message to J.M. and B.M. that Christianity is dominant and authoritative, which undermines what the Martins are teaching J.M. and B.M. about respecting other people's religions and lived experiences, consistent with Baptist tradition. As such, the school displays will substantially interfere with J.M.'s and B.M.'s religious development and threaten to undermine the religious beliefs, values, and practices the Martins seek to instill in their children as part of their Baptist faith.

149.    Furthermore, the school displays will pressure J.M. and B.M. to suppress expression of their religious identity in school. Because the Christian-centric displays will cause their peers who are not Christian to feel excluded at school, J.M. and B.M. will distance themselves from Christianity, in fear of their peers associating the imposition of the Ten Commandments with J.M.'s and B.M.'s Christianity. Because of laws like S.B. 10, which impose Christianity on non-Christians, and because of the movement to misuse Christianity as a sword to harm others, J.M. and B.M. already feel pressure to suppress their religious identity at school; they do not want to be misunderstood as agreeing with these hurtful actions taken in the name of their faith. The school displays will only exacerbate this experience.

150.    The displays mandated by S.B. 10 may also cause J.M. and B.M. to doubt their own Baptist values. For example, J.M. and B.M. strongly believe in the inclusion and equality principles of the Baptist faith. However, having the Ten Commandments imposed on their peers and making their peers feel excluded from their school community is the antithesis of J.M.'s and B.M.'s devotion to God and the family's Baptist beliefs. Knowing that Christian scripture is causing pain to their school peers may lead J.M. and B.M. to resent their religion and to question or doubt their participation in a religion that hurts their friends.

151.    The responsibility to guide J.M. and B.M. in the development of their Baptist faith is an essential aspect of the Martins' religious exercise. However, forcibly imposing on J.M. and B.M. an antiquated version of the Ten Commandments in school for nearly every hour of the school day, as required by S.B. 10, will directly interfere with this role and substantially burden the Martins' religious practice.

*Rebekah Lowe, Theodore Lowe, and their minor children*

152.    Plaintiffs Rebekah and Theodore Lowe are an interfaith couple who are raising their minor children, E.R.L. and E.M.L., with a combination of Christian beliefs and Jewish cultural traditions. Ms. Lowe was raised in multiple Christian traditions and is now affiliated with the Presbyterian Church U.S.A., while Mr. Lowe is religiously agnostic and culturally Jewish. E.R.L. and E.M.L. identify as both Christian and Jewish.

153.    Ms. Lowe oversees curriculum development for a church-resource organization that sells Sunday School curricula, liturgy writing, and other materials used by faith leaders. As part of this work, Ms. Lowe creates resources focused on empowering Christian faith leaders to be inclusive, so that people who traditionally have been excluded and harmed by Christian practices can find belonging. Ms. Lowe's background in religious education informs how she and her husband teach and guide their children on religious matters.

154.    On their own behalf, and on behalf of E.R.L. and E.M.L., the Lowes object to the displays required by S.B. 10 because the displays will promote and forcibly subject E.R.L. and E.M.L. to overtly religious classroom content in a manner that violates the Lowes' religious, spiritual, and moral beliefs and practices.

155.    The Lowes have chosen not to dictate a certain Christian denomination to their children. Instead, Ms. Lowe teaches them about God, the Bible, and the family's values and encourages them to be curious about their faith. In religious discussions with E.R.L. and E.M.L, Ms. Lowe uses "The Inclusive Bible: First Egalitarian Translation," which refrains from using gendered language to discuss God and highlights the role of women in the Bible. It is important to Ms. Lowe that the children are taught an expansive image of God and the divine, one that includes everyone. Ms. Lowe teaches her children that we are all created in God's image and that no one

person is superior to or more beloved than another. These teachings are especially important for the Lowes because they want their children to embrace their Jewish heritage, in addition to their Christian beliefs.

156.    The Lowes regularly talk to their children about faith, right and wrong, and how to treat others. They teach the children to be good family members, good friends, and good community members. Ms. Lowe ensures that the religious conversations they have with their children are age and developmentally appropriate. Thus, prior to the passage of S.B. 10, Ms. Lowe had decided against having her children read the Ten Commandments as part of their religious education. Instead, she planned to paraphrase the language of religious texts to make them understandable, relatable, and accessible for her children. She focuses on elevating the messages "love God," "love thy neighbor," and "love thyself." By mandating the display of the Ten Commandments in E.R.L.'s and E.M.L.'s classrooms, S.B. 10 will interfere with the Lowes' plan for the children's religious and spiritual upbringing.

