**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| RABBI MARA NATHAN, on behalf of herself and on behalf of her minor child, M.N., et al., <br><br> Plaintiffs, <br><br> v. <br><br> ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT, et al., <br><br> Defendants. | CIVIL ACTION NO. 5:25-cv-00756 |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

ARGUMENT ....................................................................................................................... 4

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF
           THEIR FIRST AMENDMENT CLAIMS. ............................................................ 5

          A.     Permanently Displaying a Preferential Version of Scripture in
               Every Public-School Classroom Violates the Establishment
               Clause. ...................................................................................................... 5

               1.     The Supreme Court's binding precedent in *Stone* prohibits
                       permanent displays of the Ten Commandments in public-
                       school classrooms. .......................................................................... 5

               2.     Permanently displaying an official version of the Ten
                       Commandments in every public-school classroom is
                       unconstitutionally coercive. ........................................................... 7

               3.     S.B. 10 impermissibly takes sides on theological questions
                       and officially favors one religious denomination over
                       others. ............................................................................................ 10

               4.     S.B. 10's permanent school displays do not fit within any
                       historical tradition. ....................................................................... 12

          B.     Plaintiffs Are Likely to Succeed on the Merits of Their Free
                Exercise Clause Claim. .......................................................................... 15

                 1.     S.B. 10's permanent displays of the Ten Commandments
                       are unconstitutionally coercive under the Free Exercise
                       Clause. ........................................................................................... 15

                 2.     S.B. 10's mandatory displays will violate the parent-
                       Plaintiffs' free-exercise rights. ..................................................... 16

    II.     THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH
           HEAVILY IN PLAINTIFFS' FAVOR. ............................................................... 19

CONCLUSION ................................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989) ........................................................ 4

*Berger v. Rensselaer Cent. Sch. Corp.*,
   982 F.2d 1160 (7th Cir. 1993) ....................................................... 8

*Carson v. Makin*,
   596 U.S. 767 (2022) ..................................................................... 15

*Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
   145 S. Ct. 1583 (2025) .......................................................... passim

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
   413 U.S. 756 (1973) ..................................................................... 13

*Edwards v. Aguillard*,
   482 U.S. 578 (1987) ....................................................................... 7

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..................................................................... 19

*Engel v. Vitale*,
   370 U.S. 421 (1962) ................................................................. 6, 13

*Epperson v. Arkansas*,
   393 U.S. 97 (1968) ....................................................................... 10

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947) ......................................................................... 13

*Freedom From Religion Foundation Inc. v. Mack*,
   49 F.4th 941 (5th Cir. 2022) ....................................................... 14

*Glassroth v. Moore*,
   335 F.3d 1282 (11th Cir. 2003) ................................................... 12

*Holloman ex rel. Holloman v. Harland*,
   370 F.3d 1252 (11th Cir. 2004) ................................................... 19

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
   88 F.3d 274 (5th Cir. 1996) .......................................................... 8

*Johnson v. Poway Unified Sch. Dist.*,
   658 F.3d 954 (9th Cir. 2011) ........................................................ 8

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ........................................................ 20

*Karen B. v. Treen*,
   653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982) .......................................................... 19

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022) .................................................................................... passim

*Larson v. Valente,*
    456 U.S. 228 (1982) ...................................................................................... 10, 13

*Lee v. Weisman,*
    505 U.S. 577 (1992) ...................................................................................... 5, 7, 8

*Mahmoud v. McKnight,*
    688 F. Supp. 3d 265 (D. Md. 2023) .............................................................. 17

*Mahmoud v. Taylor,*
    No. 24-297, 2025 WL 1773627 (U.S. June 27, 2025) ................................... passim

*McCreary Cnty. v. ACLU of Ky.,*
    545 U.S. 844 (2005) ....................................................................................... 9, 12, 13

*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,*
    393 U.S. 440 (1969) ........................................................................................ 11

*Reynolds v. United States,*
    98 U.S. 145 (1878) .......................................................................................... 13

*Roake v. Brumley,*
    756 F. Supp. 3d 93 (M.D. La. 2024) ............................................................. passim

*Roake v. Brumley,*
    No. 24-30706, 2025 WL 1719978 (5th Cir. June 20, 2025) .......................... passim

*Santa Fe Indep. Sch. Dist. v Doe,*
    530 U.S. 290 (2000) ........................................................................................ 8, 17

*Sch. Dist. of Abington Twp. v. Schempp,*
    374 U.S. 203 (1963) ........................................................................................ passim

*Stone v. Graham,*
    449 U.S. 39 (1980) .......................................................................................... passim

*Tex. Monthly, Inc. v. Bullock,*
    489 U.S. 1 (1989) ............................................................................................ 11

*Tex. Trib. v. Caldwell Cnty.,*
    No. 1:23-CV-910-RP, 2024 WL 420160 (W.D. Tex. Feb. 5, 2024) ............. 20

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) ........................................................................................ 14

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ........................................................................................ 16

*Van Orden v. Perry,*
    545 U.S. 677 (2005) ........................................................................................ 5, 7, 12

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) .......................................................................................... 10

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972) ........................................................................................... 15, 16

## Statutes and Rules

Federal Rule of Civil Procedure 65 ........................................................................... 20

La. Act No. 676 (2024) .............................................................................................. 11

Local Rule CV-7(C) .................................................................................................... 20

Tex. Educ. Code § 25.0915 .......................................................................................... 8

Tex. Educ. Code § 25.093 ......................................................................................... 7, 8

Tex. Fam. Code § 65.003 .......................................................................................... 7, 8

Tex. Gov't Code § 21.002 ............................................................................................ 8

Tex. S.B. 10, 89th Leg. R.S. (2025) ......................................................................... 2, 6

## Other Authorities

Kimberly Watts,
   *king audio 20250618toddstarnes*, YouTube (June 21, 2025),
   https://www.youtube.com/watch?v=Kbll35APGTs ................................................... 3

*Action on Iran; New Laws for Securing Borders, Texas Land, Our Citizens and Elections*,
   https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borders-
   texas-land-our-citizens-and-elections/ (June 23, 2025) ........................................... 3

