## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| RABBI MARA NATHAN, on behalf of herself and on behalf of her minor child, M.N., et al.,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>ALAMO HEIGHTS INDEPENDENT SCHOOL DISTRICT, et al.,<br><br>　　　Defendants. | CIVIL ACTION NO.<br>5:25-cv-00756 |

## DECLARATION OF STEVEN K. GREEN, J.D., Ph.D.

I, Steven K. Green, pursuant to 28 U.S.C. § 1746, declare the following:

1.　　I have personal knowledge of the facts set forth herein and, if called upon, could and would competently testify thereto.

2.　　I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious Studies and History at Willamette University in Salem, Oregon.  In the College of Law (my primary appointment), I teach courses in Constitutional Law, First Amendment Law, Education Law, Legal History, and Jurisprudence (legal philosophy).  In the College of Arts and Sciences, I occasionally teach courses in Constitutional History and American Religious History.  In addition to holding a J.D. from the University of Texas, I have a M.A. in American Religious History and a Ph.D. in American Constitutional History from the University of North Carolina.  I also spent a year of graduate study at Duke Divinity School and Duke Law School. A copy of my curriculum vitae ("CV") is attached as **Exhibit A** to the Expert Report of Steven K. Green, J.D., Ph.D. (the "Expert Report"), which is itself attached as **Exhibit 1** to this Declaration.

3.      I was asked to give my expert opinions on, and prepare a report examining, the history of the U.S. Constitution and First Amendment with respect to religious matters; the history of the Ten Commandments with respect to the nation's founding documents that established the American government and legal system; the history of the use of the Ten Commandments in public schools; and the denominational nature of the specific version of the Ten Commandments adopted in Texas in Senate Bill No. 10.

4.      The Expert Report is based on my knowledge, research, and study in this area, spanning the past 30 years. The methodology used and sources relied on in preparing the Expert Report are further discussed therein.

5.      I certify that **Exhibit 1** is a true and correct copy of the Expert Report that I prepared for Plaintiffs in connection with this case. If called upon, I could and would competently testify as to the facts and opinions set forth therein.

6.      I am receiving $150 per hour for expert work related to this case up to $5,000 for preparing this report; up to $3,000 for any rebuttal/reply report preparation; up to $3,000 for any deposition preparation; and up to $3,000 for any hearing preparation.

7.      My CV, attached as **Exhibit A** to the Expert Report, includes a list of the publications that I have authored in the last ten years.

8.      In the past four years, I have testified in court as an expert in one case: *Roake v. Brumley*, Civ. No. 24-517-JWD-SDJ (M.D. La. 2024).  I also will be serving as an expert in *Stinson v. Fayetteville School District No. 1*, Civ. No. 5:25-cv-05127-TLB (W.D. Ark. 2025).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of July, 2025.

Steven K. Green, J.D., Ph.D.

# Declaration of Steven K. Green Exhibit 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RABBI MARA NATHAN, on behalf of herself and on
behalf of her minor child, M.N., et al.,

     Plaintiffs,

     v.

ALAMO HEIGHTS INDEPENDENT SCHOOL
DISTRICT, et al.,

     Defendants.

CIVIL ACTION NO.
5:25-cv-00756

## EXPERT REPORT OF STEVEN K. GREEN, J.D., Ph.D

### I.    Qualifications of Expert

    1.    I am the Fred H. Paulus Professor of Law and Affiliated Professor of Religious

Studies and History at Willamette University in Salem, Oregon.[1]  In the College of Law (my

primary appointment), I teach courses in Constitutional Law, First Amendment Law, Education

Law, Legal History, and Jurisprudence (legal philosophy).  In the College of Arts and Sciences, I

occasionally teach courses in Constitutional History and American Religious History.  In addition

to holding a J.D. from the University of Texas, I have a M.A. in American Religious History and

a Ph.D. in American Constitutional History from the University of North Carolina.  I also spent a

year of graduate study at Duke Divinity School and Duke Law School.  A copy of my curriculum

vitae ("CV") is attached to this report as **Exhibit A**.

    2.    My scholarship pertains almost exclusively to the intersection of law, religion, and

history.  I am the author of seven books and more than sixty scholarly articles and book chapters

---

[1] The expert opinions expressed below are my own and do not reflect the views of Willamette University or any other institution.

1

on the subject area.[2]  My chapters and articles have appeared in leading anthologies and law reviews, including the *Oxford Research Encyclopedia of American History*, *Oxford Handbook on Church and State in the United States*, *Yale Biographical Dictionary of American Law*, *Cornell Law Review*, *Notre Dame Law Review*, *Emory Law Journal*, *Boston College Law Review*, *Syracuse Law Review*, *William and Mary Bill of Rights Journal*, *Hastings Constitutional Law Quarterly*, *Journal of Church and State*, *Journal of Law and Religion*, *First Amendment Law Review*, and the *Oxford Journal of Law and Religion*. I am a member of the Constitutional Law Section of the Association of American Law Schools, and I serve on the editorial advisory board of the *Journal of Church and State*.

3.      I have closely examined the issue of the purported relationship between U.S. law and government and the Ten Commandments in four writings, including: "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 *Journal of Law and Religion* 525-558 (2000); *The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010); *Inventing a Christian America: The Myth of the Religious Founding* (Oxford University Press, 2015); and "'Bad History:' The Lure of History in Establishment Clause Adjudication," 81 *Notre Dame Law Review* 1717-1754 (2006). Finally, in 2005, I authored an *amicus curiae* brief in *McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005), on behalf of approximately twenty leading legal historians and law scholars regarding the Ten Commandments' historical influence (or lack thereof) on the development of

---

[2] My published books include: *The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (Univ. of Virginia Press, 2024); *Separating Church and State: A History* (Cornell Univ. Press, 2022); *The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford Univ. Press, 2019); *Inventing a Christian America: The Myth of the Religious Founding* (Oxford Univ. Press, 2015); *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford Univ. Press, 2012); *The Second Disestablishment: Church and State in Nineteenth-Century America* (Oxford Univ. Press, 2010); and *Religious Freedom and the Supreme Court* (Baylor Univ. Press, 2008) (with Ronald Flowers and Melissa Rodgers). My forthcoming eighth book, *American Infidelity*, will be published by Oxford University Press in 2026.

American law and government, including the drafting of the Declaration of Independence, the U.S. Constitution, and the Bill of Rights.

4.    Additionally, I have extensively examined the role of religion in the development and operation of public schooling in the United States in four books, most comprehensively in *The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford University Press, 2012).[3]

5.    All of my books have been peer-reviewed,[4] meaning that the manuscripts were reviewed by other scholars for the rigor of my methodology, analysis, and conclusions.  In addition, my articles published in the *Journal of Church and State*, the *Oxford Journal of Law and Religion*, the *American Journal of Legal History*, and the *Journal of Law and Religion* were also peer-reviewed.

6.    The peer-review process is rigorous and involves multiple steps.  A potential publisher will distribute a proposed manuscript to two or more readers, who are scholars who have published on related topics and have knowledge of historical sources and the academic literature. The readers will then review the manuscript for the rigor of the author's methodology, analysis, and conclusions, opining on the strength of the manuscript and how it will relate to existing scholarship in the area.  Many times, the reviewers offer suggestions to the author to improve the manuscript, and publishers typically ask the author to respond in writing to any suggested changes and/or additions. This often results in preparing additional drafts of the manuscript, with the revised manuscript sometimes being redistributed to the readers for additional review. Furthermore, the peer-review process always involves at least one level of "blind" review—where

---

[3] *See also* Green, *Separating Church and State*, *supra* n.2, at 124-136, 153-164, 168-173; Green, *The Third Disestablishment*, *supra* n.2, at 133-146, 255-288; Green, *The Second Disestablishment*, *supra* n.2, at 251-325.

[4] *Religious Freedom and the Supreme Court*, *supra* n.2, which was a casebook for law students and co-authored with two other scholars, was not a candidate for the peer-review process.

the identities of the reviewers are not disclosed to the author, so as to ensure candor on the part of the reviewers.  In many instances, peer review involves a "double-blind" process, where the author's identity also remains undisclosed to the readers, again to ensure objectivity and candor of the review.

7.    In addition to having my publications peer-reviewed, as a recognized expert in my field, I have been called on to provide peer reviews of other academics' and historians' written works.  When asked to do so by a publisher, I apply the same steps as described above.  It is a matter that all scholars take seriously, so as to maintain the integrity of the profession.

8.    My attached CV includes a list of the publications that I have authored in the last ten years.

9.    In the past four years I have testified in court as an expert in one case: *Roake v. Brumley*, Civ. No. 24-517-JWD-SDJ (M.D. La. 2024).  I also will be serving as an expert in *Stinson v. Fayetteville School District No. 1*, Civ. No. 5:25-cv-05127-TLB (W.D. Ark. 2025).

10.    This report is based on my knowledge, research, and study in this area, spanning the past 30 years.  I am receiving $150 an hour for expert work related to this case, up to $5,000 for preparing this report; up to $3,000 for any rebuttal/reply report preparation; up to $3,000 for any deposition preparation; and up to $3,000 for any hearing preparation.

## II.    <u>Methodology</u>

11.    In preparing this report I relied on my graduate school training in history, which included extensive instruction in methodology.[5]  Accordingly, I applied standard and well-accepted methodologies used by historians.  This methodology involves several steps: research involving both primary and secondary sources; examining the relevant content and contextualizing

---

[5] This included a year-long course in methodology and historiography and a course in dissertation design.  Additional training in methodology is otherwise integrated into most graduate courses.

it; integrating the relevant material into text and synthesizing it with other material; and then providing analysis of the material.

12.     Initially, I identified both primary and secondary sources for review. I identified these sources as relevant to the issues raised in this case. I was careful to identify a variety of potential primary and secondary sources so that my ultimate conclusions would not rely only on sources that may have reflected only one viewpoint or otherwise limited perspectives.

13.     Next, I reviewed those sources closely and analyzed them to determine what role and weight, if any, they should be given in my overall study and analysis.  Analysis of a primary source involves reviewing the source, determining how reliable the source is, and evaluating how consistent it is with other evidence.  First, I considered the conditions and context under which each source originated: where the source was produced, by whom it was produced, when it was produced, the intentions of the author, and other historical context and circumstances at the time it was produced (*i.e.,* its provenance).  Second, I considered the extent to which each source is consistent with other sources, and the extent to which the sources complement each other.  Third, I also considered how the plain language of the source would have been interpreted at the time of its writing, and I avoided applying modern interpretations to documents that were centuries old.[6]

---

[6] For the accepted methodological standards for historians, *see* https://www.historians.org/resource/statement-on-standards-of-professional-conduct/.  According to the American Historical Association, "the professional practice of history means respecting the integrity of primary and secondary sources while subjecting them to critical scrutiny and contributing in a fair-minded way to ongoing scholarly and public debates over what those sources tell us about the past and also what they fail to illuminate." Additionally, "the practice of history requires awareness of one's own biases and a readiness to follow sound method and analysis wherever they may lead**.** Historians should document their findings and be prepared to make available their sources, evidence, and data, including any documentation they develop through interviews. Historians should not misrepresent their sources. They should report their findings as accurately as possible and not omit evidence that runs counter to their own interpretation. They should not commit plagiarism. They should oppose false or erroneous use of evidence, along with any efforts to ignore or conceal such false or erroneous use." I have followed these rules of professional conduct in preparing this report and in all of my work as a historian.