157.    Once the displays are posted, E.R.L. and E.M.L. will be subjected to them on a daily basis, for nearly every hour they are in school, requiring Ms. Lowe to divert the focus of her children's religious education to countering the religiously troubling messages conveyed by the displays. For example, part of the moral and spiritual instruction Ms. Lowe provides to her children requires loving their neighbors as themselves and promoting peace, belonging, and inclusivity within their peer groups and community. She believes and teaches her children that no one person or faith is superior to another. By declaring that "I AM the LORD thy God" and "Thou shalt have no other gods before me," S.B. 10's classrooms displays will elevate one image of God above all others, sending the message—in direct contradiction to what she teaches E.R.L. and E.M.L at home—that those who do not believe in this God or believe in multiple gods are inferior or less

41

worthy.

158.    Furthermore, Ms. Lowe believes it is vital provide her children with context for the Bible's teachings. For example, if she were to teach them to "not covet thy neighbor's . . . manservant, nor his maidservant," text that is mandated by S.B. 10, she would also teach them about the history of slavery. With each Commandment, she would take the time to explain the historical context and how the Commandment has been used or abused over time. But the displays mandated by S.B. 10 will hinder her ability to teach her children about the Bible and the Ten Commandments, when she decides to do so, with the proper context.

159.    When the Lowes provide religious guidance to their children, they ask E.R.L. and E.M.L. open-ended questions and encourage them to explore their faith. The displays mandated by S.B. 10 will interrupt that process by dictating to E.R.L. and E.M.L. what they should believe. The Lowes believe that the displays will send a confusing message to E.R.L. and E.M.L. that they must believe in the Ten Commandments in order to be "real" Christians, in contrast to what the Lowes are teaching them at home.

160.    As a result, the Lowes fear that E.R.L. and E.M.L. will feel pressured to read and believe in a government-mandated version of scripture that is not a part of their spiritual upbringing. The Lowes are concerned that, by sending a message that the approved religious doctrine is authoritative and normative, and pressuring E.R.L. and E.M.L. to submit to these beliefs, the displays will discourage E.R.L. and E.M.L. from thinking critically about religion.

161.    Furthermore, because the displays mandated by S.B. 10 will communicate to E.R.L. and E.M.L. that Christians are superior to non-Christians and that their Christian identity is more important than their Jewish identity and more important than their classmates' non-Christian religious beliefs, the displays will pressure E.R.L. and E.M.L. to suppress expression of their

Jewish identities at school to avoid potential disfavor from school officials or peers.

162.    At the same time, the displays will put E.R.L. and E.M.L. in the position of defending the existence of the Jewish faith, which imposes an undue burden on them. For example, E.R.L. was once told by a classmate that "Hannukah is a fake celebration, Judaism is not real, and [E.R.L.] needs to follow Jesus," which was incredibly distressing for E.R.L. The Lowes worry that such bullying would only increase with ever-present Christian displays of the Ten Commandments in every classroom.

163.    The message that Christians are preferred over non-Christians will also pressure E.R.L. and E.M.L. to suppress their Christian identities. E.R.L. and E.M.L. have friends of all different faiths, and receiving the message that E.R.L. and E.M.L. are superior to their non-Christian friends may cause serious emotional turmoil, distract them from their studies, and cause them to hesitate in expressing their Christian beliefs to avoid suggesting that they agree with the exclusionary message the displays send to non-Christian students. Moreover, even though E.R.L. and E.M.L. have Christian beliefs, the displays will make them uncomfortable expressing those beliefs because their Christian faith does not strictly adhere to the Ten Commandments. The Lowes do not want E.R.L. and E.M.L. to lose the community they have found at school because their beliefs do not adhere to those promoted by the government.

164.    The Lowes believe that the displays mandated by S.B. 10 will substantially interfere with E.R.L.'s and E.M.L.'s religious development and threaten to undermine the religious and moral beliefs, values, and practices that the Lowes seek to instill in E.R.L. and E.M.L. As a result, the displays will also undermine and substantially burden the Lowes' ability to direct and guide their children's spiritual development.

*Marissa Norden, Wiley Norden, and their minor children*

165.    Plaintiff Marissa Norden is Jewish, and Plaintiff Wiley Norden is nonreligious. They are raising their minor children, A.N. and E.N., in the Jewish faith.

166.    On behalf of themselves and on behalf of A.N. and E.N., the Nordens object to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on A.N. and E.N. a specific version of the Ten Commandments to which their family does not subscribe, in a manner that is contrary to the children's Jewish teachings.

167.    The version of the Ten Commandments required by S.B. 10 does not reflect the Nordens' beliefs, Jewish principles more generally, or the religious beliefs they are teaching A.N. and E.N.  Rather, it is a Christian interpretation of the Commandments that is exclusionary of non-Christians, including Jews who believe in the Ten Commandments.

168.    The displays mandated by S.B. 10 will also conflict with Jewish teachings that oppose proselytizing. A.N.'s and E.N.'s faith tradition teaches that everyone should be respectful of other people's religion. Forcing Christian beliefs and doctrine on A.N. and E.N., day in and day out, violates this tenet.