Tex. Essential Knowledge & Skills for Social Studies (Aug. 2024), Tex. Educ. Agency,
   Chapter 113, Subchapter A (Elementary School), https://tea.texas.gov/about-tea/laws-and-
   rules/sboe-rules-tac/sboe-tac-currently-in-effect/ch113a.pdf ................................... 19

Tex. Essential Knowledge & Skills for Social Studies (Aug. 2024), Tex. Educ. Agency,
   Chapter 113, Subchapter B (Middle School), https://tea.texas.gov/about-tea/laws-and-
   rules/sboe-rules-tac/sboe-tac-currently-in-effect/ch113b.pdf ................................... 19

Tex. Essential Knowledge & Skills for Social Studies (Aug. 2024), Tex. Educ. Agency,
   Chapter 113, Subchapter C (High School), https://tea.texas.gov/about-tea/laws-and-
   rules/sboe-rules-tac/sboe-tac-currently-in-effect/ch113c.pdf ................................... 19

## INTRODUCTION

Forty-five years ago, in *Stone v. Graham*, 449 U.S. 39 (1980), the U.S. Supreme Court held that the Establishment Clause of the First Amendment prohibits the government from permanently posting the Ten Commandments in public-school classrooms. In accordance with this longstanding precedent, the U.S. Court of Appeals for the Fifth Circuit held last month that a Louisiana law requiring displays of the Ten Commandments in every public-school classroom was "plainly unconstitutional" under *Stone*. *Roake v. Brumley*, No. 24-30706, 2025 WL 1719978, at *17 (5th Cir. June 20, 2025). Nevertheless, on the same day, Texas Governor Greg Abbott signed into law Senate Bill No. 10 ("S.B. 10" or "the Act"), a statute similar to Louisiana's that not only requires *every* elementary and secondary public school in the state to display the Ten Commandments in *every* classroom, but also mandates that these displays use an official version of the Ten Commandments that promotes certain Protestant beliefs and conflicts with versions used by Jews and Catholics. Moreover, each display must be at least sixteen by twenty inches, with the text printed in a size and typeface legible to a person with average vision from anywhere in the classroom. And to further elevate the importance of the state's chosen scripture, all displays must be hung in a "conspicuous place." As a result of these minimum requirements of the Act, the minor-child Plaintiffs will be unable to avoid or escape—for nearly every hour they are in school until they graduate—the specific biblical scripture adopted and prescribed by the state.

Because S.B. 10's mandatory school displays cannot be reconciled with *Stone's* binding precedent, this Court's constitutional analysis can begin and end there. But the Act is also unconstitutional under other First Amendment jurisprudence barring religious coercion, official favoritism in matters of faith, and governmental interference with parents' right to direct and guide the religious education of their children. Indeed, as the Supreme Court held just last week, a public school "burdens the religious exercise of parents when it requires them to submit their children to

1

instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill." *Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *5 (U.S. June 27, 2025) (cleaned up). The state "cannot condition the benefit of free public education on parents' acceptance of such instruction." *Id.* Accordingly, Plaintiffs respectfully request that this Court issue a preliminary injunction restraining Defendants from implementing the Act pending a final decision in this case.

## **FACTUAL BACKGROUND**

S.B. 10 requires every elementary and secondary school in Texas to display a poster or framed copy of the Ten Commandments in a "conspicuous place" in every classroom. Ex. 1, Tex. S.B. 10 § 1(a), 89th Leg. R.S. (2025). The law will take effect on September 1 for the 2025-2026 school year. *Id.* §§ 2–3.

The mandatory classroom displays must "include only the text of the Ten Commandments as provided by Subsection (c)." *See id.* § 1(c). This version is not denominationally neutral and is principally associated with Protestant beliefs and sects; it differs in meaningful ways from, and conflicts with, versions used by other denominations and faiths that recognize the Ten Commandments as part of their theology, including Judaism and Catholicism. *See* Decl. of Steven K. Green, J.D., Ph.D., Ex. A (hereinafter, "Green Rep.") ¶¶ 52–58. Furthermore, many religions do not consider the Ten Commandments to be part of their theology at all. *See id.* ¶ 52.

Under the Act, the text of the Commandments must be printed in a "size and typeface that is legible to a person with average vision from anywhere in the classroom." Ex. 1, § 1(b). The posters must be displayed permanently, year-round, as the Act does not provide for a time limit on them. *See generally* Ex. 1. And the Act requires the displays to be placed in every classroom, regardless of the subject matter taught or the age of the students. *See generally id.*

Texas lawmakers have repeatedly emphasized their hope that S.B. 10 would send a

message of faith to students and inspire them to live by the Ten Commandments. *See* Compl. ¶¶ 73–81(detailing legislators' comments). For example, after the legislature passed the Act, Sen. Phil King, S.B. 10's lead Senate sponsor and author, explained, "[W]e want every kid, [pre-k] through twelve, every day, in every classroom they sit in to look on the wall and read . . . those words that [] God says because we want them to understand how important that those statements of God, those rules of God are that they see them in their classroom every single day of their public education."[1]

Plaintiffs—who are Jewish, Christian, Unitarian Universalist, Hindu, or nonreligious— assert that the Act's scriptural displays will violate the Establishment and Free Exercise Clauses of the First Amendment. Compl. ¶¶ 227-44. Suing on behalf of themselves and their minor children, who are enrolled in public schools operated by the Defendant school districts, the parent-Plaintiffs assert a variety of objections to S.B. 10 and identify numerous harms that they and their children will suffer as a result of the statute. The displays will: (1) forcibly subject the minor-child Plaintiffs to religious doctrine and beliefs in a manner that conflicts with their families' religious and non-religious beliefs and practices;[2] (2) send a marginalizing message to the minor-child Plaintiffs and their families that they do not belong in their own school community because they

---

[1] Kimberly Watts, *king audio 20250618toddstarnes*, YouTube, at 3:40-4:14 (June 21, 2025), https://www.youtube.com/watch?v=Kbll35APGTs (video directly linked from Sen. King's official website in *Action on Iran; New Laws for Securing Borders, Texas Land, Our Citizens and Elections*, https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borders-texas-land-our-citizens-and-elections/ (June 23, 2025)).