14.    As to secondary sources, I relied on books and articles about the relevant topics and considered their analyses of the primary sources. I considered the perspective of the authors, the information available to them, and any motivations they may have had to distort their interpretations in any way.

15.    The penultimate step was to integrate the material into written text, synthesizing it with other material and providing analysis. In reliance on all sources, I sought to provide a basis for a reliable narrative about the past. Only after completing the above steps do I offer an expert opinion and conclusion.

16.    In carrying out this methodology and reaching my conclusions in this report, I applied the same degree of rigor that I apply in preparing my books and scholarly articles for publication. Proper historical analysis is necessarily analytical. As a historian, I seek to provide context to historical writings and events. The methodology I have described above is consistent with the methodology ordinarily expected of historians.

## III.    Summary of Conclusions

17.    At Plaintiffs' request, this report examines the history of the U.S. Constitution and First Amendment with respect to religious matters; the history of the Ten Commandments with respect to the nation's founding documents that established the American government and legal system; the history of the use of the Ten Commandments in public schools; and the denominational nature of the specific version of the Ten Commandments adopted in Texas in Senate Bill No. 10 (hereinafter, "S.B. 10"). I reach four key conclusions:

- The Religion Clauses of the First Amendment were rooted in the Founders' profound concerns for protecting the conscience of individuals and religious communities against all forms of coercion; avoiding official denominational discrimination and preferences, including the official promotion of religious doctrine; and preventing the religious divisiveness that flows from government favoritism of some religions over others or non-religion.

6

- The historical record demonstrates that the Declaration of Independence, the U.S. Constitution, and the Bill of Rights—the three primary founding documents establishing the American government and legal system—and the legal system more generally, were not based on the Ten Commandments.

- There is no evidence of a longstanding historical practice of widespread, permanent displays of the Ten Commandments in public-school classrooms.

- The version of the Ten Commandments adopted under S.B. 10 is derived from the Protestant King James Bible and is thus sect-specific.

**IV.    The Religion Clauses of the First Amendment Were Rooted in the Founders' Profound Concerns for Protecting the Conscience of Individuals and Religious Communities Against All Forms of Religious Coercion; Avoiding Official Denominational Discrimination and Preferences, Including the Official Promotion of Religious Doctrine; and Preventing the Religious Divisiveness that Flows from Government Favoritism of Some Religions Over Others or Non-Religion.**

18.    On the cusp of the American Revolution, the British-American colonies represented the most religiously diverse place in the world.  Congregationalists (formerly Puritans) dominated New England; Presbyterians, Quakers, Lutherans, and pietistic sects (Moravians, Mennonites) dominated the middle colonies; and Anglicans (Church of England) were entrenched in the southern colonies, where large swaths of evangelical New Light Presbyterian and Baptist groups also resided.  Quakers, Mennonites, and Baptists constituted the majority in backcountry North Carolina, while Charleston and Savannah had large Jewish, Lutheran, and Huguenot communities.  Many Catholics had settled in Maryland.  And New York became home to myriad religious groups, including, among others, Dutch Reformed, Presbyterian, Anglican, Lutheran, and Jewish populations.[7]

19.    Given this religious diversity, it is not surprising that religious persecution and significant religious discord arose when colonial governments gave official preference to some faiths or denominations over others, or when they acted to impede the religious exercise of some

---

[7] *See* Winthrop S. Hudson, *Religion in America*, 3rd ed. (New York: Charles Scribner's Sons, 1981), 23-58.

individuals. For example, despite the religious pluralism, nine of the thirteen colonies maintained religious establishments, which meant an officially sanctioned Protestant denomination that was financially supported through forced tax assessments on all freeholders, regardless of whether that person adhered to that faith. Dissenting churches, if allowed to operate at all, did so at the whim of colonial officials.[8] Following the Protestant revivals of the First Great Awakening of the 1730s and 1740s, evangelicals in New England and Virginia faced persecution as officials refused to grant licenses to their clergy, refused to allow the operation of their churches, and then taxed the dissenters to support the dominant religion (either Congregationalism or Anglicanism). Resistant dissenters faced fines or imprisonment.[9] In 1744, in a widely circulated pamphlet, Connecticut clergyman and judge Elisha Williams criticized his own Congregationalist majority for using civil authority to harass and persecute evangelical ministers, asserting that "the civil authority hath no power to make or ordain articles of faith, creeds, forms of worship or church government."[10] Religious persecution was not unique to New England, however, as it took place in the Southern Anglican-controlled colonies as well, most notably in Virginia, which fined and expelled Catholics and Quakers.[11]

20.    Other examples of concerns raised by governmental religious favoritism included a decade-long controversy in the 1760s over a proposal to appoint an Anglican bishop in the American colonies, which would have brought the full apparatus of an exclusive religious

---

[8] Frank Lambert, *The Founding Fathers and the Place of Religion in America* (Princeton: Princeton University Press, 2003), 46-124; Thomas J. Curry, *The First Freedoms: Church and State in America to the Passage of the First Amendment* (New York: Oxford Univ. Press, 1986), 1-77.

[9] Hudson, *Religion in America, supra* n. 7, at 23-58; Christopher Beneke, *Beyond Toleration: The Religious Origins of Religious Pluralism* (New York: Oxford Univ. Press, 2006) 17-40.

[10] Elisha Williams, "A Reasonable Plea for the Liberty of Conscience and the Right of Private Judgment in Matters of Religion," (1744), in *Political Sermons of the American Founding Era, 1730-1805*, ed., Ellis Sandoz (Indianapolis: Liberty Fund, 1991), 97.

[11] Lambert, *The Founding Fathers and the Place of Religion in America, supra* n. 8, at 46-72; Edward L. Bond, *Damned Souls in a Tobacco Colony: Religion in Seventeenth Century Virginia* (Macon, GA: Mercer Univ. Press, 2000), 145-152, 160-174.

establishment that included ecclesiastical courts. Colonialists almost universally viewed the proposal as an attempt to impose religious conformity while inviting religious oppression. It led many to call for the complete disestablishment of religion by the government, and it strongly influenced the Founders' views on matters involving religion and the state.[12]

21.     Members of the Founding generation, when they began meeting in congresses in 1774 to discuss resistance to Britain and the formation of a new nation, were painfully aware of this recent historical context, as well as the legacy of religious persecution in Europe.[13] They recognized the need to prevent such persecution in the new nation, defuse any inter-religious conflict, and avoid the corrosive effect on civil society caused by the fusion of government and religion.[14]  In 1774, for instance, James Madison bemoaned the jailing of five Baptist ministers who refused to obtain licenses from Virginia authorities in order to preach. "There are at this [time] in the adjacent County not less than 5 or 6 well[-]meaning men in close Gaol for publishing their religious Sentiments which in the main are very orthodox," Madison wrote to his former Princeton classmate William Bradford.[15]  "I have neither patience to hear talk or think of any thing relative to this matter, . . . So I beg you to pity me and pray for Liberty of Conscience for all."[16]  Two years later, when the Continental Congress was drafting the Articles of Confederation, John Dickinson proposed a provision to address (and prevent) common religious preferences and persecutions. The provision provided that no person "shall be molested or prejudiced . . . for his or her religious

---

[12] *See* Patricia U. Bonomi, *Under the Cope of Heaven: Religion, Society, and Politics in Colonial America* (New York: Oxford Univ. Press, 1986).

[13] For example, the Thirty Years War of the early seventeenth century had pitted Protestants against Catholics, whereas the English Civil War (1643-1651) was between Presbyterians and Anglicans. *See* Geoffrey Parker, *The Thirty Years' War* (London: Routledge, 1997); Brian Manning, ed., *Politics, Religion, and the English Civil War* (New York: St. Martin's Press, 1974).

[14] Lambert, *The Founding Fathers and the Place of Religion in America, supra* n. 8, at 137-158.

[15] Letter from James Madison to William Bradford, Jan. 24, 1774, FOUNDERS ONLINE, https://founders.archives.gov/documents/Madison/01-01-02-0029.

[16] *Ibid.*

persuasion, . . . nor be compelled to frequent or maintain or contribute to maintain any religious Worship, Place of Worship, or Ministry, . . . [nor] be disqualified . . . from holding any offices Civil or military" because of their religion.[17]  As for the proposition that government had the authority to declare and promote articles of faith, Baptist minister John Leland spoke for many people, writing that, because "religion is a matter between God and individuals, the religious opinions of men [are] not being the objects of civil government, nor in any way under its control." Thus, "[t]he duty of magistrates is not to judge the divinity or tendency of doctrines."[18]

22.    In the years immediately preceding the 1787 Constitutional Convention, Madison further elaborated on his concerns regarding government involvement in matters of faith. Specifically, in his *Memorial and Remonstrance* of 1785, Madison vehemently opposed government support for religious instruction, urging the public and lawmakers to reject Patrick Henry's proposed Virginia measure, "A Bill Establishing a Provision for Teachers of the Christian Religion."[19]  Several of his points are instructive here.  Madison believed that religion, including the promotion of religious doctrines, was "exempt from the authority" of government.[20]  Not only did such actions inevitably favor one religion over another and offend the notion of denominational equality,[21] they also represented "an unhallowed perversion of the means of salvation."  They implied "either that the Civil Magistrate is a competent Judge of Religious Truth; or that he may employ Religion as an engine of Civil policy."[22]  And to allow the government to promote religious

---

[17] Derek Davis, *Religion and the Continental Congress, 1774-1789* (New York: Oxford Univ. Press, 2000), 160-161. According to Davis, the congress declined to include the article, not out of disagreement with its sentiments, but as inconsistent with the Articles' truncated states-rights approach.

[18] John Leland, "The Rights of Conscience Inalienable" in *The Sacred Rights of Conscience*, eds., Daniel Dreisbach and Mark David Hall (Indianapolis: Liberty Fund, 2009), 337, 339.

[19] James Madison, *Memorial and Remonstrance against Religious Assessments*, in Founders' Constitution, vol. 5, doc. 43, https://press-pubs.uchicago.edu/founders/documents/amendI_religions43.html.

[20] *Ibid*., ¶ 2.

[21] *Ibid*., ¶ 3: "Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?"