169.    Further, the school displays include topics that the Nordens do not want non-family members explaining to A.N. and E.N. For example, the displays required under S.B. 10 reference adultery and coveting the wife of one's neighbor. The Nordens do not want their young children's teachers to explain these topics to A.N. and E.N.

170.    The Nordens believe that S.B. 10's classroom displays will result in religious coercion of their children, who represent a minority faith in their classrooms. Having the Christian-centric Ten Commandments displayed prominently in every classroom will present belief in this version of the Ten Commandments as a widely accepted fact. The displays will send the message

that this version is authoritative, that all classrooms and school facilities are Christian spaces, and that A.N. and E.N., as Jewish students who do not adhere to this version of scripture, are unwelcome and outsiders in the school community. As a result, the displays mandated by S.B. 10 will pressure A.N. and E.N. to believe in, or pretend to believe in, the state's preferred religious doctrine. These pressures will be especially strong in the school context because the Nordens have taught A.N. and E.N. to respect their teachers and to do the best they can in school and because the school is an institution of authority.

171.     The Nordens are also concerned that the displays will pressure A.N. and E.N. to suppress expression of their Jewish identities in school. By emphasizing that A.N. and E.N. follow a faith different than the majority of their peers and conveying that their Jewish faith is less worthy, the displays will pressure A.N. and E.N to assimilate and hide their Judaism to fit in with their classmates.

172.     By imposing on A.N. and E.N. a Christian-centric version of the Ten Commandments for nearly every hour of the school day, the displays mandated by S.B. 10 will substantially interfere with their religious development and threaten to undermine the religious beliefs, values, and practices that the Nordens seek to instill in their children as part of their Jewish tradition. As a result, the displays will also substantially burden the Nordens' religious exercise and practice, which includes the responsibility to guide A.N. and E.N. in the development of their Jewish upbringing.

*Rabbi Joshua Fixler and his minor children*

173.     Plaintiff Joshua Fixler is Jewish and raising his minor children, D.F., E.F., and F.F in the Jewish faith tradition. Mr. Fixler is the rabbi at a temple in Houston. D.F., E.F., and F.F.'s

religious education in Judaism has occurred primarily through Rabbi Fixler's family, his synagogue, and his faith community.

174.    On behalf of himself, and on behalf of D.F., E.F., and F.F., Rabbi Fixler objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on D.F., E.F., and F.F. a specific version of the Ten Commandments to which the family does not subscribe, in a manner that is contrary to Jewish teachings and the family's Jewish faith.

175.    The version of the Ten Commandments required by S.B. 10 does not align with Rabbi Fixler's beliefs or with Jewish belief and tradition more generally. The text mandated by the law is a Christian version, adapted from the King James translation, which differs significantly from Jewish understandings of the Ten Commandments. For example, S.B. 10's displays will use the Christian language of "thou shalt not kill," whereas Jews translate the Hebrew as "thou shalt not murder"; the rabbinic understanding is that this law does not pertain to killing in contexts like self-defense or capital punishment. Furthermore, early debate over the Ten Commandments involved Christian scholars who argued that all the legislation in the Hebrew Bible could be reduced to the Ten Commandments. However, Jewish scholars interpret these commandments as being ten important obligations among the 613 commandments in the Hebrew Bible. For example, "Love your neighbor as yourself" is one of the most important commandments in Judaism, but it will not be represented in the school displays. Even within the Hebrew Bible, there are at least two versions of the Ten Commandments, and the wording differs between them. Displaying a single version of the Ten Commandments will suggests to D.F., E.F., and F.F. that the Commandments are clear and unambiguous, whereas Rabbi Fixler believes they are not.

176.     The school displays will also include topics—like adultery and coveting the wife of one's neighbor—that Rabbi Fixler does not want his children's elementary school teachers, or anyone outside of his family, to explain to D.F., E.F., and F.F.

177.     The displays mandated by S.B. 10 will also elevate one set of religious values over others, offending Jewish tenets that emphasize egalitarianism and inclusion. It is against Rabbi Fixler's Jewish values and beliefs, and those he teaches his children, to impose faith on non-adherents or to use religious scripture as a tool to oppress others. To the extent the displays are intended to promote ostensible "Judeo-Christian values," Rabbi Fixler believes this concept intentionally blurs the distinctions between Judaism and Christianity—and he does not wish for the displays to be promoted to his children in the name of his faith.

178.     By imposing on D.F., E.F., and F.F. a Christian-centric version of the Ten Commandments for nearly every hour of the school day, the displays mandated by S.B. 10 will substantially interfere with D.F., E.F., and F.F.'s religious development and will threaten to undermine the religious beliefs, values, and practices that Rabbi Fixler seeks to instill in his children as part of his Jewish faith.