[2] *See, e.g.*, Decl. of Rabbi Mara Nathan ¶¶ 5–10; Decl. of Ron Eisenberg ¶¶ 5–9; Decl. of Cantor Seth Ettinger ¶¶ 5–12; Decl. of Elizabeth Lemaster ¶¶ 5–7; Decl. of Carah Helwig ¶¶ 5–6; Decl. of Alyssa Martin ¶¶ 4, 6, 10; Decl. of Lauren Erwin ¶¶ 5–7; Decl. of Pastor James Griffin Martin ¶¶ 5–11; Decl. of Rebekah Lowe ¶¶ 5, 7–13; Decl. of Marissa Norden ¶¶ 5–6; Decl. of Rabbi Joshua Fixler ¶¶ 5–10; Decl. of Reverend. Cynthia Mood ¶¶ 5–9; Decl. of Arvind Chandrakantan ¶¶ 6–9; Decl. of Cheryl Rebecca Smith ¶¶ 5–9; Decl. of Allison Fitzpatrick ¶¶ 5–6; Decl. of Mara Richards Bim ¶¶ 6, 9–15.

do not subscribe to the state's preferred religious text;[3] (3) religiously coerce the minor-child Plaintiffs by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text, and by pressuring them to suppress expression of their own religious or nonreligious beliefs and backgrounds at school;[4] and (4) substantially interfere with the religious development of the minor-child Plaintiffs and threaten to undermine the beliefs, practices, and values regarding matters of faith that the parent-Plaintiffs wish to instill in their children, thereby usurping the parents' authority to direct their children's religious education and religious or nonreligious upbringing.[5]

## **ARGUMENT**

In deciding whether to grant a preliminary injunction, a district court must weigh whether a movant has established: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). Here, all four factors weigh decisively in Plaintiffs' favor.

---

[3] *See, e.g.*, Rabbi Nathan Decl. ¶ 10; Decl. of Virginia Galaviz Eisenberg ¶¶ 9–10; Decl. of Sarah Ettinger, ¶ 12; Lemaster Decl. ¶ 7; Helwig Decl. ¶ 7; Decl. of Cody Barker ¶ 7; Erwin Decl. ¶ 7; Decl. of Theodore Lowe ¶¶ 9–10; Decl. of Wiley Norden ¶ 8; Rabbi Fixler Decl. ¶ 10; Chandrakantan Decl. ¶ 9; Fitzpatrick Decl. ¶ 7; Bim Decl. ¶ 13.

[4] *See, e.g.*, Rabbi Nathan Decl. ¶¶ 10–11; V.G. Eisenberg Decl. ¶ 10; Cantor Ettinger Decl. ¶¶ 11–12; Lemaster Decl. ¶¶ 9–10; Helwig Decl. ¶¶ 7–8; Alyssa Martin Decl. ¶¶ 8–10; Erwin Decl. ¶¶ 7–8; Pastor Martin Decl. ¶ 10; Rebekah Lowe Decl. ¶¶ 12–14; Marissa Norden Decl. ¶¶ 7–9; Rabbi Fixler Decl. ¶ 10; Reverend Mood Decl. ¶ 9; Chandrakantan Decl. ¶¶ 8, 10; Smith Decl. ¶¶ 6, 8; Fitzpatrick Decl. ¶ 8; Bim Decl. ¶¶ 16–17.

[5] *See, e.g.*, Rabbi Nathan Decl. ¶¶ 10, 12; V.A. Eisenberg Decl. ¶¶ 11–12; Ron Eisenberg Decl. ¶¶ 11–12; Sarah Ettinger Decl. ¶¶ 11, 13; Cantor Ettinger Decl. ¶¶ 11, 13; Lemaster Decl. ¶¶ 6, 9; Helwig Decl. ¶¶ 6, 10; Barker Decl. ¶¶ 6–10, 12; Alyssa Martin Decl. ¶¶ 6–10, 13; Erwin Decl. ¶¶ 7, 9; Abigail Martin Decl. ¶¶ 7–12; Pastor Martin Decl. ¶¶ 7–12; Theodore Lowe Decl. ¶¶ 5–12; Rebekah Lowe Decl. ¶¶ 5, 7–15; Wiley Norden Decl. ¶ 10; Marissa Norden Decl. ¶ 12; Rabbi Fixler Decl. ¶¶ 9-11; Reverend Mood Decl. ¶ 5-11; Chandrakantan Decl. ¶¶ 8, 12; Smith Decl. ¶¶ 6, 10; Fitzpatrick Decl. ¶¶ 6, 9; Bim Decl. ¶ 7–8, 16.

# I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS.

## A.    Permanently Displaying a Preferential Version of Scripture in Every Public-School Classroom Violates the Establishment Clause.

### 1.    *The Supreme Court's binding precedent in Stone prohibits permanent displays of the Ten Commandments in public-school classrooms.*

S.B. 10 is constitutionally forbidden under binding, directly applicable Supreme Court precedent. In *Stone v. Graham*, the Court struck down a Kentucky law that, like S.B. 10, required the display of "a durable, permanent copy of the Ten Commandments . . . on a wall in each public elementary and secondary school classroom in the Commonwealth," ruling that the statute violated the Establishment Clause. 449 U.S. at 39–40 n.1. *Stone* has been the law of the land for nearly half a century. Even in the one Establishment Clause case where the Supreme Court upheld a governmental display of the Ten Commandments, the Court emphasized that the public-school context in *Stone* set it apart from a relic placed decades ago among other monuments on the Texas Capitol grounds: "There are, of course, limits to the display of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. . . . [*Stone*] stands as an example of the fact that we have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Van Orden v. Perry*, 545 U.S. 677, 690–91 (2005) (plurality opinion) (cleaned up).[6]

Accordingly, when Louisiana lawmakers unlawfully sought to post the Ten Commandments in every public-school classroom last year, a federal district court held that *Stone*

---

[6] *See also Van Orden*, 545 U.S. at 703 (Breyer, J., concurring) ("The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state.") (citing *Stone*, 449 U.S. 39; *Lee v. Weisman*, 505 U.S. 577, 592 (1992)).

was controlling. The court rejected the defendants' argument that *Stone* was no longer good law because *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), purportedly "undermined" its "doctrinal foundation," the *Lemon* test. *Roake v. Brumley*, 756 F. Supp. 3d 93, 165 (M.D. La. 2024). The Fifth Circuit affirmed, explaining, "Although the Supreme Court set aside the *Lemon* test in *Kennedy*, . . . *Kennedy* did not overrule *Stone*. *Kennedy* does not mention *Stone* or purport to overrule the decisions (other than *Lemon*) on which *Stone* relies, *i.e., Schempp* or *Engel*. *Stone* remains good law and therefore controls, if it directly applies. We conclude that it does." *Roake*, 2025 WL 1719978, at *14 ((cleaned up) (citing *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963); *Engel v. Vitale*, 370 U.S. 421 (1962))).