[22] *Ibid*., ¶ 5.

doctrine would "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion has produced among its several sects" and lead to "Religious discord."[23] The *Memorial and Remonstrance* was not only instrumental in defeating Henry's bill, but it laid the groundwork for passage of the Virginia Statute for Establishing Religious Freedom of 1786,[24] which Madison reintroduced to the House of Delegates a few months after submitting his pamphlet. Drafted primarily by Thomas Jefferson, the Virginia statute disestablished the Church of England in Virginia and guaranteed religious equality for all sects.  In the statute's preamble, Jefferson expressly condemned "the impious presumption of legislators and rulers, civil as well as ecclesiastical, who being themselves but fallible and uninspired men, have assumed dominion over the faith of others, setting up their own opinions and modes of thinking as the only true and infallible, and as such endeavouring to impose them on others."[25]

23.    The following year, Madison and others gathered to draft the Constitution, the primary foundational document that established the government and legal system for the United States. It did not invoke God or scripture.  In fact, the delegates to the constitutional convention went a step further by expressly *prohibiting* any religious test for federal office holders. They recognized the exclusiveness and divisiveness of such practices and rejected the authority of government to determine or announce articles of faith.[26]

24.    Two years later, in 1789, as a member of the House of Representatives, Madison introduced several proposed amendments to the Constitution, including what would become the

---

[23] *Ibid.*, ¶ 11.
[24] Thomas Jefferson, "Bill for Establishing Religious Freedom," in Founders' Constitution, vol. 5, doc. 37, https://press-pubs.uchicago.edu/founders/print_documents/amendI_religions37.html.
[25] Green, *Separating Church and State*, *supra* n.2, at 57-60. The statute notably did not refer to Jesus, reflecting the intent of Madison, Jefferson, and others that its protection should extend to "the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination." 1 Writings of Thomas Jefferson 62 (P. Ford ed. 1892).
[26] Green, *Separating Church and State*, *supra* n.2, at 65-75; *see also* U.S. Const, art. VI, cl. 3.

First Amendment of the Bill of Rights.  Like the Constitution, the Bill of Rights mentioned neither God nor the Bible.  Madison's Virginia experience and his strong opposition to both governmental promotion of religion and governmental interference with religious exercise were indubitably a strong factor in his resolve to see the Religion Clauses enacted. He ushered the amendment through the House debate, fending off proposals that would have lessened its scope and effect.  He then served on the House-Senate conference committee where he again defeated efforts to weaken its language.  Although Madison is not solely responsible for the First Amendment, no other person had a greater impact on its enactment,[27] a role that the members of the U.S. Supreme Court have recognized as far back as *Reynolds v. United States*,[28] through *Everson v. Board of Education*,[29] and beyond.

25.     These historical events and writings evince that the fundamental concerns and principles animating the Religion Clauses include that:

- Government should not coerce or promote religious fealty or any religious belief.[30]

- No person's standing in the political community should be contingent upon their religious beliefs, or lack thereof.

- No person's access to public benefits should be contingent upon affirming any article of faith.

- Government should not take a position on any religious doctrine or promote any denomination or denominational belief or practice as favored or preferred.[31]

---

[27] Richard Labunski, *James Madison and the Struggle for the Bill of Rights* (New York: Oxford Univ. Press, 2008), 179-240; Green, *The Second Disestablishment*, *supra* n. 2, at 64-72; Green, *The Grand Collaboration*, *supra* n. 2, at 144-154.

[28] 98 U.S. 145, 163-64 (1878).

[29] 330 U.S. 1. 11-13, 33-41 (1947).

[30] Mark Storslee, "History and the School Prayer Cases," 110 U.Va. L. Rev. 1619, 1683 (2024) ("Founding-era proponents of religious liberty condemned any governmental attempt to command formal acts of worship through law, no matter how permissively such laws functioned in practice."). *See also* Michael McConnell, "Establishment and Disestablishment at the Founding," 44 Wm. & Mary L. Rev. 2105, 2131 (2003) ("An establishment [of religion] is the promotion and inculcation of a common set of beliefs through governmental authority.").

[31] *See* Letter from Thomas Jefferson to Samuel Miller, Jan. 23, 1808, FOUNDERS ONLINE, https://bit.ly/31BeShI (asserting that government officials were "interdicted by the constitution from intermeddling with religious

26.     Madison, Jefferson, and other Founders repeatedly affirmed these core principles, and elaborated on them, even after the ratification of the First Amendment.  For example, Jefferson explained that the Religion Clauses were concerned not only with coercion sanctioned by "fine & imprisonment" but also with governmental action that could result in "some degree of proscription perhaps in public opinion."[32]  Thus, to him, a mere governmental "recommendation" of religious practice, even without the backing of legal force, was no "less a law of conduct for those to whom it is directed."[33]  Madison likewise wrote in 1820 that even governmental "recommendation only" concerning religion "naturally terminates in a conformity to the creed of the major[ity] and of a single sect, if amounting to a majority."  Government promotion of religious doctrine and, in particular, declaring what version of a religious doctrine is true and correct, was anathema to members of the founding generation.[34]

## V.     The Historical Record Demonstrates that the Declaration of Independence, the U.S. Constitution, and the Bill of Rights—the Three Primary Founding Documents Establishing the American Government and Legal System—and the American Legal System More Generally, Were Not Based on the Ten Commandments.

27.     The Declaration of Independence, the U.S. Constitution, and the Bill of Rights serve as the primary source of authority and ideals that underlie the American government and legal system.  None of these documents were based on the Ten Commandments.  Indeed, there is simply no historical evidence for concluding that the Framers of the Declaration, Constitution, or Bill of Rights or their contemporary political and legal figures considered the Ten Commandments

---

institutions, their doctrines, disciplines, or exercise. . . . I do not believe it is for the interest of religion to invite the civil magistrate to direct . . . its doctrines.").

[32] *Ibid.*

[33] *Ibid.*

[34] James Madison, Detached Memoranda, ca. Jan. 31, 1820, FOUNDERS ONLINE, https://bit.ly/3HGs2e7; *see also* John Leland, The Rights of Conscience Inalienable, Jan. 1, 1791, in *Evans Early American Imprint Collection* at 10, U. MICH. LIBRARY DIGITAL COLLECTIONS, https://name.umdl.umich.edu/N18125.0001.001 ("[T]he minds of men are biassed[] to embrace that religion which is favored and pampered by law[] (and thereby hypocrisy is nourished) while those who cannot stretch their consciences to believe any thing and every thing in the established creed[] are treated with contempt and opprobrious names; and by such means some are pampered to death by largesses[] and others confined from doing what good, they otherwise could, by penury.").

to be a basis for either American law or government.[35]  On the contrary, the three documents reflect the overwhelming influence of Enlightenment rationalism on ideas of governance and the rule of law.   Additionally, as discussed above, the Framers were acutely aware of the need to accommodate the country's religious diversity, which was remarkable for the time, to refute the notion that government had any role in declaring and promoting religious doctrine, and to avoid the religious persecution and strife that had historically stemmed from government establishments of religion and encroachments on religious exercise, both in the colonies and in Europe.

28.     The significant sources of law for the American colonies were broad and varied. With the exception of a short-lived experiment in the New England Puritan colonies (Massachusetts Bay, New Haven, Connecticut, and Plymouth),[36] the colonies generally relied on secular sources for the law, not the Bible. Yet, even in the Puritan colonies, reliance on the Ten Commandments (as opposed to reliance on biblical law as a whole) was proportionately insignificant and largely limited to certain criminal and domestic laws, such as blasphemy and adultery.  Indeed, as Calvinists, Puritans believed they were bound by the New Testament, rather than by the Old Testament, where the Ten Commandments are found.  Thus, even though many early Puritan leaders believed in the supremacy of biblical law, they relied primarily on secular sources for the bulk of their laws, including those governing property ownership and inheritance. And the Glorious Revolution of 1688-89 in England, which led to a similar revolt in Boston to overthrow the Governor General of the Dominion of New England, quickly brought an end to this

---

[35] *See* Paul Finkelman, "The Ten Commandments on Courthouse Lawn and Everywhere," 73 Fordham L. Rev. 1477 (2005); Steven K. Green, "The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," 13 J.L. & Religion 101 (2000).

[36] For example, the *Lawes and Libertyes* of Massachusetts Bay (1641) cited to scriptural authority for several offenses and behavioral rules.  Other New England colonies borrowed from the Massachusetts code.

"religious experiment," resulting in a new charter in Massachusetts Bay that removed almost all references to biblical law and replaced them with common law practices and procedures.[37]

29.    Putting aside the Puritan colonies' abandoned early legal codes, the principal early sources were the common and statutory law of England, as well as the law of the non-common law courts of England, such as equity, chancery, admiralty, and ecclesiastical courts.[38]

30.    Many legal historians consider the Magna Carta of 1215 to be a seminal source of modern English and American law.  It addressed various legal subjects, including inheritance, land ownership and sale, taxation, jury trials and trial procedure, proportionality in punishment, and the taking of property without compensation. In so doing, it set forth principles that are central to our legal rights and system today, including the understanding that no person can be "seized or imprisoned, or stripped of his rights or possessions … except by the lawful judgment of his equals or by the law of the land."[39]

31.    Colonialists were also highly influenced by the 1689 English Bill of Rights, which made the monarchy subject to the laws of Parliament and established legal rights and relationships for British citizens (*e.g.*, freedom of speech, no excessive bail and fines, no cruel and unusual punishment, and the right to a jury trial).[40]

32.    Many of the colonies incorporated liberties guaranteed by Magna Carta and the English Bill of Rights directly into their laws and governing documents.  Neither Magna Carta nor the English Bill of Rights referred to either the Ten Commandments as a whole or to any specific

---

[37] George Lee Haskins, *Law and Authority in Early Massachusetts* (New York: Macmillan, 1960), 158-162.
[38] Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.35, at 1500-1504.
[39] *See* Bernard Schwartz, *The Great Rights of Mankind: A History of the American Bill of Rights* (New York: Oxford Univ. Press, 1977), 2-8.
[40] *Ibid.* at 21-23; Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.35 at 1503-1504.

commandment.[41]   Another influential source on the development of early American law was William Blackstone's *Commentaries on the Law of England* (1765-69).   Even though the *Commentaries* included a section on "Offenses Against God and Religion"—not surprising since Blackstone defended the established Church of England and prosecutions for blasphemy—and Blackstone asserted that the ultimate authority for the law was "divine law" as revealed in the scriptures, he recognized that a high proportion of legal matters were controlled by a secular body of "municipal or civil law." Despite his discussions about ecclesiastical and religious influences on the law, Blackstone did not claim that the Ten Commandments served as a basis for English law.[42]

33.     An analysis of the three central Founding documents and other political writings of the time demonstrates that the lack of influence of the Ten Commandments on colonial law continued into the Founding period. The Declaration of Independence does not cite the Ten Commandments, or even the Bible more generally, as the foundation of the American government and law;  nor does the Declaration of Independence incorporate any aspects of the Ten Commandments. Rather, the document proclaimed that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed." Indeed, although the Declaration includes allusions to Nature's God and natural law/rights, even these prefatory religious references are not acknowledgments of a law-giving biblical God.[43]   They must be understood in the context

---

[41] *See* Bernard Bailyn, *The Ideological Origins of the American Revolution* 22-54 (Harvard Univ. Press, 1967); Neil H. Cogan ed., *Contexts of the Constitution* (New York: Foundation Press, 1999), 657-666, 686-692; Steven K. Green, "The Mixed Legacy of Magna Carta for American Religious Freedom," 32 J.L. & Religion 207 (2017). Although both made passing references to "God," these references were highly formalistic and bore no relationship to the substance of the documents.