179.     Rabbi Fixler believes that S.B. 10's ubiquitous and unavoidable displays of the Ten Commandments in classrooms will result in religious coercion of D.F., E.F., and F.F., who represent a minority faith in their classrooms. The displays will send the message that this Christian version of the Ten Commandments is authoritative, that all classrooms and school facilities are Christian spaces, and that D.F., E.F., and F.F.—as Jewish students who do not adhere to this version of scripture—are unwelcome in the school community. As a result, the displays mandated by S.B. 10 will pressure D.F., E.F., and F.F. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine and are likely to make D.F., E.F., and F.F. uncomfortable with

expressing their Jewish beliefs and identities at school. Rabbi Fixler is deeply invested in religious education, including the religious education of his own children. While he is honored that this education is entrusted to him through his synagogue's educational programming, he believes that public schools should have no role in this type of education.

180.    The responsibility to guide D.F., E.F., and F.F. in the development of their Jewish faith is an essential aspect of Rabbi Fixler's religious exercise and role as a parent. Forcibly imposing a Christian version of the Ten Commandments on D.F., E.F., and F.F. will directly interfere with Rabbi Fixler's ability to carry out this parental responsibility and substantially burden his religious exercise.

### *Reverend Cynthia Mood and her minor children*

181.    Plaintiff Cynthia Mood is Presbyterian and is raising her minor children, C.M. and L.M., in the Christian faith. She is an ordained pastor at a Presbyterian Church.

182.    As a matter of faith, it is important to Reverend Mood that C.M. and L.M. be exposed to multiple denominations and faith traditions so that her children understand that there is not one dominant religion or belief system. As such, C.M. and L.M. attend worship services, Bible study, and other religious programming at multiple churches of various denominations on a weekly basis.

183.    On her own behalf, and on behalf of C.M. and L.M., Reverend Mood objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject C.M. and L.M. to overtly religious doctrine in a manner that violates Reverend Mood's religious beliefs and practices. The displays will further usurp Reverend Mood's parental role in directing her children's religious education, religious values, and religious upbringing, and will send an improper message to Reverend Mood, her children, and her community that people of some

religious denominations or faith systems are superior to others. Moreover, the displays are likely to confuse C.M. and L.M. about their own faith.

184. Reverend Mood's faith tradition teaches that religious scripture like the Ten Commandments must be navigated within the context of her faith community to ensure that her children's understanding of the Commandments aligns with her Christian teachings and values. Posting the Ten Commandments in school, without any context, will conflict with this tenet.

185. The school displays mandated by S.B. 10 will substantially interfere with C.M.'s and L.M.'s religious development and threaten to undermine the religious beliefs, values, and practices that Reverend Mood seeks to instill in C.M. and L.M. as part of her Christian faith. For example, the text in the state's approved version of the Ten Commandments is antiquated and repeatedly uses "thou shalt not," focusing on what *not* to do. When Reverend Mood teaches religious scripture to her children, she focuses on an individual's strength—what one *can* do, not what they *cannot* do. Reverend Mood believes that focusing on positive actions, rather than what a child cannot do, encourages expression of feelings and connection with community, both of which are important values rooted in her Presbyterian faith that she is trying to instill in C.M. and L.M. Reverend Mood believes that it is her responsibility, along with her faith community, to teach C.M. and L.M. about religious scripture and its context, not the responsibility of their public school.

186. The version of the Ten Commandments required by S.B. 10 also conflicts with the faith values of equality, inclusivity, and respect for all humans that Reverend Mood teaches her children. For example, the school displays will use terms such as "manservant" and "maidservant" that effectively treat some people as property. The school displays also will include topics that

Reverend Mood does not want persons outside of her family or faith community to explain to C.M. and L.M., such as adultery and coveting the wife of one's neighbor.

187.     The antiquated language used in the school displays will also be confusing to Reverend Mood's very young children, who are still learning to read. Because C.M. and L.M. are young and impressionable, they will understand the content posted on classroom walls as authoritative and may believe that the school displays are the "true" version of the Ten Commandments.

188.     As a consequence of having the displays imposed on them for nearly every hour of the school day, C.M. and L.M. may come to believe that Christianity is dominant and authoritative. Elevating one religion over other belief systems or non-belief is contrary to the Christian values that Reverend Mood is instilling in C.M. and L.M. and undermines what she is teaching them about respecting other people's religion or non-belief and their lived experiences.

189.     In addition, because the displays will convey that the version of scripture posted in classrooms is the authoritative or "correct" version of the Ten Commandments, C.M. and L.M. will be pressured throughout their public education to believe in this version if they want to be good students and be liked by their teachers.

190.     The responsibility to guide C.M. and L.M. in the development of their Christian faith is an essential aspect of Reverend Mood's religious exercise and her role as a parent and pastor. Forcibly imposing the Ten Commandments on C.M. and L.M. for nearly every hour of the school day will substantially burden that religious exercise.