S.B. 10 is even more egregiously unconstitutional than the statute overturned in *Stone*. Unlike in *Stone*, Texas lawmakers took it upon themselves to select and approve an official version of the Ten Commandments—one aligned with Protestant beliefs—and then mandate that this specific text be posted in every classroom. Further, the Texas legislature went to great lengths to ensure that students cannot avoid the displays: The Ten Commandments must be posted in a "conspicuous place" and printed in a "size and typeface that is legible to a person with average vision from anywhere in the classroom." Ex. 1, §§ 1(a)–(b)(1). And while the statute in *Stone* required the display to be sixteen inches wide by twenty inches high, 449 U.S. at 40 n.1, S.B. 10 allows displays to be even larger, providing only that they be "*at least* 16 inches wide and 20 inches tall." *See* Ex. 1, § (b)(2) (emphasis added). Finally, the statute in *Stone* required a context statement alongside the Ten Commandments, setting forth their purported historical relevance, *see Stone*, 449 U.S. at 40 n.1, but S.B. 10 lacks even this. As *Stone* is binding law, and directly applicable, this Court need look no further in its analysis. *See Roake*, 2025 WL 1719978, at *15 (display requirements in Louisiana statute were materially identical to those in *Stone*).

2.    *Permanently displaying an official version of the Ten Commandments in every public-school classroom is unconstitutionally coercive.*

Even if *Stone* were not directly applicable and binding law, S.B. 10's mandatory religious displays are unconstitutional under the Supreme Court's coercion jurisprudence. The Court has repeatedly "recognized the potentially coercive nature of classroom instruction" in public schools. *Mahmoud*, 2025 WL 1773627, at *17. "'The State exerts great authority and coercive power through' public schools 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'" *Id.* (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)). In addition, "mandatory attendance requirements," *Edwards*, 482 U.S. at 584, create a legal "obligation" for parents "to send their children to public school unless they find an adequate substitute." *Mahmoud*, 2025 WL 1773627, at *20 (discussing Maryland's compulsory-education laws). Thus, "'[t]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'" *Id.* at *17 (quoting *Lee v. Weisman*, 505 U.S. 577, 592 (1992)).[7] Indeed, "[t]hat is why a religious practice may be deemed unconstitutional in the 'special context of the public elementary and secondary school system,' but deemed constitutional elsewhere." *Roake*, 2025 WL 1719978, at *13 (quoting *Edwards*, 482 U.S. at 583).[8]

Like other states, Texas requires parents to send their minor children to school. Tex. Educ. Code § 25.093(a). Excessive unexcused absences will subject students and parents to various educational and legal penalties, including civil prosecution and fines. *See* Tex. Fam. Code

---

[7] *See also Lee*, 505 U.S at 643 (Scalia, J., dissenting) ("[W]e have made clear our understanding that school prayer occurs within a framework in which legal coercion to attend school (*i.e.*, coercion under threat of penalty) provides the ultimate backdrop.").

[8] *Cf. Van Orden*, 545 U.S. at 691 (plurality opinion) ("The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day.").

§ 65.003(b); Tex. Educ. Code §§ 25.0915(a), 25.093; *see also* Compl. ¶¶ 61–64. And, in such proceedings, if "a parent refuses to obey a court order . . . the court may punish the parent for contempt of court[.]" Tex. Educ. Code § 25.093(g) (citing Tex. Gov't Code § 21.002, which authorizes a fine or confinement in jail for contempt of court).

Once students are at school, staff control their movements and often their expression: Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. *See Mahmoud*, 2025 WL 1773627, at *19 ("The government's operation of public schools . . . implicates direct, coercive interactions between the State and its young residents. The public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct."). Thus, Texas students, especially those in classrooms,[9] are a "captive" audience, and the Supreme Court has reaffirmed in recent years that it remains "problematically coercive" under the Establishment Clause for public schools to impose religious messages on captive students. *See Kennedy*, 597 U.S. at 541–42 (citing *Lee*, 505 U.S. at 580; *Santa Fe Indep. Sch. Dist. v Doe*, 530 U.S. 290, 311 (2000));[10] *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279–80 (5th Cir. 1996) (striking down law permitting official prayers at school events because students are "a captive audience that cannot leave without being punished by the state or School Board for truancy or excessive absences").

---

[9] *See, e.g.*, *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 957 (9th Cir. 2011) (students in mathematics classroom were "captive" to teacher's proselytizing his view on the "role of God in our Nation's history"); *Berger v. Rensselaer Cent. Sch. Corp.*, 982 F.2d 1160, 1167 (7th Cir. 1993) (enjoining Bible distributions in public-school classrooms because "children are a captive audience" and "they are most assuredly not free to get up and leave").

[10] In *Kennedy*, the Court upheld the right of a public-school football coach to engage in a quiet and private act of prayer after games, noting that the prayers looked "very different" from those in *Lee* and *Santa Fe*. 597 U.S. at 541-542. The coach's prayers were purely private and not attributable to the school, did not involve students, and were not imposed on a captive audience. *See id.* at 525, 531, 542.