[42] William Blackstone, *Commentaries on the Laws of England*, ed., Charles Harr (Boston: Beacon Press, 1962), 2:38-45, 4:41-61.

[43] All four of the deific allusions in the Declaration—Nature's God, Creator, Supreme Judge, and Providence—reflect Enlightenment, natural law terminology, not scriptural references. Green, *Inventing a Christian America*, *supra* n.2, at 166-172.

of Thomas Jefferson's embrace of Enlightenment thought: Jefferson, the primary author of the Declaration, and the Enlightenment writers on which he relied, distinguished natural law from Old Testament law, and these references to natural law suggest a *rejection* of the notion that the Declaration pertains to biblical law or the Ten Commandments.[44]

34.    Significantly, the Constitution and the Bill of Rights, which set forth the framework for the U.S. legal system and government, do not include even these perfunctory or formalistic references to God. Rather, the Constitution is "ordained" by "the People of the United States." Nor does either document incorporate into its text any commandment or other provision tied to a biblical source.[45] This is not surprising given the experience of the colonialists and the Framers' resulting vision for a secular government, as discussed above.

35.    Consistent with the text of the Constitution and the Bill of Rights, neither the Ten Commandments nor the Bible more generally received any explicit mention in the debates and publications surrounding the Founding documents. In the wide-ranging debates—reprinted in Madison's *Notes of the Debates in the Federal Convention*, the *Annals of Congress*, Farrand's *Records of the Federal Convention*, Elliot's *Debates in the Several State Conventions*, and elsewhere—the Founders mentioned Roman law, European Continental law, British law, and various other legal systems. But as can best be determined, no delegate cited the Ten Commandments or the Bible as an authority or foundation for any provision included in the Constitution.[46] In fact, the debates confirmed the Framers' belief that minimizing any connection

---

[44] In fact, Jefferson, doubted the authenticity and authority of the Ten Commandments. In a letter to John Adams, Jefferson wrote that "the whole history of [the Ten Commandments] is so defective and doubtful that it seems vain to attempt minute enquiry into it; and such tricks have been plaid with their text … that we have a right, from that cause, to entertain much doubt what parts of them are genuine." Letter from Thomas Jefferson to John Adams, Jan. 24, 1814, *The Adams-Jefferson Letters*, ed. Lester J. Cappon (Chapel Hill, Univ. of North Carolina Press, 1987), 421.
[45] Green, *Inventing a Christian America*, *supra* n.2, at 178-182.
[46] On August 10, 1787, during the Constitutional Convention, it appears that Benjamin Franklin made an oblique reference to one of the commandments during a debate over whether to include a wealth qualification for the President and members of Congress: "We should remember the character which the Scripture requires in rulers, that they should

between religious law and civil law was integral to American liberty. For example, James Madison noted in one debate that "Religion itself may become a motive to persecution & oppression. These observations are verified by the Histories of every Country ancient & modern."[47]  And George Reid of Delaware declared, in a debate over the power of Congress, that "the Legislature ought not to be too much shackled. It would make the Constitution like Religious Creeds, embarrassing to those bound to conform to them & more likely to produce dissatisfaction and Scism, than harmony and union."[48] Ultimately, the only significant discussion of religion during the debates led to the clause prohibiting religious tests for holding office—and, thereby, rejecting any endorsement of a preferred legal status for Christianity or any other faith.

36.     Similarly, neither the "Bible" nor "scripture" nor the "Ten Commandments" appears in the *Federalist Papers*, which are generally considered to set forth the most important discussions of the meaning of the Constitution at the time of ratification. The *Federalist Papers* included only a handful of passing allusions to "God" and "gods," the "Almighty," "Heaven," and to religion. In one place (*Federalist* 43), for example, Madison referred to "the transcendent law of nature and of nature's God." But, like the religious references in the Declaration, this language was an allusion to the Enlightenment concept of natural law rather than of an Old Testament God. Instead of asserting a connection between biblical law and the new nation, most references to religion in the *Federalist Papers* denounced religious factions and intolerance and the mixing of church and state.[49] As Madison wrote in *Federalist* 10, "A zeal for different opinions concerning religion, concerning government, and many other points . . . have, in turn, divided mankind into

---

be men hating covetousness." Max Farrand, *Records of the Federal Convention* (New Haven: Yale Univ. Press, 1911), 2:249.  Otherwise, there are no references to the Ten Commandments or to a commandment in the three volumes of Farrand's *Records*.

[47] *Ibid.* at 1:135.

[48] *Ibid.* at 1:583.

[49] *The Federalist Papers,* ed., Clinton Rossiter (New York: New American Library, 1961), nos. 10, 43, and 51.

parties, inflamed them with mutual animosity, and rendered them much more disposed to vex and oppress each other than to co-operate for their common good."[50]

37.     In sum, it is my expert opinion that the three Founding documents establishing the American government and legal system are not premised on or rooted in the Ten Commandments, demonstrating that there is no historical basis for singling out the Ten Commandments as seminal in the formation of American law and government.  On the contrary, the historical record reveals that the Ten Commandments had minimal impact on the development of American law.

## VI.    There is No Evidence of a Longstanding Historical Acceptance and Practice of Widespread, Permanent Displays of the Ten Commandments in Public-School Classrooms.

38.     When the U.S. Constitution and First Amendment were drafted, *public* schooling was essentially nonexistent.  Education at the time of the Founding occurred in *private* academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers.[51] Only in New England were there town "district" schools for children to attend, but these quasi-public prototypes required parents to pay a "rate," and, again, the teachers were largely local clergy. "Almost everywhere and in every case, the avowed purpose of founding schools was religious: the schools were there to make Christians."[52]  As a result, early textbooks, like the popular *New England Primer*, included religious references, using scripture to teach spelling or reading, and were designed chiefly to inculcate religious fealty.[53] Practices in these handful of prototype schools thus offer little insight into the history of *public* education and the Ten

---

[50] *Ibid.*, n.10.
[51] Carl Kastle, *Pillars of the Republic: Common Schools and American Society* (New York: Hill & Wang, 1983), 13-29.
[52] Warren A. Nord, *Religion and American Education* (Chapel Hill: Univ. of North Carolina Press, 1995), 64-65.
[53] *Ibid.*, 64-65; Edward P. Cubberley, *Readings in the History of Education* (Boston: Hughton Mifflin Co., 1911), 311-315; Richard L. Venezky, "A History of the Reading Textbook," 87 *Elementary Sch. J.* 246 (1987) ("Calvinism, with its stress on innate evil and the omnipotence of a wrathful God, had no room for readiness or multistage development. The child's interests were irrelevant to the need to inculcate the religious beliefs of the adult society.").

Commandments, but even so, there is a lack of evidence that these schools permanently displayed the Ten Commandments on classroom walls.

39.    Believing that an educated citizenry was essential for the survival of the new republic, education reformers pushed for the establishment of publicly operated and funded "common schools" in the early 1800s.[54]  To that end, in 1826, Massachusetts created the first state board of education, which was mandated to provide universal, "non-sectarian," public education. Under the leadership of Horace Mann, the board eliminated doctrinal religious instruction but retained use of the Bible to inculcate "universal" Christian morals; Mann believed that the Bible was to be read without "note or comment"—to "let the Bible speak for itself."[55] Other states eventually followed suit, likewise authorizing free, common schools that offered a liberal education, with some permitting limited "nonsectarian" religious activities such as prayers and Bible reading.[56]

40.    However, even these scaled-back religious practices in common schools were deeply controversial and not universally accepted, in part, because they required students of minority faiths to receive official government indoctrination in the religious doctrine of another faith or denomination.  The Bible readings exclusively used the Protestant King James version of the text, and its use quickly drew the opposition of Catholics and Jews; in fact, "requiring religious exercises in the public schools garnered resistance from the beginning."[57] Indeed, the history of

---

[54] Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 13-16. Thomas Jefferson recommended the creation of grammar schools "for teaching reading, writing, and arithmetic" and was against "putting the Bible and Testament into the hands of the children, at an age when their judgments are not sufficiently matured for religious enquiries." *See* Thomas Jefferson, *Notes on the State of Virginia* (1787), ed. William Penden (Chapel Hill: Univ. of North Carolina Press, 1982), 146-147.
[55] Horace Mann, *The Twelfth Annual Report of the Board of Education* (Boston: Dutton & Wentworth, 1849), 116-117 (maintaining that "all dogmatical theology and sectarianism [have been] sacredly excluded.").
[56] Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 20-24.
[57] *Ibid.* at 16-36. Storslee, "The School Prayer Cases," *supra* n.30, at 1690 ("The practice of requiring religious exercises in schools appears never to have achieved anything like a ubiquitous practice, even in its heyday.").

religious exercises in America's public schools, to the extent they occurred, is one of dissension, exclusion, conflict, and litigation, beginning in the 1840s with the first organized Catholic opposition to religious instruction.  In 1840, the nation's Catholic bishops issued a pastoral letter denouncing the use of the King James Bible and Protestant-biased textbooks, such as the McGuffey *Reader*: "We can scarcely point out a book in general use in the ordinary schools . . . wherein covert and insidious efforts are not made to misrepresent our principles, to distort our tenets, to vilify our practices, and to bring contempt upon our Church."[58]  Notably, in 1844, the Philadelphia "Bible riots" led to three days of clashes between Nativist Protestants rallying in support of the use of the Protestant Bible in Philadelphia's public schools and Irish Catholics protesting it. During the riots, buildings were set on fire, hundreds of thousands of dollars in property damage occurred, thousands of people were displaced from their homes, and at least twenty people died.[59]

41.    Conflicts over religious exercises in public schools continued throughout the nineteenth century and beyond.[60] My research, and that of other scholars, has documented approximately thirty reported court cases between 1850 and 1960 involving challenges to public-school religious exercises,[61] demonstrating that these practices were not universally permitted or

---

[58] Peter Guilday, *The National Pastorals of the American Hierarchy (1792-1919)* (Washington, DC: National Catholic Welfare Council, 1923), 132-134.

[59] Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 80-84.

[60] *See generally ibid.*; *see also, e.g.*, *Engel v. Vitale*, 370 U.S. 421 (1962); *Abington Twp. Sch. Dist. v. Schempp*, 374 U.S. 203 (1963).