*Arvind Chandrakantan and his minor children*

191.     Plaintiff Arvind Chandrakantan is a lifelong Hindu and is raising his minor children, A.C., M.C., and V.C., as Hindu. Because the children are fourth-generation Americans,

it is very important to Dr. Chandrakantan that they are raised in the Hindu tradition and that they stay connected to their Indian heritage.

192.     On behalf of himself, and on behalf of his children, Dr. Chandrakantan objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on A.C., M.C., and V.C. religious scripture that contradicts the family's religious beliefs.

193.     The Chandrakantan family does not subscribe to the religious dictates of the Ten Commandments. In particular, they object to the first four commandments—stating that there is only one God, prohibiting idol worship, prohibiting use of the Lord's name in vain, and requiring observing the Sabbath—because they are at odds with Hindu teachings.

194.     For example, the Ten Commandments assert that there is only one God, whereas Hinduism teaches that there are many manifestations of the Divine. Similarly, the Ten Commandments treat idol worship as categorically wrong, while some Hindu practices include venerating statues or images as physical representations of the Divine. Thus, the displays will send A.C., M.C., and V.C. the message—with the apparent endorsement of authority figures, including teachers—that certain aspects of Hindu faith and worship are inherently wrong.

195.     By imposing the Ten Commandments on A.C., M.C., and V.C. for nearly every hour of the school day, the displays mandated by S.B. 10 will interfere with the children's religious development and threaten to undermine the religious beliefs and values that Dr. Chandrakantan is seeking to instill in them. By conveying that Christianity is the only acceptable religion in school, the displays will pressure A.C., M.C., and V.C. to observe, meditate on, and venerate the state's preferred religious doctrine.

196.     Moreover, the displays will present belief in the Ten Commandments and Christianity as the assumed norm in school and in broader society. This will send the damaging

message that A.C., M.C., and V.C. are outsiders in their community because they do not adhere to this scripture and do not share the religious beliefs preferred by the government.

197.    The religious displays and feeling like outsiders will put pressure on A.C., M.C., and V.C. to religiously assimilate. Dr. Chandrakantan is aware of historical instances in which Christian missionaries used proselytization and forced exposure to Christianity to turn Hindu children away from their Hindu faith, and he is particularly sensitive to the negative impact that the school district pushing Christian doctrine could have on his children's Hindu identities.

198.    The constant presence of the Ten Commandments in every classroom may also place A.C., M.C., and V.C. in the position of defending their family's Hindu practices, which differ from the Christian beliefs and practices promoted by the displays. Forcing A.C., M.C., and V.C. to defend or explain their Hindu beliefs and practices imposes an undue burden on them.

199.    Dr. Chandrakantan believes that his role in directing his children's upbringing is one of the most important responsibilities he has as a parent. Imposing permanent, prominently placed displays of religious directives for nearly every hour that his children are in school will directly interfere with and substantially burden and undermine his ability to raise his children in the Hindu faith.

*Cheryl Rebecca Smith and her minor child*

200.    Plaintiff Cheryl Rebecca Smith is a member of a Unitarian Universalist church and is raising her minor child, L.P.J., in the Christian faith. Ms. Smith and L.P.J. regularly attend services at the church and L.P.J. attends Presbyterian summer camp.

201.    On behalf of herself and on behalf of L.P.J., Ms. Smith objects to the school displays mandated by S.B. 10 because the displays elevate one belief system over others in violation of the Unitarian Universalist tradition. The displays will send the message to L.P.J. and

L.P.J.'s peers that S.B. 10's version of the Ten Commandments is authoritative and will present belief in this version as a widely accepted fact. By sending the message to L.P.J. that some Christian faiths are superior, the displays will contradict the family's Unitarian Universalist religious values. Their faith tradition teaches that they must be respectful of other people's religions, or lack thereof, and that religious beliefs and practices should not be imposed on non-adherents. Forcing Christian beliefs and doctrine on public-school students violates this tenet.

202.    Ms. Smith further objects to the displays mandated by S.B. 10 because the displays will promote and forcibly impose on L.P.J. a version of the Ten Commandments that the family does not follow. For example, Ms. Smith finds the reference to "manservants" and "maidservants" in the displays morally troubling and contrary to her faith and the faith values she teaches L.P.J. about equality and humanity.

203.    The Ten Commandments displays mandated by S.B. 10 also include topics that Ms. Smith does not wish to be explained to L.P.J. by L.P.J.'s teachers, should L.P.J. or other students ask about them. Instead of bringing clarity to L.P.J. about issues of morality, it will only confuse L.P.J. For example, the displays required under S.B. 10 reference adultery and coveting the wife of your neighbor. Ms. Smith does not want her child's elementary school teachers explaining these topics, which are inappropriate for children of this age and, if introduced in the context of religious doctrine, should be broached by her, her husband, and their faith community, within the broader context of their religious beliefs and values.