Viewed through the lens of this special concern for captive-audience public-school students, S.B. 10's mandatory classroom displays of the Ten Commandments will be religiously coercive. While "[p]arts of the Ten Commandments include basic principles regarding criminal conduct that are part of a civilized society, such as the prohibition against murder . . . they come from religious texts and include commandments that have clear religious import, such as requiring worship of one God and keeping the Sabbath holy." *Roake*, 2025 WL 1719978, at *6; *accord Stone*, 449 U.S. at 41–42 ("The Commandments do not confine themselves to arguably secular matters . . . Rather, the first part of the Commandments concerns the religious duties of believers[.]"); *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 869 (2005) ("[T]he original text viewed in its entirety is an unmistakably religious statement dealing with religious obligations and with morality subject to religious sanction."). It follows that "[t]heir display in public school classrooms, as required by [state law], qualifies as a religious display." *See Roake*, 2025 WL 1719978, at *6.

These religious displays will serve "no . . . educational function." *See Stone*, 449 U.S. at 42. "The statute does not require that the Ten Commandments be integrated into a curriculum of study. On the contrary, under the statute's minimum requirements, the posters must be indiscriminately displayed in every public school classroom in [Texas] regardless of class subject-matter." *Roake*, 2025 WL 1719978, at *15. What is more, to further ensure that the displays will be unavoidable and that students will perceive them as authoritative rules that must be followed, the state went out of its way to draw students' attention to them. *See Supra* p. 6.

Capitalizing on the direct and indirect coercive forces unique to the public-school context, S.B. 10's minimum requirements for the displays will pressure students to engage in religious exercise. *See, e.g.*, *Schempp*, 374 U.S. at 224–25 (holding that school-directed reading of Bible

passages constitutes "religious exercise" where, as here, it is not "presented objectively as part of a secular program of education"); *see also, e.g.*, *Roake*, 756 F. Supp. 3d at 193 ("Plaintiffs' minor children will be forced 'in every practical sense,' through Louisiana's required [school] attendance policy, to be a 'captive audience' and to participate in a religious exercise: reading and considering a specific version of the Ten Commandments, one posted in every single classroom, for the entire school year, regardless of the age of the student or subject matter of the course.").[11] As in *Stone* and *Roake*, "'[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments.'" *Roake*, 2025 WL 1719978, at * 17 (quoting *Stone*, 449 U.S. at 42).

     3.    *S.B. 10 impermissibly takes sides on theological questions and officially favors one religious denomination over others.*

The Supreme Court unanimously affirmed last month that the Establishment Clause requires that the "government maintain 'neutrality between religion and religion.'" *Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1594 (2025) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). The Court explained: "'The clearest command of the Establishment Clause' is that the government may not 'officially prefe[r]' one religious denomination over another. . . . This principle of denominational neutrality bars States from passing laws that 'aid or oppose' particular religions . . . or interfere in the 'competition between sects.'" *Id.* at 1591 ((cleaned up) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982); *Epperson*, 393 U.S. at 106)).

The Court has thus repeatedly warned against government action that takes sides in

---

[11] The constitutional prohibition against government coercion of religious exercise includes vocal and silent activities. *See Stone*, 449 U.S. at 42 ("Nor is it significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp* and *Engel*[.]"); *Wallace v. Jaffree*, 472 U.S. 38, 60–61 (1985) (holding that state could not encourage students to engage in silent prayer).

"controversies over religious doctrine and practice." *See Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).[12] Here, in violation of these longstanding fundamental principles, Texas has chosen sides on religious controversies of the utmost importance, announcing an official position on perhaps the greatest theological question of all: Which religion (and which religious texts) should public-school students and families believe in and follow? The state's explicit preference for biblical scripture rules out any number of faiths in which the Ten Commandments are generally not recognized as part of the religious tradition.[13] Moreover, legislators dove even deeper into core theological questions and controversies surrounding the correct content and meaning of the Ten Commandments by hand-picking the specific text, a Protestant version that is inconsistent with versions followed by most Jews and Catholics. *See* Green Rep. ¶¶ 53–58; *accord Roake*, 756 F. Supp. 3d at 200 ("The Act requires the display of a specific Protestant version of the Decalogue.").[14] Indeed, although the version of the Ten Commandments mandated by S.B. 10 is Protestant and drawn from the King James Bible, the specific text and wording of the Commandments, and their prescribed manner of display by S.B. 10, are objectionable even to some adherents of certain Protestant denominations.[15]

---

[12] *See also Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 20 (1989) (plurality opinion) (["T]here exists an overriding interest in keeping the government—whether it be the legislature or the courts—out of the business of evaluating the relative merits of differing religious claims[.]" (cleaned up)); *Schempp*, 374 U.S. at 243 (Douglas, J., concurring) (the First Amendment requires "on the part of all organs of government a strict neutrality toward theological questions").

[13] *See* Green Rep. ¶ 52; *see also* Chandrakantan Decl. ¶ 6. The displays also reject the beliefs of atheists and other nonreligious people. *See, e.g.*, Helwig Decl. ¶¶ 3, 5; Barker Decl. ¶¶ 3–4; Fitzpatrick Decl. ¶¶ 3, 5.

[14] The Louisiana statute enjoined in *Roake* mandates a version of the Ten Commandments that is identical to the version adopted in S.B. 10. *See* La. Act No. 676 (2024).

[15] *See generally* Pastor Martin Decl. (Baptist); Rev. Mood Decl. (Presbyterian Church (USA)); Bim Decl. (Baptist).

When "a state law establishes a denominational preference, courts must treat the law as suspect and apply strict scrutiny in adjudging its constitutionality." *Catholic Charities*, 145 S. Ct. at 1591 (cleaned up). Texas's decision to adopt, by statute,[16] this particular version of the Ten Commandments and promulgate it via mandatory displays in public-school classrooms cannot be reconciled with the Establishment Clause's requirement that the government maintain a strict neutrality toward theological questions, or its command that one religious denomination cannot be preferred over another. *See, e.g.*, *McCreary Cnty.*, 545 U.S. at 894 n.4 (Scalia, J., dissenting) ("The Establishment Clause would prohibit, for example, governmental endorsement of a particular version of the Decalogue as authoritative."). And, as discussed below, S.B. 10 does not overcome strict scrutiny. *See infra* pp. 18-19.