[61] Decisions upholding prayer and/or Bible reading in public schools, prior to the Supreme Court's decisions in *Engel* and *Schempp*, included: *Donahoe v. Richards*, 38 Me. 379 (1854); *Commonwealth v. Cooke*, 7 Am. L. Reg. 417 (Mass. 1859); *McCormick v. Burt*, 95 Ill. 263 (1880); *Moore v. Monroe*, 20 N.W. 475 (Iowa 1884); *Hart v. Sch. Dist. of Sharpsville*, 2 Lanc. 346 (Pa. Comm. 1885); *Nessle v. Hum*, 1 Oh. N.P. Rpts 140 (1894); *Pfeiffer v. Bd. of Educ.*, 77 N.W. 250 (Mich. 1898); *Curran v. White*, 22 Pa. Cty Rpts 201 (1898); *Stevenson v. Hanyon*, 7 Pa. Dist. 585 (1898); *Billard v. Bd. of Educ.*, 76 P. 422 (Kan. 1904); *Hackett v. Brooksville Graded Sch. Dist.*, 87 S.W. 792 (Ky. 1905); *Church v. Bullock*, 109 S.W. 115 (Tex. 1908); *Wilkerson v. City of Rome*, 110 S.E. 895 (Ga., 1922); *Kaplan v. Independent Sch. Dist.*, 214 N.W. 18 (Minn. 1927); *People ex rel. Vollmar v. Stanley*, 255 P. 610 (Col. 1927); *Doremus v. Bd. of Educ.*, 75 A.2d 880 (N.J. 1950). Cases barring prayer and/or Bible reading in public schools included: *Bd. of Educ. v. Minor*, 23 Ohio St. 211 (Ohio 1873); *Weiss v. Dist. Bd. of Sch. Dist. No. 8*, 44 N.W. 967 (Wis. 1890); *Freeman v. Scheve*, 91 N.W. 846, 847 (Neb. 1902); *State ex rel. Freeman v. Scheve*, 93 N.W. 169 (Neb. 1903); *People ex rel.*

accepted.[62]

42.    Other data supports this conclusion.  As the nineteenth century drew to a close, many public schools no longer engaged in religious practices. In the mid-1880s and 1890s, U.S. Commissioner of Education, William T. Harris, issued a series of reports on curriculum and educational practices in the nation's public schools, based on surveys sent to local school districts. The surveys collected information regarding, among other topics, the prevalence of religious exercises in schools, showing that they had significantly declined in the closing decades of the century, particularly in urban areas and in the West.[63]

43.    Looking more specifically at the Ten Commandments, the evidence for a longstanding historical practice and acceptance of widespread use of the Ten Commandments, let alone its permanent display in public-school classrooms does not exist. Some Texas lawmakers have pointed to early textbooks to broadly assert that the Ten Commandments have been a prominent part of American public education from the start.[64] However, in examining early textbooks and their use in more detail, it is my conclusion that there is no historical evidence to support this claim.

44.    As noted above, *supra* ¶ 38, the *New England Primer*, which first appeared around 1690 and was republished into the early nineteenth century, had the central purpose of inculcating

---

*Ring v. Bd. of Educ.*, 92 N.E. 251, 254-256 (Ill. 1910); *Herold v. Parish Bd. of Sch. Dirs.*, 68 So. 116 (La. 1915); *State ex rel. Dearle v. Frazier*, 173 P. 35 (Wash. 1918); *State ex rel. Finger v. Weedman*, 226 N.W. 348 (S.D. 1929); *Zellers v. Huff,* 236 P.2d 949 (N.M. 1951).

[62] Green, *The Bible, the School, and the Constitution*, *supra* n.2, at 93-136, 236-243; Albert Levitt, "Compulsory Bible Reading in Public Schools," 99 Central L.J. 77-83, 93-103 (1925); Bruce J. Dierenfield, *The Battle Over School Prayer* (Lawerence, KS: Univ. Press of Kansas, 2007), 23-66.

[63] See, for example, William T. Harris, *Report of the Commissioner of Education for the Year 1888-1889* (Washington, DC: Government Printing Office, 1890), 622-634.

[64] *See S.B. 10 S. Debate*, 2025 Leg., 89th Reg. Sess. 3:07:30-3:08:04; 3:13:06-3:13:25 (March 18, 2025), available at https://senate.texas.gov/videoplayer.php?vid=21349&lang=en (statement of Sen. King); *S.B.10 Hearing Before H. Comm. on Pub. Educ.* 6:15:13-6:15:32 (April 29, 2025), available at https://house.texas.gov/videos/21958 (statement of Rep. Noble);  *S.B. 10 H. Debate*, 2025 Leg., 89th Reg. Sess. 5:57:06-5:58:02 (May 21, 2025), available at https://house.texas.gov/videos/22201 (statement of Rep. Noble); *S.B. 10 H. Debate*, 2025 Leg., 89th Reg. Sess. 4:59:12-5:00:12 (May 24, 2025), available at https://house.texas.gov/videos/22257 (statement of Rep. Noble).

religious fealty along sectarian, Calvinist lines—"the primer was a codification of primary religious creed."[65] But the *Primer* was used chiefly, if not exclusively, in *religiously* run schools,[66] and, importantly, it fell into disuse during the early decades of the nineteenth century, before the rise of public education.[67] Thus, as a matter of historical methodology and analysis, it does not represent a precedent for, or provide evidence of, later practices in *public* schooling.[68]

45.     Noah Webster (1758-1843) authored various textbooks used in the early 1800s; his *American Spelling Book*, first published in 1783, was the most popular speller into the mid-nineteenth century.[69] Early in his career, Webster was a leader in the nonsectarian reform movement and opposed religiously infused curriculum, and his spellers and readers made only occasional references to "commandments." For example, the 1839 edition of his speller includes only one mention of the commandments: "Fear God, and keep his commandments, for this is the whole duty of man." Similarly, the 1863 *Speller* states in a single entry: "God is the divine legislator. He proclaimed his ten commandments from Mt. Sinai." Significantly, the words "commandment" or "commandments" do not appear in the book's 1795, 1808, 1822, 1843, 1848, 1857, 1866, 1880, and 1908 editions. References to the Ten Commandments or "commandments" are also missing from Webster's *American Selection of Lessons in Reading and Speaking*, another popular reader, which was discontinued in the early 1800s.[70]

---

[65] Venezky, "A History of the Reading Textbook," *supra* n.53, at 248-250.

[66] McConnell, "Establishment and Disestablishment at the Founding," *supra* n.30, at 2171 (At the time, "there was no such thing as a secular school; all schools used curriculum that was embued with religion. The *New England Primer*, of which some three million copies were printed, consisted largely of a hornbook and catechism.").

[67] According to Edward P. Cubberley, schools abandoned using the *Primer* in the early 1800s, before the advent of public schooling. Cubberley, *Readings in the History of Education*, *supra* n. 53, at 314.

[68] Venezky, "A History of the Reading Textbook," *supra* n.53, at 248-250; Cubberley, *Readings in the History of Education*, *supra* n.53, at 311-315.

[69] The original title of the 1783 edition was the "Grammatical Institute of the English Language, Part One." The speller was followed by a grammar book and a reader. By 1786, the title had been changed to the "American Spelling Book," and in the 1820s, it was published as "The Elementary Spelling Book."

[70] Venezky, "A History of the Reading Textbook," *supra* n.53, at 250; Noah Webster, *The Elementary Spelling Book, being an Improvement on the American Spelling Book* (Portland, ME: O.L. Sanborn, 1829, 1839), 168. Noah Webster, *American Selection of Lessons in Reading and Speaking* (New York: Geo. Bunce & Co., 1788, 1790, 1794, 1800). I

23

46.    Another early textbook used in many common schools throughout the nineteenth century was the McGuffey *Readers*, which were written and compiled by Presbyterian minister William McGuffey. McGuffey wrote various *Readers* for grades one through six, with numerous editions that were republished into the early twentieth century.[71]  While some early editions of the *Readers* set out an excerpt of the Ten Commandments as part of a reading lesson, it was just one of dozens of lessons available to students and teachers.  For example, the 1853 edition of McGuffey's *Eclectic Second Reader* included 105 separate lessons, with only one lesson mentioning the "The Ten Commandments," listed last, starting at page 216.[72]  Other editions and versions did not reproduce the Ten Commandments verbatim, making only sporadic reference to a specific commandment, such as the prohibition on bearing false witness, as part of a lesson or story. References to the Ten Commandments in other editions and versions were even more attenuated. The 1853 edition of the *Third Reader*, for instance, includes an extract from the Sermon on the Mount: "Whosoever, therefore, shall break one of these least commandments . . . shall be least in the kingdom of heaven."[73]  The 1857 edition of the *Fifth Reader* stated that "the commandment of the Lord is pure, enlightening the eyes."[74]  Even then, references to a commandment are minimal when compared to the numerous lessons included in each book (up to 200 lessons per book, depending on the edition).  Still other editions and versions of McGuffey's

---

conducted word searches using digitized editions of the book available through the online resources Early American Imprints-Evans Digital Collection, HathiTrust digital service, and the Internet Archive.  Some editions are not available in digitized formats and were thus not searched.
[71] Gerry Bohning, "The McGuffey Eclectic Readers," 40 *Reading Teacher* 263 (1986).
[72] William H. McGuffey, *McGuffey's Eclectic Second Reader* (Cincinnati: Sargent, Wilson & Hinkle, 1853), at 216-217, https://archive.org/details/mcguf2ndread002mcguffey/page/216/mode/2up.
[73] William H. McGuffey, *McGuffey's Eclectic Third Reader* (Cincinnati: Winthrop R. Smith, 1853), at 134-135, https://ar chive.org/details/mcguffeysnewlyre01mcgu/page/134/mode/2up.
[74] William H. McGuffey, *McGuffey's Eclectic Fifth Reader* (Cincinnati: Winthrop R. Smith, 1857), at 111, https://ar chive.org/details/mcguffeysnewfour05mcgu/page/110/mode/2up.

*Readers*, especially later ones, did not include any reference, oblique or otherwise, to any of the commandments.[75]

47.    In sum, the Ten Commandments, even when used or referred to in *McGuffey*'s *Readers*, were not a significant aspect of the texts, and the extent to which common-school teachers may have relied on those particular readings and spelling lessons, as opposed to the dozens of others available in the same book, cannot be verified. Moreover, references to the commandments were largely eliminated in later versions of the *Readers,* and while the *Readers* were used in many common schools from their initial publication through the early twentieth century, reliance on them tapered as public schools turned to other available options.[76]  It follows that, as a matter of historical methodology and analysis, the common schools' use of these early textbooks, standing alone, does not demonstrate widespread use of the Ten Commandments in public schools.  Nor does it demonstrate a longstanding historical acceptance of an entirely *distinct* practice— permanently displaying the Ten Commandments in public-school classrooms.

48.    The available data and research further support my conclusion that there is no longstanding, widespread history of permanently displaying the Ten Commandments in public-

---

[75] I conducted word searches though digitized editions of the books available through online resources, including Early American Imprints, Evans Digital Collection, the HathiTrust digital service, the Internet Archive, and Project Gutenberg. The editions and versions I reviewed included all six levels of the *Readers* with edition dates ranging from 1844 to 1920 (a total of 36 books). The word "commandment" or "commandments" occurred primarily in the Third and Fourth *Readers* and varied between one to three references per book out of 100-200 lessons per book. The 1848 Second *Reader* included three references to a commandment, with that number reduced to one reference in the 1853 edition, and then no references in subsequent editions of the Second *Reader* in 1866 and 1880. In contrast, a sampling of the First, Fifth, and Sixth Readers between 1865 to 1901 uncovered no references to the commandments.