204.    The displays mandated by S.B. 10 will also improperly send the message to Ms. Smith, L.P.J., and their community that people of some religious denominations or faith systems are superior to others and that there is an official religious hierarchy featuring the state's officially favored "in" group and the state's officially disfavored "out" group. Ms. Smith believes that L.P.J.

will take this as a negative judgment on kids who do not follow Christianity. This will harm L.P.J.'s experience in school and will make for a strained and potentially hostile learning environment for L.P.J. L.P.J. will notice that classmates who are not Christian or who do not follow the particular version of the Ten Commandments displayed in classrooms are viewed as less worthy or even ostracized, which may cause L.P.J. to suppress or question L.P.J.'s own Christian faith because this harm would be done in the name of Christianity. The displays could also make it more likely that L.P.J. will be questioned and made to feel uncomfortable about the religious beliefs Ms. Smith has instilled in L.P.J. because they depart from those sanctioned in the displays.

205.    The responsibility to guide L.P.J.  in the development of L.P.J.'s faith is an essential aspect of Ms. Smith's religious exercise and role as a parent. Forcibly imposing on L.P.J. a version of the Ten Commandments for nearly every hour of the school day, in accordance with S.B. 10, will directly interfere with her ability to carry out this parental responsibility and substantially burden her religious exercise.

### Allison Fitzpatrick and her minor children

206.    Plaintiff Allison Fitzpatrick is spiritual but does not identify with or support any organized religion. Along with her husband, who is an atheist, Ms. Fitzpatrick is raising her minor children, C.F. and H.F., in a household and tradition that seeks to provide the children with autonomy to develop their own beliefs about religion.

207.    The Fitzpatrick family does not subscribe to the religious dictates of the Ten Commandments generally or the specific version that S.B. 10 mandates. Ms. Fitzpatrick does not want C.F. and H.F. to be exposed to any organized religion. While the family discusses religion generally, they do not observe or adhere to any religious text, practice, or ritual.

208.    On behalf of herself, and on behalf of C.F. and H.F., Ms. Fitzpatrick objects to the displays mandated by S.B. 10 because they will promote and forcibly subject C.F. and H.F. to religious scripture that Ms. Fitzpatrick does not believe in and does not teach her children.

209.    The displays required by S.B. 10 will substantially interfere with C.F.'s and H.F.'s development when it comes to religious questions and matters and will threaten to undermine the beliefs, values, and practices that Ms. Fitzpatrick and her husband seek to instill in their children. Specifically, the displays will impose on C.F. and H.F. one set of religious values and beliefs over the family's values, which are not based in religion.

210.    By imposing on C.F. and H.F. a particular Christian version of the Ten Commandments for nearly every hour of the school day, the displays required by S.B. 10 will send a confusing message to C.F. and H.F. that the Commandments are rules that must be followed and that people who do not follow the Commandments are "bad" or less worthy. Ms. Fitzpatrick is concerned this will lead to peer-on-peer harassment and proselytization of C.F. and H.F. due to their nonreligious beliefs.

211.    The displays will also increase the pressure on C.F. and H.F. to suppress expression of their nonreligious background and views at school. At the same time, the displays will pressure C.F. and H.F. to observe, meditate on, venerate, and adopt the state's preferred religious doctrine, even if C.F. and H.F. recognize that the posted scripture differs from what they are taught at home.

212.    The displays will also directly interfere with and substantially burden Ms. Fitzpatrick's ability to direct C.F. and H.F.'s education pertaining to religious questions and matters in a manner that emphasizes and instills nonreligious values.

*Mara Richards Bim and her minor child*

213.     Plaintiff Mara Richards Bim is a faith leader in an Alliance of Baptists Church and is set to be ordained as a minister in the fall of 2025. She is raising her minor child, H.B., in the Baptist faith.

214.     H.B.'s religious education has primarily occurred through Ms. Bim's instruction and through Ms. Bim's church, faith community, and family. H.B. attends Sunday School and is attending a vacation Bible school at their Baptist church. In any given week, H.B. receives some form of Christian education six out of seven days.

215.     On behalf of herself and on behalf of H.B., Ms. Bim objects to the displays mandated by S.B. 10 because they will promote and forcibly subject H.B. to overtly religious doctrine in a manner that violates the family's religious beliefs and practices.

216.     The displays will also usurp Ms. Bim's parental role in directing H.B.'s religious education, religious values, and religious upbringing. Specifically, Ms. Bim believes that S.B. 10 will substantially interfere with H.B.'s religious development and threaten to undermine the religious beliefs, values, and practices she seeks to instill in H.B. as part of her Baptist faith.

217.     As a faith leader and parent, Ms. Bim believes that scripture, including the Ten Commandments, is best understood—especially by children—when presented within the context of her family's church and specific faith community. This ensures that a child's introduction to, and comprehension of, religious texts align with the family's and community's religious beliefs.