4.    *S.B. 10's permanent school displays do not fit within any historical tradition.*

Under *Kennedy*'s "historical practices and understandings" test, "[t]he line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Roake*, 2025 WL 1719978, at *17 (quoting *Kennedy*, 597 U.S. at 536–37 (modified citation in original)). To that end, this Court must look to the purposes animating the Establishment Clause at the Founding.

In drafting and enacting the First Amendment, at least two concerns stood out at the time. First, religious coercion "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537.

---

[16] Unlike in *Van Orden*, 545 U.S. at 712–13, where the challenged monument was not erected due to any law requiring such displays, and the Fraternal Order of Eagles (not the government) selected the text of the Commandments inscribed on the monument, here the state went out of its way to require public-school displays of the Commandments and to select, vote on, and officially approve the specific text to be used. Intentionally choosing, in this manner, "which version of the Ten Commandments to display" communicates denominational preference. *See Glassroth v. Moore*, 335 F.3d 1282, 1299 n.3 (11th Cir. 2003).

Thus, James Madison and Thomas Jefferson, who were instrumental in the creation of the First Amendment and whose writings the Supreme Court has repeatedly referenced in construing the Establishment Clause,[17] were adamant that "[g]overnment should not coerce or promote religious fealty or any religious belief." *See* Green Rep. ¶¶ 25–26. They each took a broad view of what constitutes impermissible religious coercion by the government. *Id.* ¶ 26. Second, the Founders were all too aware of the religious persecution and religious discord engendered by colonial governments' official preferences for some denominations over others. *See id.* ¶¶ 18–25. Madison and Jefferson believed that "[g]overnment should not take a position on any religious doctrine or promote any denomination or denominational belief or practice as favored or preferred." *Id.* ¶ 25.

As *Kennedy* and *Catholic Charities* make clear, the anti-coercion and denominational-neutrality principles at the heart of the Establishment Clause are just as vital today as they were at the Founding. Because S.B. 10's displays will be religiously coercive and will give preference to particular denominations—violating original First Amendment principles—the law cannot pass constitutional muster under *Kennedy*'s historical test. But even if the historical record theoretically could redeem a statute that violates the Establishment Clause's fundamental prohibitions on religious coercion and denominational preference (it cannot),[18] it does not do so here.

In *Roake*, the Fifth Circuit examined "whether the permanent posting of the Ten Commandments in public school classrooms fits within, or is consistent with, a broader tradition of using the Ten Commandments in public education" and affirmed the district court's finding of

---

[17] *See Schempp*, 374 U.S. at 214; *see also, e.g.*, *Reynolds v. United States*, 98 U.S. 145, 162–63 (1878); *Everson v. Bd. of Educ.*, 330 U.S. 1, 11–13 (1947); *Engel*, 370 U.S. at 425, 436; *Larson*, 456 U.S. at 245; *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 770 n.28 (1973); *McCreary Cnty.*, 545 U.S. at 878.

[18] *See, e.g.*, *Roake*, 756 F. Supp. 3d at 210 ("[E]ven if there was sufficient evidence to show that this practice fit within a broader tradition of using the Ten Commandments in public schools, . . . [the] Act is inconsistent with any historical tradition by being discriminatory and coercive.").

a "substantial likelihood that there is insufficient evidence of a broader tradition in place at the time of the founding, or within the history of public education, so as to justify [the Louisiana statute]." 2025 WL 1719978, at *18–19 (applying *Kennedy* and *Freedom From Religion Foundation Inc. v. Mack*, 49 F.4th 941 (5th Cir. 2022)).

Plaintiffs' expert evidence here points to the same conclusion. As an initial matter, the American public education system, as we know it today, did not come into existence until the early 1800s. Green Rep. ¶¶ 38–39. To the extent that religious practices generally occurred in those early common schools, especially practices that were denominationally preferential, and thus discriminatory, they were extremely contentious, sparking lawsuits, protests, and even violent riots. *Id.* ¶¶ 40–41. Moreover, with regard to the Ten Commandments specifically, while some early textbooks included lessons referring to the Ten Commandments, those lessons were sporadic at best; they were not significant aspects of the texts, and they were largely eliminated over time. *Id.* ¶¶ 43–47. *Cf. Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014) (upholding legislative prayers, which enjoyed "unambiguous and unbroken history" of widespread acceptance, including by the Founders, and have "withstood the critical scrutiny of time and political change").

As Dr. Steven K. Green, an expert in the history of the First Amendment's Religion Clauses, as well as the intersection of religion and public schools, has concluded: "[T]he Ten Commandments were not a prominent part of American public education . . . Nor more specifically, . . . is there evidence of a longstanding, let alone unbroken, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools." Green Rep. ¶ 51. Relying on similar testimony presented by Dr. Green in an expert report and during a

live hearing,[19] the *Roake* district court agreed, finding that "there is insufficient evidence of such a broader tradition [of use of the Ten Commandments in public education] to justify [the Louisiana law]" and that the defendants' evidence did not "reflect any sort of tradition of permanently displaying the Decalogue in public-school classrooms at the time of the Founding or of incorporation." 756 F. Supp. 3d at 204. This Court should make the same finding.

**B.    Plaintiffs Are Likely to Succeed on the Merits of Their Free Exercise Clause Claim.**

Given that the Establishment and Free Exercise Clauses have complementary purposes, *Kennedy*, 597 U.S. at 533, it is not surprising that S.B. 10 also violates the Free Exercise Clause. Mandating displays of the Ten Commandments in every public-school classroom infringes Plaintiffs' right to "choose [their] own course [in matters of faith] . . . free of any compulsion from the state," *see Schempp*, 374 U.S. at 222 as well as the parent-Plaintiffs' fundamental right, "as contrasted with that of the State, to guide the religious future . . . of their children." *See Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972).

1.    *S.B. 10's permanent displays of the Ten Commandments are unconstitutionally coercive under the Free Exercise Clause.*

The right to free exercise necessarily includes the right *not* to be pressured into government-sponsored religious observance that violates one's conscience, as well as the right not to be coerced by the government to suppress one's own religious beliefs and practices. *See Carson v. Makin*, 596 U.S. 767, 778 (2022) (reiterating that the Free Exercise Clause bars "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions" (cleaned up)); *see also Mahmoud*, 2025 WL 1773627, at *19 (rejecting notion that the Free Exercise Clause

---

[19] The court found that Dr. Green had employed "adequate and standard methodology used by historians," and that his testimony was "well supported and persuasive." *Roake*, 756 F. Supp. 3d at 204–05.

provides "nothing more than protection against compulsion or coercion to renounce or abandon one's religion").