[76] To be sure, despite the minimal role of the Ten Commandments in the *Readers*, they nevertheless included significant religious content aimed at inculcating Protestant religious beliefs. *See* Henry Steele Commager, *Forward* to *McGuffey's Sixth Eclectic Reader* (New York: New American Library, 1962), ix; John H. Westerhoff, *McGuffey and His Readers: Peity, Morality, and Education in Nineteenth-Century America* (Nashville: Abington Press, 1978). Indeed, for that reason, many viewed the *Readers* as anti-Catholic. Ruth Miller Elson, *Guardians of Tradition: American Schoolbooks of the Nineteenth Century* (Lincoln: Univ. of Nebraska Press, 1964), 47-54. But, just as the frequency of lessons referencing one or more commandments declined over time, so too did the overall religious content of the McGuffey *Readers*. According to one study, approximately 30% of the selections were religious in the 1844 *Fourth Reader*.  By the 1903 edition, the religious content of the *Readers* amounted to only 3%. John A. Nietz, "Why the Longevity of the McGuffey Readers?" 4 *Hist. Educ. Q.* 119 (1964).

school classrooms.  First, as a historian, considering the substantial religious turmoil and conflict that arose from the incorporation of prayer and Bible reading into some common schools, *supra* ¶¶ 40-41, I would expect to see similar responses if teachers in the common-school era were placing substantial or undue emphasis on early textbook lessons involving particular versions of Ten Commandments, or frequently putting up permanent displays of the commandments in classrooms, especially in light of the denominational differences among various versions of the Ten Commandments. *See infra* ¶¶ 52-58.  This was not the case, however.  For example, out of the thirty reported legal challenges to religious instruction listed above, *supra* n.61, only two involved an issue about the Ten Commandments, and neither case involved the posting of the commandments on classroom walls.[77]

49.     Second, the surveys conducted by the U.S. Commissioner of Education in the mid-1880s and 1890s, *supra* ¶ 42, did not reflect any specific, routine practice of displaying the Ten Commandments in classrooms or otherwise using them in classroom instruction.[78]  Third, I also examined various editions of Thomas Cooley's popular nineteenth-century legal treatise, *Constitutional Limitations*, for any discussion regarding the use of the Ten Commandments in the public schools (all editions of Cooley's treatises include information pertaining to religious liberty

---

[77] *See Commonwealth v. Cooke*, 7 Am. L. Reg. 417-326 (Mass. 1859); *Pfeiffer v. Board of Educ.*, 77 N.W. 250 (Mich. 1898).

[78] *See, e.g.*, William T. Harris, *Report of the Commissioner of Education for the Year 1888-1889* (Washington, DC: Government Printing Office, 1890), 622-634; *ibid.* (1893-1895), at 2:1656; *ibid.* (1896-1897), at 2189-2191; *ibid.*, (1897-1898), at 1539-1563.  Using the digital search resource HathiTrust, I searched fourteen years of Commission Reports, from 1884 to 1898, during Harris's tenure as commissioner.  Aside from a handful of references to using the Ten Commandments in British, Canadian, and parochial schools, I found only two entries that might indicate limited references to them in a few American public schools. The 1886-1887 *Report* includes a quotation from a school superintendent in North Carolina who stated that "the Ten Commandments embody great principles" that represented "*eternal* truth, binding upon men before they were commanded by God on Mount Sinai." *Report of the Commissioner, 1886-1887*, 201.  The 1897-1898 *Report* relates a "sentiment" prepared for use in Wisconsin schools in patriotic exercises that states: "The best citizen, the best patriot, and the best sone of his country, is he who gives the best manhood to his country.  He is the man who writes upon his nature the Ten Commandments and the Nine Beatitudes." *Report of the Commissioner, 1897-1898*, at 2:1555.  Yet, in neither entry is there any indication that the commandments were used in classrooms or posted on classroom walls.

and religious exercises in public schools). The treatises' treatment of religious-liberty issues generally, and religious exercises in the public schools more specifically, do not refer to the posting of the Ten Commandments or its use in public schools' curricula.[79]

50. Finally, as far as I am aware, no state law specifically permitted or mandated the posting of the Ten Commandments in public schools prior to 1927. A 1912 Columbia Teachers' College study of state regulations of religious activities in public schools over the previous century listed various laws authorizing the use of the Bible in public schools, but none referenced the Ten Commandments. A later study by two professors at Gettysburg College likewise did not indicate any laws or regulations specifically pertaining to the use of the Ten Commandments in the schools.[80] The first state law specifically permitting the display of the Ten Commandments was not enacted until 1927, when the North Dakota legislature approved a measure providing that "[t]he board of a school district may . . . [a]uthorize schools within the district to display the ten commandments with a display of other historical documents in the school and in a classroom."[81] The statute was later struck down by a federal court.[82]

51. Based on all the factors discussed above, *supra* ¶¶ 38-50 and the lack of compelling counterevidence, it is my expert judgment that the Ten Commandments were *not* a prominent part of American public education for the two centuries preceding the Supreme Court's decision in

---

[79] *See, e.g.*, Thomas Cooley, *A Treatise on the Constitutional Limitations*, 2nd ed. (Boston: Little, Brown & Co., 1871), 516-527; *ibid*., 3rd ed. (1874), at 467-481; *ibid.*, 4th ed (1878), at 584-589; *ibid*., 6th ed. (1890), at 577, 583-586; *ibid.*, 7th ed. (1903), at 659-688.

[80] Jarome K, Jackson and Constanne F. Malmberg, *Religious Education and the State* (Garden City, NY: Doubleday, Doren & Co., 1928), 1-14.

[81] *See* NDCC, 15.1-09-33; "S.L. 1927, c. 247, ss 1, 2. A search of the digital service, Hein Online State Statutes: A Historical Archive, which covers the late colonial period through the mid-twentieth century, produced only one other early twentieth-century state statute authorizing the use of the Ten Commandments in the public schools, Maine Rev. Statutes, ch. 19, sec. 125, 1930.

[82] *See Ring v. Grand Forks Pub. Sch. Dist.*, 483 F. Supp. 272 (N.D. 1980) (holding that the statute violated the Establishment Clause of the First Amendment).

*Stone v. Graham*.[83]   Nor more specifically, in my expert opinion, is there evidence of a longstanding, let alone unbroken, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools.

**VII.    The Version of the Ten Commandments Adopted Under S.B. 10 is Protestant and Thus Religiously Exclusive.**

52.    The Ten Commandments are set forth in Chapter 20 of the Book of Exodus and repeated (although not word-for-word) in Chapter 5 of the Book of Deuteronomy (Chapter 34 of Exodus also discusses the Ten Commandments).   Many religions do not accept the Ten Commandments as authoritative doctrine and/or do not consider it to be a part of their religious tradition, including but not limited to Eastern religions, such as Hinduism, Buddhism, Taoism, Jainism, and Sikhism, and earth-based and humanistic religions.   Of non-Judeo-Christian faiths, Muslims make up one of the larger groups in the United States.[84]   The Qur'an contains no listing of the Ten Commandants, and there is a lack of consensus among the various branches of Islam as to its authority.   Because "[t]he Qur'an does not contain a passage commonly known as the Ten Commandments," many Muslims would likely not identify it as being part of their faith tradition.[85]   Some Christian denominations, such as Jehovah's Witnesses, regard the Ten Commandments as having theological significance but believe that the commandments are not binding on them.   Other

---

[83] 449 U.S. 39 (1980).

[84] *See, e.g.*, Muslim Population by State 2025, WORLD POP. REV., https://worldpopulationreview.com/state-rankings/muslim-population-by-state.

[85] Sabastian Gunther, "Oh People of Scripture! Come to a Word Common to You and to Us (Q. 3:64):  The Ten Commandments and the Qur'an," *Journal of Qur'anic Studies* 9 (2007): 28-58, 29. The Qur'an obliquely refers to the Ten Commandments twice, without listing it. *See* Qur'an 2: 83-84, 7: 142-145. "As far as the Decalogue is concerned, the Qur'an does not cite details of any of the Commandments." Liyakat Takim, "The Ten Commandments and the Tablets of Shi'i and Sunni Tafsir Literature: A Comparative Perspective," *The Muslim World* 101 (Jan. 2011): 94-109. Even though some parallels exist between the Ten Commandments and precepts in the Qur'an, such as adherence to monotheism and honoring one's parents, "there are differences between the catalogues of religious-ethical precepts in the Bible and in the Qur'an. These differences relate to the emphasis and wording of certain commandments. Moreover, there are other commandments in the Qur'anic lists that are entirely absent from the Biblical lists, just as particular Biblical commandments are not included in the Qur'an. . . . These findings make it impossible to speak of *one* code common to and equally binding on all three monotheistic religions." Gunther, "The Ten Commandments and the Qur'an," *supra*, at 45.

28

faith traditions that typically consider the Ten Commandments to be authoritative as a religious matter, including Protestants, Catholics, and Jews, have substantial differences among them with respect to religious teachings that pertain to the structure, content, and meaning of the commandments.[86]

53.    The version of the Ten Commandments mandated by S.B. 10 is Protestant in its *structure*: The ordering system is associated with, and derives from, the Protestant King James version of the Bible.  As discussed below, the numbering of the commandments differs between Protestant, Catholic, and Jewish versions.[87]

54.    Further, S.B. 10's version of the Ten Commandments is Protestant in its *content*, again being drawn from the Protestant King James translation of the Bible.[88]  The decision to use a Protestant translation of the Ten Commandments has substantial theological implications; there are significant differences and religious disputes between the Jewish, Catholic, and Protestant traditions when it comes to the content and meaning of the commandments.[89]

55.    As one example, the Hebrew Ten Commandments, and English translations followed by most Jews, explicitly exalt God's delivery of the Israelites from slavery: "I the LORD am your God who brought you out of the land of Egypt, the house of bondage."  This is "a statement of faith that in itself is a Commandment."[90]  For many Jews, this language is a critical recognition of their special relationship and covenant with God, and erasing this text may be considered deeply offensive to them as a spiritual matter.  The version of the Ten Commandments

---

[86] "Ten Commandments," *The Oxford Companion to the Bible* (New York: Oxford Univ. Press, 1993), 737 ("The enumeration of the commandments varies among the religious communities."); Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.35, at 1498-1499 (analyzing version of Ten Commandments nearly identical to version mandated by S.B. 10).

[87] Finkelman, "The Ten Commandments on the Courthouse Lawn and Elsewhere," *supra* n.35, at 1492.

[88] *Ibid.*

[89] *Ibid.* at 1495

[90] *Ibid.* at 1486. *See generally*, Ben-Tsiyon Segal and Gershon Levy, *The Ten Commandments in History and Tradition* (Jerusalem: Magnes Press, 1990) (discussing the uniqueness of the Decalogue and its place in the Jewish tradition).

adopted by Texas lawmakers states only, "I Am the Lord thy God;" it omits any reference to God's role in bringing the Jewish people out of Egypt and slavery.[91]  According to one commentary, for Jews, this prologue is "intimately connected to the first commandment ('You shall have no other gods before me'). . . . And the first commandment, together with the prologue, serves as the foundation upon which all the others stand. . . . Given the importance of the prologue to a correct understanding of the rest of the commandments [for Jews], excising it (for purposes of 'posting' the Decalogue in public places, for example) violates the intent of the commandments."[92]

56.     Further illustrating the conflict between the Protestant text of S.B. 10's official version of the Ten Commandments and Jewish beliefs about the commandments, S.B. 10 directs "Thou shalt not kill."  The Jewish version, however, admonishes, "You shall not murder."[93]  This "difference in translation is significant."[94]  As another scholar in this area of study has explained, "There is a clear legal difference between to kill and to murder, and this difference has had, and continues to have, important theological implications."[95]  Indeed, the state's decision to use the word "kill" instead of "murder" touches on a longstanding doctrinal controversy between religions that persists today.