218.     Ms. Bim's family and her Baptist church do not emphasize the Ten Commandments to children at H.B.'s stage in life and instead emphasize the Commands of Jesus: to love God and to love our neighbors just as we love ourselves. While the Ten Commandments are part of the text that Baptists hold sacred, they are not the central focus of the Baptist faith. Ms. Bim believes the

displays required by S.B. 10 will emphasize the Ten Commandments as a pillar of faith and American citizenship, in a way that conflicts with her family's faith.

219.    As a spiritual matter and to prevent H.B. from receiving messages that conflict with their Baptist faith, Ms. Bim believes it is critical that she or her family's church present the Ten Commandments to H.B. at the proper time, in the correct context, and using the New Revised Standard Version of the Bible. Instead, S.B. 10 will impose the state's translation, drawn from the Kings James Bible—which Ms. Bim's church and family do not use—on H.B. every day, in every classroom.

220.    The Bible does not contain only a single list of what is referred to as "the Ten Commandments." Rather, the Ten Commandments are detailed many times in the Bible, and each permutation contains differences. In Ms. Bim's Baptist faith, study of the Ten Commandments includes a nuanced conversation about these differences within scripture. Ms. Bim believes that the simplified list of Commandments curated by the state and presented in a translation unfamiliar to H.B. will confuse H.B. and prove detrimental to H.B.'s religious education. Because H.B. will be continually exposed to the school displays, Ms. Bim is concerned that H.B. will question whether the religious teachings H.B. is receiving from Ms. Bim and her faith community are "wrong" because they are different from what H.B. learned at school. Ms. Bim is worried that this questioning will cause H.B. to abandon their faith tradition altogether, leaving H.B. unmoored in life.

221.    Ms. Bim also believes that S.B. 10's use and approval of one particular version of the Ten Commandments, and its mandate that this scripture be displayed in H.B.'s classrooms, improperly sends the message to her, H.B., and their community that people of some Christian denominations are superior to others and that, in the eyes of the state, there is a religious hierarchy.

In other words, the message from the state to Ms. Bim, H.B., and their faith community is that they are not the "right" kind of Christians because they do not adhere to S.B. 10's state-sponsored religion. This religious favoritism violates the family's Baptist beliefs, which prioritize treating one's neighbors as oneself—including by refraining from harming others physically, emotionally, or spiritually. H.B. has many religiously diverse classmates who will be made to feel othered, less-than, and excluded by S.B. 10's required postings. The Bim family considers this to be un-Christian behavior that Ms. Bim does not wish H.B. to witness or learn at school.

222.    Ms. Bim further believes that S.B. 10 represents an intrusion of governmental authority into matters of faith. As a Baptist within the historic Baptist tradition, she holds to the call by Roger Williams, the founder of the first Baptist church in America, for a "hedge or wall of separation between the garden of the church and the wilderness of the world." Since Williams's clarion call, Baptists, including Ms. Bim, have adamantly stood against the intrusion of the government into religious matters and against the imposition of religion upon the citizens of the state. The state's imposition of a curated version of the Ten Commandments on Ms. Bim, H.B., and their community is oppressive and, in Ms. Bim's view, asserts a false notion that the state's authority in this matter is greater than God's.

223.    Ms. Bim believes that, through S.B. 10, the state is making a theological claim—a claim about the nature and substance of God—by presenting a simplified and curated list of Commandments and mandating that they be presented in this specific translation. In Ms. Bim's Baptist tradition, it is deeply impermissible for the government to make any such theological claim.

224.    The displays of the Ten Commandments posted in H.B.'s classrooms will not only interfere with and undermine Ms. Bim's ability to guide H.B.'s spiritual development, but they will also pressure H.B. to accept and believe—contrary to the family's Baptist tradition—the

exclusionary religious messages conveyed by the displays, including that some Christian denominations and theologies are more true and preferable than others and that the state has legitimate authority over theological claims.

225.    Ms. Bim believes that H.B. will also be pressured to suppress H.B.'s faith in God and in the freedom of conscience the Creator has endowed each of us with, especially in school. Ms. Bim's Baptist tradition venerates freedom of conscience, and Ms. Bim believes that it is neither right for someone to violate, or ask others to violate, their own consciences. Ms. Bim fears that, in witnessing and being part of a religiously coercive experience, H.B. will begin to view Christianity as a coercive system of oppression, or to reject her, her spouse, and their faith community as authority figures on issues of faith and religion.

226.    The ability to direct and guide H.B.'s spiritual development and religious formation is an essential aspect of Ms. Bim's religious exercise. The displays mandated by S.B. 10 will significantly interfere with and substantially burden her ability to carry out this religious exercise.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

227.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

228.    The Establishment Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law respecting an establishment of religion."