As discussed above, S.B. 10's mandatory displays will religiously coerce students, who will be subjected to the Ten Commandments for nearly every hour they are in school, in every classroom, with no exceptions and without regard to the subject matter being taught or the ages of the students. *See supra* pp. 7-10. Short of withdrawing from public school, there will be no ability to opt out of these displays, and the state's official religious doctrine will be unavoidable. But "[p]ublic education is a public benefit, and the government cannot 'condition' its 'availability' on [Plaintiffs'] willingness to accept a burden on their religious exercise." *See Mahmoud*, 2025 WL 1773627, at *20 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

> 2.    *S.B. 10's mandatory displays will violate the parent-Plaintiffs' free-exercise rights.*

Generally speaking, government conduct will be subject to strict scrutiny where a plaintiff shows "that a government entity has burdened his sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (cleaned up). The Supreme Court clarified last week, however, that courts "need not [even] ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny" when it comes to a public-school "educational requirement or curriculum" that would "'substantially interfer[e] with the religious development' of [a] child or pose 'a very real threat of undermining' the religious beliefs and practices the parent wishes to instill in the child." *Mahmoud*, 2025 WL 1773627, at *18 (quoting *Yoder*, 406 U.S. at 218). The displays mandated by S.B. 10 will do just that.[20]

––––––––––––––––

[20] Plaintiffs also meet *Kennedy*'s threshold for strict scrutiny. 597 U.S. at 525. S.B. 10 is not neutral with respect to religion. By design, and on its face, the law mandates the display of

S.B. 10 will not merely involve *secular* materials to which Plaintiffs have religious objections. *Cf. id.* at *6–8 (discussing challenged LGBTQ-inclusive storybooks). Rather, it will force on the minor-child Plaintiffs denominationally preferential,[21] *patently religious* materials—biblical scripture, no less—that will directly conflict with the parent-Plaintiffs' religious beliefs and their own teachings to their children about matters of faith. *Supra* nn. 2, 5.

Moreover, S.B. 10 will not merely impose the Ten Commandments on students on an *occasional* basis. *Cf. Mahmoud v. McKnight*, 688 F. Supp. 3d 265, 297 (D. Md. 2023). Rather, students will be confronted with them for nearly every hour of the school day, from pre-kindergarten through senior year. The displays are designed to attract students' attention and will be given a "conspicuous" place of honor on classroom walls. *Supra* p. 6. Moreover, as lawmakers' own comments make clear, *supra* pp. 2–3, Compl. ¶¶ 73–81, the displays are "designed to present certain values and beliefs as things to be celebrated and certain contrary values and beliefs as things to be rejected." *See Mahmoud*, 2025 WL 1773627, at *15. As a result, the displays will send an exclusionary and spiritually burdensome message to the Plaintiffs and their children that they do not belong and are "outsiders, not full members of the [school] community" because they do not subscribe to the state-approved version of the Ten Commandments. *See Catholic Charities*, 145 S. Ct. at 1591 (quoting *Santa Fe*, 530 U.S. at 309); *supra* n.3

---

expressly religious scripture in every public-school classroom. It also requires a specific version of that scripture to be used, one that is exclusionary of numerous faiths. *See supra*, pp. 10–12; *Roake*, 756 F. Supp. 3d at 200 (Louisiana's H.B. 71 was "not neutral toward religion" because it "require[d] the display of a specific Protestant version of the Decalogue" and the legislative history further confirmed the departure from neutrality). And because S.B. 10 will coerce the minor-child Plaintiffs, *supra* n.4, pp. 7–10, 15–16, and usurp the parent-Plaintiffs' rights, *supra* n.5, *infra* pp. 16–18, it will burden their religious exercise.

[21] *See Catholic Charities*, 145 S. Ct. at 1591 ("The Establishment Clause's prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause, too. . . . because the fullest realization of true religious liberty requires that government refrain from 'favoritism among sects.'" (cleaned up)).

At bottom, S.B. 10's displays will "impose upon children a set of [religious] values and beliefs that are hostile to their parents' religious beliefs," and "exert upon children a psychological pressure to conform to the[se] specific [religious] viewpoints." *See Mahmoud*, 2025 WL 1773627, at \*17; *see also Roake*, 756 F. Supp. 3d at 200 (holding that Louisiana's law was designed to advance certain Christian beliefs, and that the legislature "proceed[ed] in a manner intolerant of [contrary] religious beliefs." (cleaned up)). If Montgomery Public Schools' occasional use of secular LGBTQ-inclusive materials at school substantially interfered with the religious development of the petitioners' children and undermined the religious beliefs and practices they sought to instill in their children, so too—to an even greater extent—will S.B. 10's scriptural displays.

These impositions on Plaintiffs' religious beliefs and practices cannot be sustained under strict scrutiny. *See Catholic Charities*, 145 S. Ct. at 1591 (noting that the government bears the burden under strict-scrutiny standard). S.B. 10's requirement that public schools post an official state-approved version of the Ten Commandments in every classroom does not further any compelling governmental interest. It "serves no . . . educational function." *Stone*, 449 U.S. at 42. Indeed, even if it were true that the Ten Commandments had played an important role in American public education or the formation of the nation's principal Founding documents, singling out this one religious text—a denominationally preferential version—over every other historical or foundational text for mandatory, permanent display does not serve a compelling interest.