57.     S.B. 10's Protestant version of the Ten Commandments is also at odds with views held by many Catholics. One notable example: Drawing from the King James Bible, S.B. 10 warns, "Thou shalt not make thyself any graven images."  However, most Catholic translations omit that prohibition.[96]  These differences in translation are "substantive" and "theological."[97]  A broad

---

[91] "Ten Commandments," *Oxford Companion*, *supra* n.86, at 737.
[92] "Ten Commandments," in *The Cambridge Dictionary of Christian Theology*, ed., Ian A. McFarland, et. al (Cambridge: Cambridge University Press, 2011), 106-107.
[93] Murder, *Oxford Companion*, 532.
[94] Finkelman, *supra*, at 1495.
[95] *Ibid.*
[96] *Ibid.* at 1493-94 (internal quotation marks omitted).
[97] *Ibid.* at 1494; "Idolatry," *Cambridge Dictionary of Christian Theology*, 234 (comparing the different Jewish, Protestant, and Catholic understandings of the use of idols).

prohibition on "graven images" could, for some Catholics, call into question the faith's reliance on and adoration of various religious statues. Moreover, the ordering of Protestant and Catholic versions of the Ten Commandments is different. Because Catholic versions omit the prohibition on graven images, most Catholics consider the prohibition on taking the Lord's name in vain as being the second Commandment, rather than being the third as it is for most Protestants and as is mandated under S.B. 10.[98]

58.     Despite any assertions to the contrary, because of the substantial doctrinal differences among those religions that consider the Ten Commandments to be part of their theology, it is my expert opinion that the version of Ten Commandments adopted under S.B. 10 is Protestant and *not* nondenominational. Moreover, even if there were a way to somehow reconcile the differences among faith systems that teach the Ten Commandments, S.B. 10's government-approved version is religiously exclusive in that it fails to include those religions that do not accept the Ten Commandments.

Respectfully submitted,

Steven K. Green, J.D., Ph.D.
July 2, 2025

---

[98] *See* "Graven Image" and "Idols," *Oxford Companion*, 261-262, 297-298 (describing the interchangeability of the terms "graven image" and "idol" in Hebrew and noting that "[s]trict prohibition of idolatry is one of the most distinctive features of Israelite religion," whereas many Christian denominations interpret the commandment quite permissively to allow idols and icons: "there are significant differences in practice between Roman Catholic and Orthodox churches, on the one hand, and some Protestant churches, on the other.").

# Exhibit A

**STEVEN KEITH GREEN**
Willamette University
900 State St., SE
Salem, OR 97301
503-370-6732
sgreen@willamette.edu

**CURRENT EMPLOYMENT**

**The Fred H. Paulus Professor of Law** and **Affiliated Professor of History and Religious Studies,** Willamette University, 900 State St., SE, Salem, OR 97301, (503) 370-6405. Teaching areas: Constitutional Law, First Amendment, Legal History, Education Law, Jurisprudence, Religious History, and Criminal Law.  (Professor rank since 2006).

**Associate Professor of Law** (2001-2005) Willamette University College of Law.

**Director**, Willamette Center for Religion, Law and Democracy, Willamette University (2007-2020).  Directed interdisciplinary academic program in religion and public life.

**EDUCATION**

**Ph.D.** in Constitutional History, University of North Carolina, Chapel Hill, 1997.

**M.A.** in American Religious History, University of North Carolina, Chapel Hill, 1987.

**J.D.**, University of Texas School of Law, 1981.

**B.A.** in History and Political Science (Religious Studies minor), Texas Christian University, 1978. *Magna Cum Laude*, Phi Beta Kappa.

Additional graduate study at Duke Law School and Duke Divinity School, 1986-1987.

**OTHER TEACHING EXPERIENCE**

**Visiting Assistant Professor**, Vermont Law School, 1988-1991. Taught courses in Church and State, Wills and Estates, Criminal Law, Lawyering (civil procedure, ethics and jurisprudence), Appellate Advocacy, and Legal Writing and Analysis.

**Guest Lecturer**, Georgetown University Law Center and Washington College of Law at American University, 1994-2001. Regular guest lecturer in church-state and First Amendment classes.

**Graduate Teaching Fellow**, University of North Carolina, 1986-1988. Lectured, led discussion groups, and graded papers and examinations in undergraduate history courses in American survey (both sections), American constitutional history, and military history.

1

**AWARDS**

Religious Liberty Award, Northwest Religious Liberty Association, 2016.
Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2014.
Religious Liberty Award, United Sikhs of Oregon, 2010.
Robert L. Misner Award for Scholarship Excellence, Willamette College of Law, 2006.
Professor of the Year Award for Teaching, Willamette College of Law, 2003.

**PUBLICATIONS**

**Books**

*"Infidel(ity):" The Gilded Age Battle Over Freethought, Free-Love, and Feminism* (forthcoming, Oxford University Press).

*The Grand Collaboration: Thomas Jefferson, James Madison, and the Invention of American Religious Freedom* (University of Virginia Press, 2024).

*Separating Church and State: A History* (Cornell University Press, 2022).

*The Third Disestablishment: Church, State, and American Culture, 1940-1975* (Oxford University Press, 2019).

*Inventing a Christian America* (Oxford University Press, 2015).

*The Bible, the School, and the Constitution: The Clash that Shaped Modern Church-State Doctrine* (Oxford University Press, 2012).

> Finalist, Oregon Book Award (2013); Nominated for the John Philip Reid Book Award by the American Society for Legal History (2013); Nominated for the Philip Schaff Prize by the American Society of Church History (2013).

*The Second Disestablishment: Church and State in Nineteenth Century America* (Oxford University Press, 2010).

*Religious Freedom and the Supreme Court*, with Ronald B. Flowers and Melissa Rogers (Baylor University Press, 2008).

**Book Chapters**

"The Supreme Court and Religion," *Routledge Handbook of Politics and Religion in Contemporary America* (Routledge, 2024).

"The Bible in American Law, Politics, and Rhetoric," *The Bible in the American Experience* (Society for Biblical Literature, 2020).

"The Public Funding of Private Religious Schools," *The Oxford Handbook of Religion and American Education* (Oxford University Press, 2018).

"The Nineteenth-Century 'School Question': An Episode in Religious Intolerance or an Expansion of Religious Freedom?" *The Lively Experiment: The Story of Religious Toleration in America* (Rowman & Littlefield, 2015).

"The Separation of Church and State in the United States," *Oxford Research Encyclopedia of American History* (Oxford University Press, 2015).

"The First School Prayer Debate and its Impact on Modern Church-State Doctrine," *Religious Freedom in America* (University of Oklahoma Press, 2015).

"Separationism as an Organizing Principle," *The Wiley-Blackwell Companion to Religious Diversity* (Wiley-Blackwell Pub., 2013).

"Religion and Law," *The Wiley-Blackwell Companion to American Legal History* (Wiley-Blackwell Pub., 2013).

## **Articles**

"The Indispensable Founders," *Liberty Magazine* (March-April, 2025): 10-13.

"303 Creative and the Corrosive Nature of Easily Decisions," *Univ. St. Thomas Journal of Law and Public Policy* 17 (2025): 534-554.

"First Amendment Imbalance: Kennedy v. Bremerton School District," *Notre Dame Law Review* 99 (2024): 101-120.

"Disrupted Symmetry: Assessing the Hazards of the Supreme Court's 'One-Sided' Separation of Church and State," *Liberty Magazine* (Nov.-Dec. 2023): 5-9.

"Religion Clause Chaos," *American Constitution Society Supreme Court Review* (2022).

"Requiem for State 'Blaine Amendments,'" *Journal of Church and State* 64 (2022): 437-457.

"The Supreme Court's Ahistorical Religion Clause Historicism," *Baylor Law Review* 73 (2021): 507-561.

"No Aid, No Agency," *William & Mary Bill of Rights Journal* 29 (2021): 1053-1096.

"The Legal Ramifications of Christian Nationalism," *Roger Williams Law Review* 26 (2021): 430-494.

3

"The Path No Taken: Reinhold Niebuhr, John Courtney Murray, and the Proposition of Church-State Separation," *Oxford Journal of Law and Religion* 7 (2019): 1-20.

"The Irrelevance of Church-State Separation in the Twenty-First Century," *Syracuse Law Review* 69 (2019): 999-1040.

"The Mixed Legacy of Magna Carta for American Religious Freedom," *Journal of Law and Religion* 32 (2017): 207-226.

"The Fount of Everything Just and Right? The Ten Commandments as a Source of American Law," *Journal of Law and Religion* 13 (2000): 525-558.

## <u>Reviews</u>

*The Religion Supported State: Piety and Politics in Early National New England*, by Nathan S. Rives. *New England Quarterly* (2024).

*Sincerely Held: American Secularism and Its Believers*, by Charles McCrary. *Fides et Historia* (2022).

*City on a Hill: A History of American Exceptionalism*, by Abram C. Van Engen. *Church History* (2021).

*The Religion Clauses: The Case for Separating Church and State*, by Erwin Chemerinsky, and *Beyond Belief, Beyond Conscience*, by Jack Rakove, SCOTUS Blog, September, 2020.

"Why Public Schools Should be Mindful of Meditation," *Religious Studies Review* 46 (June 2020): 169-170.

*Sacred Liberty: America's Long, Bloody, and Ongoing Struggle for Religious Freedom*, by Steven Waldman. *Church History* 88 (2019): 869-870.

*Taxing the Church: Religion, Exemptions, Entanglement, and the Constitution*, by Edward A. Zelinsky, *Reading Religion* (September, 2018).

*Religious Freedom: The Contested History of an American Ideal*, by Tisa Wenger, *Church History* (2018).

*Reading the Bible with the Founding Fathers*, by Daniel L. Dreisbach, *Church History* (2017).

*The Evangelical Origins of the Living Constitution*, by John Compton, *American Historical Review* 120 (Feb. 2015): 279-280.

*Religious Lessons: Catholic Sisters and the Captured Schools Crisis in New Mexico*, by Kathleen Holscher, *Church History* (2014).

**COMMENTARY AND BLOGS** (selected)

"How Jefferson's and Madison's Partnership – a Friendship Told in Letters – Shaped America's Separation of Church and State," *The Conversation*, June, 2024.

"Set to Privilege Christianity in Public Schools, Texas Sends a Message About Who is Welcome – And Who is Not," *Religion Dispatches*, April 28, 2023.

"We Must Still Defend Separation of Church and State: Here's How," *Church & State* (Sept. 2022): 10-11.

"What a Turn of the Century Anti-Abortion and Contraceptive Crusader Reveals about GOP Efforts to Ban Abortion Pills by Mail," *Religion Dispatches*, August 2, 2022.