229.    In *Stone v. Graham*, the Supreme Court struck down a statute similar to S.B. 10, holding that posting the Ten Commandments in public-school classrooms violates the

Establishment Clause. 449 U.S. at 41-42. *Stone* remains binding precedent, and S.B. 10 is thus unconstitutional.

230.     By mandating that a state-sanctioned version of the Ten Commandments be displayed in every public elementary and secondary school classroom in Texas, S.B. 10 impermissibly prefers a set of distinct religious beliefs and dictates and will impose those preferred religious beliefs and dictates on Texas's public-school children, including the minor-child Plaintiffs.

231.     As a result of the Ten Commandments displays mandated by S.B. 10, Texas students—including the minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress expression of their personal religious and nonreligious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

232.     In addition, by mandating that a Protestant version of the Ten Commandments be displayed in every public elementary and secondary school classroom and prescribing an official religious text for schoolchildren to venerate, S.B. 10 adopts an official position on religious matters, violating the Establishment Clause's prohibition against taking sides in questions over theological doctrine and violating the "clearest command" of the Establishment Clause that "the government may not 'officially prefe[r]' one religious denomination over another." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1591 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982) (alteration in original)). The Act's mandatory, religiously preferential displays will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Establishment Clause.

233.    There is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in public-school classrooms. On the contrary, the Supreme Court unambiguously held in *Stone* that such a practice is proscribed by the Constitution.

234.    By implementing S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Establishment Clause of the First Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

235.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Establishment Clause rights.

## COUNT II

### VIOLATION OF THE FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

236.    Plaintiffs re-allege and incorporate by reference all the above paragraphs as if they were fully set forth herein.

237.    The Free Exercise Clause of the First Amendment to the United States Constitution guarantees that "Congress shall make no law . . . prohibiting the free exercise [of religion]."

238.    The displays mandated by S.B. 10 will burden the religious exercise of the minor-child Plaintiffs by pressuring them into observance, meditation on, veneration, and adoption of the state's favored religious scripture—in violation of their own religious or nonreligious beliefs—to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers. The displays will also pressure the minor-child Plaintiffs to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices while in school to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

239.    The displays mandated by S.B. 10. will burden the religious exercise of the parent-Plaintiffs by usurping their authority to direct their children's religious education and religious or nonreligious upbringing.

240.    Under the Free Exercise Clause, when the government burdens religious exercise pursuant to a policy that is not religiously neutral, courts will find a constitutional violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). The displays required under S.B. 10 are not neutral with respect to religion. By design, the Act mandates the display of expressly religious scripture, the Ten Commandments, in every public-school classroom and, moreover, requires that a specific Protestant version of that scripture be used.

241.    Further, under the Free Exercise Clause, a public school "burdens the religious exercise of parents" where, as here, "it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *Mahmoud*, 2025 WL 1773627, at *5 (cleaned up). Given the nature of this burden, courts "need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny." *Id.* at *22.

242.    The displays mandated by S.B. 10 will not further a compelling governmental interest and, even if they did, they are not narrowly tailored to any such interest under the Free Exercise Clause.

243.    By administering and implementing S.B. 10, Defendants, under the color of state law, will unavoidably violate Plaintiffs' rights under the Free Exercise Clause of the First

Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment, and under 42 U.S.C. § 1983.

244.    Plaintiffs have no adequate remedy at law for the denial of their fundamental Free Exercise Clause rights.

## REQUEST FOR RELIEF

Plaintiffs respectfully request the following relief:

A.    An order declaring that S.B. 10 violates the Establishment Clause and Free Exercise Clause of the First Amendment to the United States Constitution;

B.    An order preliminarily and, thereafter, permanently enjoining the Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from complying with S.B. 10 by displaying the Ten Commandments in public elementary and secondary school classrooms;

C.    An award, from Defendants to Plaintiffs, of reasonable attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

D.    An order retaining this Court's jurisdiction of this matter to enforce the terms of the Court's order; and

E.    Such other relief as the Court deems just and proper.

DATED: July 2, 2025                    Respectfully submitted,

By: */s/ Jonathan K. Youngwood*
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
Avia Gridi*
Kristen Crow*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*
*avia.gridi@stblaw.com*
*kristen.crow@stblaw.com*

AMERICAN CIVIL LIBERTIES UNION
OF TEXAS FOUNDATION, INC.
Adriana Piñon
Thomas Buser-Clancy
Sarah Corning**
Chloe Kempf
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
*apinon@aclutx.org*
*tbuser-clancy@aclutx.org*
*scorning@aclutx.org*
*ckempf@aclutx.org*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*
*hweaver@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*
Jess Zalph*
Alexandra Zaretsky*
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*
*zaretsky@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott
Samuel T. Grover
Nancy A. Noet*
P.O. Box 750
Madison, WI 53701
(608) 256-8900
*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

*Counsel for Plaintiffs*

* Motion for *Pro Hac Vice* Admission
Forthcoming
** Admission Application Forthcoming