Finally, even if Defendants were to somehow meet their heavy burden under the first prong of the strict-scrutiny standard, they would nevertheless fail the "narrowly tailored" prong. There are many ways in which students could be taught any relevant history of the Ten Commandments without the state selecting an official version of scripture, enshrining its approval in state law, and

then subjecting students to it in every classroom on a permanent, daily basis. Most obviously, the matter could be broached "objectively as part of a secular program of education," *Schempp*, 374 U.S. at 225, through "an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone*, 449 U.S. at 42.[22] In fact, Texas's current academic standards purport to do so, providing that high school world history students will study the "impact of political and legal ideas contained in the . . . Hammurabi's Code, the Jewish Ten Commandments, Justinian's Code of Laws, Magna Carta, the English Bill of Rights, the Declaration of Independence, the U.S. Constitution, and the Declaration of the Rights of Man and of the Citizen."[23] These standards are an implicit acknowledgement by Texas officials that permanently posting the Ten Commandments in every public-school classroom, in accordance with the minimum requirements of S.B. 10, is not narrowly tailored to any proper governmental interest.

## II.   THE REMAINING PRELIMINARY-INJUNCTION FACTORS WEIGH HEAVILY IN PLAINTIFFS' FAVOR.

Plaintiffs are likely to suffer irreparable harm because they "have shown that th[e] [Act's] displays will cause an 'irreparable' deprivation of their First Amendment rights." *See Roake*, 2025 WL 1719978, at *20 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). The U.S. Supreme Court and Fifth Circuit have repeatedly held that "[t]he loss of First Amendment

---

[22] Nor is S.B. 10 narrowly tailored to any state-asserted interest in instilling ethical or moral values in students. Government "cannot employ a religious means to serve otherwise legitimate secular interests." *Karen B. v. Treen*, 653 F.2d 897, 901 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982); *see also Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1283 (11th Cir. 2004) (teacher's in-class prayer was not a permissible way to teach compassion because religious exercise "is not within the range of [pedagogical] tools among which teachers are empowered to select").

[23] Tex. Essential Knowledge & Skills for Social Studies ("TEKS") (Aug. 2024), Tex. Educ. Agency, Chapter 113, Subchapter C (High School) at 20, https://tea.texas.gov/about-tea/laws-and-rules/sboe-rules-tac/sboe-tac-currently-in-effect/ch113c.pdf. TEKS provide many opportunities for children of all ages to learn about religion. *See, e.g.*, *id.*, Subchapter A (Elementary School), at 22,       25,       https://tea.texas.gov/about-tea/laws-and-rules/sboe-rules-tac/sboe-rules-tac-currently-in-effect/ch113a.pdf; *id.*, Subchapter B (Middle School) at 18, https://tea.texas.gov/about-tea/laws-and-rules/sboe-rules-tac/sboe-tac-currently-in-effect/ch113b.pdf.

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*, 2025 WL 1773627, at * 24 (cleaned up). The harm here will be especially egregious because it will involve the unrelenting imposition of scripture on children for hours each day.

The public interest and the balance of potential harms to the parties also weigh in Plaintiffs' favor. There will be no harm to the public interest, or to Defendants specifically, because a preliminary injunction will merely maintain the status quo pending this litigation's outcome and because Defendants do "not have a genuine interest in enforcing a regulation that violates federal law." *Roake*, 2025 WL 1719978, at *20 (cleaned up). On the contrary, the Fifth Circuit explained in *Roake* that "[i]njunctions protecting First Amendment freedoms are always in the public interest, . . . and courts must be particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Id.* at *20 (cleaned up).

## CONCLUSION

In accordance with Federal Rule of Civil Procedure 65 and Local Rule CV-7(C),[24] Plaintiffs respectfully request that this Court preliminarily enjoin all Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from displaying the Ten Commandments pursuant to S.B. 10.

Date: July 2, 2025                                  Respectfully submitted,

                                                    By: /s/  *Jonathan K. Youngwood*

---

[24] The Federal Rule of Civil Procedure 65(c) security bond requirement should be waived. This is a non-commercial case that involves only non-monetary injunctive relief and serves a public interest to protect constitutional rights. There is no likelihood of harm or probable loss should the injunction be granted. *See, e.g.*, *Tex. Trib. v. Caldwell Cnty.*, No. 1:23-CV-910-RP, 2024 WL 420160, at *8 (W.D. Tex. Feb. 5, 2024) (waiving Rule 65 bond); *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (Rule 65(c) security requirement is discretionary).

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
Janet A. Gochman*
Noah Gimbel*
Jordan T. Krieger*
Avia Gridi*
Kristen Crow*
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*
*jgochman@stblaw.com*
*noah.gimbel@stblaw.com*
*jordan.krieger@stblaw.com*
*avia.gridi@stblaw.com*
*kristen.crow@stblaw.com*

AMERICAN CIVIL LIBERTIES UNION
OF TEXAS FOUNDATION, INC.
Adriana Piñon
Chloe Kempf
Sarah Corning**
Thomas Buser-Clancy
P.O. Box 8306
Houston, TX 77288
(713) 942-8146
*apinon@aclutx.org*
ckempf@aclutx.org
scorning@aclutx.org
tbuser-clancy@aclutx.org

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
Daniel Mach*
Heather L. Weaver*
915 15th Street, NW, Suite 600
Washington, DC 20005
(202) 675-2330
*dmach@aclu.org*
*hweaver@aclu.org*

AMERICANS UNITED FOR
SEPARATION OF CHURCH & STATE
Alex J. Luchenitser*
Amy Tai*
Jess Zalph*

1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7306
*luchenitser@au.org*
*tai@au.org*
*zalph@au.org*

FREEDOM FROM RELIGION
FOUNDATION
Patrick C. Elliott
Samuel T. Grover
Nancy A. Noet*
P.O. Box 750
Madison, WI 53701
(608) 256-8900
*patrick@ffrf.org*
*sgrover@ffrf.org*
*noetn@ffrf.org*

*Counsel for Plaintiffs*

* Motion for *Pro Hac Vice* Admission
Forthcoming

** Admission Application Forthcoming

Jonathan K. Youngwood
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing documents will be personally served on each

Defendant pursuant to the Federal Rules of Civil Procedure, along with the Summonses and

Complaint in this action, immediately following the issuance of the Summons documents by the

Western District of Texas Clerk's Office.  A Request for Issuance of Summons has been filed on

the case docket as ECF Document No. 2 and is currently pending.


Dated: July 2, 2025

By: *<u>/s/ Jonathan K. Youngwood</u>*
SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
*jyoungwood@stblaw.com*

*Counsel for Plaintiffs*