"A 'Revolutionized Supreme Court Term," *Canopy Forum*, Emory University, August 1, 2022.

"Religious beliefs give strength to the anti-abortion movement – but not all religions agree," *The Conversation*, May 10, 2022.

"Most Favored Status: How the Supreme Court is Converting Religious Freedom into an Instrument for Discrimination and Preference," *Church & State*, June 2021, 20-21.

"How the Supreme Court Found its Faith and Put 'Religious Liberty' on a Winning Streak," *The Conversation*, April 2021.

"Religion and the Presidential Election," *Canopy Forum*, Emory University, October, 2020.

"The Supreme Court just expanded the 'ministerial exception' shielding religious employers from anti-bias laws," *The Conversation*, July 8, 2020.

"Using a 'Little Bad History' the Supreme Court Just Gutted Church-State Separation in 38 States," *Religion Dispatches*, July 6, 2020.

"Trump's Problem with Race and Religion," *Canopy Forum*, Emory University, July 2020.

"RIP State Blaine Amendments: Espinoza and the No-Aid Principle," SCOTUS Blog, June 30, 2020.

"No Higher Source than the Consent of the People," *Cato Unbound*, Cato Institute, June 24, 2020.

"Trump's Low-Hanging Fruit," *Berkeley Forum*, Georgetown University, February 2020.

"Blindsided by the Blitz," *Church & State*, May 2019, 20-21.

"Gorsuch's Religious Question," *The Conversation*, March 2017.

"Was America Founded as a Christian Nation?" *CNN Online*, March, 2015.

**SYMPOSIA, PRESENTATIONS, AND LECTURES**

"The Supreme Court's 'Return' to History," Religious Freedom Summit, Alexandra, VA, April 6, 2025.

"The Grand Collaboration," Virginia Wesleyan University, Chesapeake, VA, March 13, 2025.

"Chaos in the Classroom," American Academy of Religion/Society for Biblical Literature, San Diego, CA, Nov. 24, 2024.

"Campus Speech," American Constitution Society, Portland Chapter, Pacific Northwest College of Art, Portland, OR, Sept. 20, 2024.

"Unfolding Our Shared Future: The British and American Judiciaries," University of East Anglia, Norwich, UK, April 26, 2024.

"First Amendment Imbalance: Kennedy v. Bremerton School District," Notre Dame Law School, Jan. 26, 2024.

"303 Creative and the Corrosive Nature of Easly Decisions," Univ. St. Thomas Law School, Minneapolis, Nov. 17, 2023.

"Religious Freedom Today," Smithsonian Folklife Festival, Washington, DC, July 8, 2023.

"Separating Church and State: A History," Harvard Divinity School, Oct. 13, 2022.

"Separating Church and State: A History," Christian Legal Society National Conference, Newport Beach, CA, Oct. 7, 2022.

"'Re-establishing (Christian) America," Religion and Society Conference, University of Cordoba, Cordoba, Spain, June 9-10, 2022.

"The Supreme Court's Religion Clause Docket," Oregon State Bar Association CLE, May 19, 2022.

"Inventing a Christian America," Association for Lifelong Learning, Corvallis, OR, April 6, 2022.

"Teaching About Religion in Texas Public Schools: Historical and Legal Perspectives and a Case Study," the Religion and Public Schools and the Law, Religion, and Culture sections of the American Academy of Religion, San Antonio, TX, Nov. 20, 2021.

"Judging History: Espinoza and the Legal Interpretation of our Educational Past," History of Education Society, San Diego, CA, Nov. 3, 2021.

Constitution Day Lecture, University of Portland, Sept. 16, 2021.

"Religious Liberty at the Crossroads," Institute for Humane Studies, George Mason University, April 10 & 11, 2021.

Panel discussion on the Future of the Establishment Clause, Michigan State University Law School, April 6, 2021.

"COVID Restrictions and Religious Liberty," The Federalist Society, Willamette University College of Law, March 17, 2021.

Panelist, "The Decline of the Establishment Clause," ABA Section on Civil Rights and Social Justice, Oct. 8, 2020.

"The Legal Ramifications of Christian Nationalism," Roger Williams University Law School, Sept. 25, 2020.

"Religion in Strange Times," Religious Studies Symposium, Texas Christian University, Ft. Worth, TX, Feb. 20, 2020.

"The Supreme Court's Shadow Docket and Religion," Association of American Law Schools, Washington, DC, Jan. 5, 2020.

Commentator on *Teaching Mindfulness and Yoga in Public Schools*, American Academy of Religion, San Diego, CA, Nov. 25, 2019.

Respondent on *The Third Disestablishment*, American Academy of Religion, San Diego, CA, Nov. 23, 2019.

"Espinoza and State No-Aid Provisions," National Organization of Lawyers for Education Associations Conference, Seattle, WA, Oct. 10, 2019.

"Impeachment," American Constitution Society, Willamette University, Oct. 9, 2019.

Church-State Workshop, Georgia State University Law School, Atlanta, Aug. 8-9, 2019.

"The Irrelevance of Church-State Separation," Religion in American Life Conference, University of East Anglia, Norwich, UK, July 24-25, 2019.

Annual Historian's Lecture on *Inventing a Christian America*, Minnesota Historical Society, St. Paul, MN, March 9, 2019.

"The Public Funding of Private Religious Schools," American Academy of Religion, Denver, CO, Nov. 19, 2018.

Forum on Religious Liberty Issues, LDS Church, Roseburg, OR, October 14, 2018.

"Religious Liberty and Non-Discrimination," Constitution Day, Willamette University, Salem, OR, September 17, 2018.

Debate on *Masterpiece Cakeshop*, Federalist Society and American Constitution Society, Willamette University, Salem, OR, February 12, 2018.

"The Bible and American Public Life in the Time of Trump," Society for Biblical Literature, Boston, MA, Nov. 19, 2017.

"The Future of "No-Aid" Separationism and State "Blaine" Amendments after *Trinity Lutheran Church v. Comer*," Religion and Law Discussion Group, American Academy of Religion, Boston, MA, Nov. 19, 2017.

Debate, "Masterpiece Cakeshop and Religious Discrimination," Linfield College, McMinnville, OR, Nov. 9, 2017.

"Constitution Day Talk," American Constitution Society, Willamette University College of Law, Salem, OR, Sept. 19, 2017.

"The Constitutionality of President Trump's Travel Ban," Federalist Society Debate, Willamette University College of Law, Salem, OR, Aug. 28, 2017.

"Trinity Lutheran and the Future of Sate Blaine Amendments," Federalist Society Western Conference, Ronald Reagan Presidential Library, Simi Valley, CA, Jan. 28, 2017.

"The Emerging Imbalance within Separationism," Religion and Law Discussion Group, American Academy of Religion, San Antonio, TX, Nov. 20, 2016.

"A Fine Mess You Left Us," Oregon Law Review Symposium on the Legacy of David Frohnmeyer, Portland, OR, April 1, 2016.

"The Irrelevance of Church-State Separation," Religious Liberty in the Twenty-First Century Conference, Claremont Graduate University, Claremont, CA, March 25-26, 2016.

"The Irrelevance of Disestablishment," The Legitimate Scope of Religious Establishment Conference, Venice, Italy, March 7-9, 2016.

"Magna Carta and Religious Freedom," Magna Carta Conference, Dartmouth University, Hanover, NH, Nov. 7, 2015.

Panelist, "Christian Nationalism," Society of U.S. Intellectual History, Washington, DC, Oct. 17, 2015.

Debate, "Gay Marriage and Religious Liberty," Willamette University College of Law Federalist Society, Sept. 9, 2015.

Keynote, "Religious Liberty in American History, Ashland University, Newport, RI, May 1-3, 2015.

Panelist, "Vaccinations and the Law," Salem Statesman Journal and Willamette University College of Law, Salem, OR, April 16, 2015.

"The Hobby Lobby Decision," Twenty-First Century Healthcare Reform Symposium, Willamette University College of Law, Salem, OR, Feb. 27, 2015.

"The Hobby Lobby and Greece v. Galloway Decisions," Beit Haverim, Lake Oswego, OR, Jan. 18, 2015.

"The Meaning and Ramifications of Greece v. Galloway," Religion and Law Discussion Group, American Academy of Religion, San Diego, Ca., Nov. 23, 2014.

"The Hobby Lobby Decision," University of Memphis Law School, Memphis, TN, Nov. 7, 2014.

"The Hobby Lobby Ruling," The Hobby Lobby Aftermath, Northwest Religious Liberty Association, Vancouver, WA, Sept. 29, 2014.

"Did America Have a Christian Founding?" George Fox University, Newberg, OR, Sept. 18, 2014.

Panelist, "Religious Liberty and the Roberts' Court," American Constitution Society, Portland, OR, July 8, 2014.

Panelist, *The Sacred Rights of Conscience*, Liberty Fund, Indianapolis, June 13-15, 2014.

Panelist, "The Contraceptive Care Debate: Obama Care and Religious Accommodation," Willamette University College of Law, Salem, OR, March 20, 2014.

**PREVIOUS LEGAL EMPLOYMENT**

**Legal Director and Special Counsel**, Americans United for Separation of Church and State, Washington, D.C.  January, 1992 to June, 2002.  Directed legal and legislative programs for national public interest organization committed to preserving religious liberty and separation of church and state; oversaw litigation and appeals; filed party and amicus briefs in U.S. Supreme Court and other appellate courts; reviewed and drafted proposed legislation; testified before Congress, state legislatures, and various government committees, agencies, and boards.

**Trial Court Magistrate**, Alaska Court System, Palmer, Alaska, February 1984 to July 1985.  Judicial officer for the District Court for the Matanuska-Susitna Borough. Presided over misdemeanor jury and non-jury trials as well as felony criminal hearings, small claims trials and traffic trials. Also served as Superior Court Master for juvenile, child in need-of-aid, probate, and domestic matters.

**Staff Attorney**, Alaska Legal Services Corporation, Dillingham and Anchorage, Alaska, July 1982 to January 1984. Represented low-income clients in a civil practice consisting of domestic, children's, landlord-tenant, public entitlements, and probate law. Also represented Alaska Natives in land claims, allotments, and fishing rights cases.

**Judicial Law Clerk**, Texas Court of Appeals, Houston, Texas, August 1981 to June 1982. Served as judicial law clerk for Associate Justice George Miller; preformed legal research, wrote legal memoranda and opinions.

**PROFESSIONAL ASSOCIATIONS AND ACTIVITIES**

Bar of the Supreme Court of the United States
Licensed to Practice Law in Texas, Alaska, Minnesota, and Maryland
Admitted to Practice Law before the United States Courts of Appeals for the Second,
    Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits
American Bar Association
American Society of Church History
American Academy of Religion, Law, Religion and Culture Section
National Council of Churches, Committee on Religious Liberty
*Journal of Church and State*, Editorial Council
American Constitution Society, Oregon Lawyers Chapter

Member, Oregon Law Commission Work Group on Standing, 2014-2015
Convener, Oregon Task Force on Religious Attire in the Public Schools, 2010
Author, Oregon Law Commission Study on the Faith-Based Initiative, 2002-2004