EXHIBIT
A

Expert Report Submitted in
*Rabbi Mara Nathan v. Alamo Heights Independent School District*,
Civil Action No. 5: 25-cv-00756

Mark David Hall
Professor, Robertson School of Government
Regent University
July 25, 2025

Table of Contents

1. Education and Professional Qualifications
2. Compensation
3. Prior Testimony
4. Basis for Opinion and Research Relied Upon
5. Introduction
6. The Supreme Court Has Been Clear: Courts Must Consider History and Tradition in Light of Original Meaning When Evaluating Establishment Clause Claims
7. Original Understanding of the Establishment Clause
      a. A Wall of Separation?
      b. The First Federal Congress and George Washington
8. History, Tradition, and the Ten Commandments
      a. Ten Commandments as a Source of Law
      b. History and Tradition of Displaying the Ten Commandments on Public Property
      c. Ten Commandments and American Education
      d. What about *Relatively* Recent Practices
9. Favoritism and Coercion
      a. A Protestant Version of the Ten Commandments?
      b. Coercion?
10. Conclusion

## 1. Education and Professional Qualifications

I am a Professor in Regent University's Robertson School of Government, Director of Religious Liberty in the States, and a Senior Fellow at the Center for Religion, Culture & Democracy. I am also Distinguished Faculty Fellow at George Fox University, a Senior Fellow at the Center for the Study of Law and Religion at Emory University, and a Senior Fellow at Baylor University's Institute for Studies of Religion.

This report relates to my opinions as an expert in the history of religious liberty, church-state relations, and religion and politics in the United States. My background, experience, and publications are summarized in my curriculum vitae, which is attached to this report. I began teaching politics full time after receiving a Ph.D. in Government from the University of Virginia in 1993.

I am the author or co-editor of a number of works on religious liberty and church-state relations, the most significant of which are *Proclaim Liberty Throughout All the Land: How Christianity Has Advanced Freedom and Equality for All Americans* (Fidelis, 2023); *Great Christian Jurists in American History*, ed. with Daniel L. Dreisbach (Cambridge, 2019); *Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth* (Nelson, 2019); *Faith and the Founders of the American Republic*, ed. with Dreisbach (Oxford, 2014); *The Sacred Rights of Conscience*: *Selected Readings on Religious Liberty and Church-State Relations in the American Founding*, ed. with Dreisbach (Liberty Fund, 2009); *The Forgotten Founders on Religion and Public Life*, ed. with Dreisbach and Jeffry H. Morrison, (Notre Dame, 2009); *The Founders on God and Government*, ed. with Dreisbach and Morrison (Rowman &

Littlefield, 2004); "Foundations of the Right of Charitable Uses," with Adam J. MacLeod, *Mississippi Law Journal* 94 (February 2025), 251-320 (Peer Reviewed); "America's Founders, Religious Liberty, and the Common Good," *University of St. Thomas Law Journal* 15 (2019): 642-661; "Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment," *American Political Thought* 3 (Spring 2014): 32-63; "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases," *Oregon Law Review* 85 (2006): 563-614. As well, much of my work on American political thought touches these issues. See, for instance, *Roger Sherman and the Creation of the American Republic* (Oxford, 2013) and *The Political and Legal Philosophy of James Wilson, 1742-1798* (Missouri, 1997).

Especially relevant for this report is my article, co-authored Andrea Picciotti-Bayer, entitled "Ten Commandments in the Public Square and Public Schools." It will be published in the *William and Mary Bill of Rights Journal* 34 (October, 2025). This essay draws from the *amicus curiae* brief we wrote for *Roake v. Brumley* (United States Court of Appeals for the Fifth Circuit, December 2024). I also authored an *amicus curiae* brief in support of defendants for *Stinson v. Fayetteville School District,* United States District Court, Western District of Arkansas (July 2025). All of these works draw from the expert report I wrote in 2019 for the State of Arkansas for the cases of *Donna Cave et al. v. John Thurston* No. 4: 18-cv-00342-KGB and *Anne Orsi et al. v. John Thurston* No. 4: 18-cv-343-KGB (the report was filed in 2019, Steven Green wrote a rebuttal, and I wrote a response to his rebuttal).

Portions of this report are drawn from these and other publications.

I discuss laws and cases in this brief, but I am not an attorney and do not presume to offer a legal opinion on any of the matters that I consider. Everything in this report was originally drafted by me although the Conscience Project's Andrea Picciotti-Bayer and First Liberty Institute's Erin Smith suggested edits and translated citations from the Chicago Manual of Style to the format required by The Bluebook.

## 2. Compensation

I am being compensated at a rate of $250 per hour for preparing this report.

## 3. Prior Testimony

In addition to the Ten Commandment cases mentioned above, I have served as an expert in:

1. *Loe, et al. v. Walz, et al.* Case No. 23-cv-1527 (U.S. Dist. Ct., Dist. of Minn.) (2024). I was a rebuttal witness for the Becket Fund for Religious Liberty.

2. *Thornton v. Bullhead City,* Case No. 3:22-cv-08195, United States District Court for the District of Arizona (2024). Adam MacLeod and I wrote an expert report for the Institute for Justice.

3. *Robert Ingersoll and Curt Freed v. Arlene's Flowers and Barronelle Stutzman,* No. 13-2-00953-3; *State of Washington v. Arlene's Flowers and Barronelle Stutzman,* No. 13-2-00871-5; *Arlene's Flowers and Barronelle Stutzman v. Robert W. Ferguson,* No. 13-2-0189-2 (2019). I was a rebuttal witness for the Alliance Defending Freedom.

4. *Juliana, et al., v. United States,* Case No.: 6:15-cv-01517 (D. Ore.) (2018). I was a rebuttal witness for the U.S. Department of Justice.

**4. Basis for Opinion and Research Relied Upon**

I base the following opinions on my own knowledge, research, experience, and publications, and the work of other academics and writers. The materials I have used to research and write this report are the standard sources used by other experts in my field. Notably, I rely on a careful analysis of relevant primary sources documents when opining on the development of religious liberty and church-state relations in America, the judiciary's approach to the Religion Clauses, and the history of the Ten Commandments throughout American history (including how they have been presented). When I cite secondary literature, I make sure that the author(s) arguments are grounded in the appropriate primary sources.

**5. Introduction**

The Ten Commandments are of paramount importance to the Jewish and Christian faiths, and they are a source of Western law.[1] In America, they have been (and are) taught in churches and synagogues, and throughout much of this nation's history they have been taught by parents, tutors, and teachers at home and in private and public schools. They are regularly displayed in courthouses and statehouse grounds, and some states have desired to display them in public schools. Predictably, those who would scrub religion from the public square have argued that Ten Commandment displays on public property violate the First Amendment's Establishment and Free Exercise Clauses. Many such separationists even object to passive displays of the Ten Commandments in public schools.

In 2024, Louisiana lawmakers passed H.B. 71, a law requiring public schools to display the Ten Commandments in public school classrooms.[2] Days after Louisiana Governor Jeff Landry signed the bill into law, the American Civil Liberties Union, the American Civil Liberties Union of Louisiana, Americans United for Separation of Church and State, and the Freedom from Religion Foundation sued the state superintendent of education, other education officials, and five parish school boards, claiming that the law violates the First Amendment's

---

[1] The Commandments may be found in *Exodus* 20:1-17, *Exodus* 34:11–26, and *Deuteronomy* 5:6-21. While Muslims do not accept the Ten Commandments as they appear in the Hebrew Scriptures, they view Moses as a prophet and the *Quran* contains commandments that parallel those accepted by Jews and Christians. See *Quran* 6:151–53.

[2] La. Stat. Ann. § 17:2124 (2024).

Establishment and Free Exercise clauses.[3] Relying on factually incorrect historical evidence and a Supreme Court precedent (*Stone v. Graham* (1980)) that is almost certainly no longer good law, the district court held that H.B. 71 is unconstitutional.[4] A panel for the United States Court of Appeals for the Fifth Circuit Court, relying on the same flawed evidence and dated precedent, upheld the District Court's opinion.[5] En banc review is under consideration.[6]

On April 14, 2025, Arkansas Governor Sarah Huckabee Sanders signed into law a bill requiring passive displays of the Ten Commandments in the state's public school classrooms.[7] Separationist organizations challenged the law as violating both the Establishment and Free Exercise Clauses because they involve "religious coercion and favoritism in matters of faith."[8] I wrote an *amicus* brief submitted by the First Liberty Institute arguing, among other things, that both of these claims are inaccurate.[9]

On June 20, 2025, the Texas Legislature passed S.B. 10, a bill requiring copies of the Ten Commandments to be posted in every public school classroom.[10] On June 21, Texas Governor Greg Abbot signed the bill into law. Yet again, separationists groups filed a lawsuit to prevent the law from going into effect. Their complaint and Steven Green's expert report contain many problematic and sometimes inaccurate claims.

The United States Supreme Court has long held that the First Amendment's Religion Clauses must be understood in light of "its generating history."[11] More recently, it has also asked whether there is a history and tradition of local, state, and national governments engaging in particular practices. There is no good reason to believe that the Establishment Clause was originally understood to prohibit religious language, images, or practices in public spaces.

---

[3] Robert Tait, *ACLU Sues Louisiana over Requiring the Display of Ten Commandments in Public Schools*, GUARDIAN (June 20, 2024, 12:53 PM), https://www.theguardian.com/us-news/article/2024/jun/20/aclu-sues-louisiana-ten-commandments-public-schools; *see also* Roake v. Brumley, 756 F. Supp. 3d 93, 136 (M.D. La. Nov. 12, 2024).

[4] *Roake*, 756 F. Supp. 3d,136. Mark David Hall and Andrea Picciotti-Bayer "Ten Commandments in the Public Square and Public Schools," *William and Mary Bill of Rights Journal* 34 (forthcoming, Oct. 2025); Adrea Picciotti-Bayer and Mark David Hall, *Amicus Curia* brief in support of appellants, *Roake v. Brumley,* United States Court of Appeals for the Fifth Circuit, December 2024.

[5] *Roake v. Brumley.*

[6] See: https://becketfund.org/case/roake-v-brumley/.

[7] See: https://www.8newsnow.com/news/national-news/ten-commandments-in-god-we-trust-in-classrooms-is-now-arkansas-law/

[8] Memorandum in Support of Plaintiff's Motion for Preliminary Injunction. Case 5:25-cv-05127-TLB, 01/12/2025, 2.

[9] *Stinson v. Fayetteville School District,* United States District Court, Western District of Arkansas (July 2025), available here: https://firstliberty.org/wp-content/uploads/2025/07/057-1-Brief-of-Amicus-Curaie-7-8-25_Redacted.pdf

[10] Available here: https://legiscan.com/TX/text/SB10/id/3247430/Texas-2025-SB10-Enrolled.html.

[11] *Everson v. Board of Education,* 330 U.S. 1, 33 (1947).

Moreover, there is a long history and tradition of displaying the Ten Commandments on public property and exposing children to them (and even teaching about them) in private and public schools.

Opponents of Ten Commandments displays misconstrue the Supreme Court's use of history and tradition to suggest that in order for a practice to be constitutional that there has to be a long history of civic authorities engaging in that specific practice. I show that this is not the case. As well, I address the inaccurate assertions that the Ten Commandments are not a source of American (and Western) law and that the version used in Texas is Protestant. Finally, I explain that passive displays of the Ten Commandments cannot in any meaningful sense of the word be considered "coercive."

## 6. The Supreme Court Has Been Clear: Courts Must Consider History and Tradition in Light of Original Meaning When Evaluating Establishment Clause Claims

In *Everson v. Board of Education* (1947), Justice Hugo Black contended that the "meaning and scope of the First Amendment" have been interpreted in "light of its history and the evils it was designed forever to suppress."[12] These evils included

> efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of nonbelief in their doctrines, and failure to pay taxes and tithes to support them.[13]

Black's majority opinion concluded that because New Jersey's program of reimbursing parents for the cost of transporting their children to schools, including religious schools, was not the sort of evil the founders desired to prohibit, that the State's program was constitutional.

Justice Wiley Rutledge and three other justices dissented from the majority's holding, but Rutledge agreed with Black that the First Amendment must be understood in light of the founders' views. In his words, "[n]o provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment. It is at once the refined product and the terse summation of that history."[14]

Since *Everson,* the vast majority of jurists who have written Religion Clause opinions have made historical arguments to support their conclusions.[15] Judicial liberals have been even

---

[12] *Id.,* 14-15.

[13] *Id.,* 9.

[14] *Id.,* 33.

[15] Mark David Hall, "Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases," *Oregon Law Review* 85 (2006): 563-613. A slightly revised version of the article was reprinted in the *High Court Quarterly Review* 5 (2009): 109-153.

more likely to appeal to founding era history than have judicial conservatives.[16] I provide a detailed study of the justices' use of history in Religion Clause opinions in a 2006 law review article, but I discuss only the most significant cases here.[17]

One of the most extensive discussions of the Court's use of history was made by Justice William Brennan in his concurring opinion in *Abington School District v. Schempp*, 374 U.S. 203 (1963). He contended that:

> the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers. It is a line which the Court has consistently sought to mark in its decisions expounding the religious guarantees of the First Amendment. What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. When the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government.[18]

Like Justice Black in *Everson*, Brennan emphasized that the founders wanted to prohibit coercion in matters of faith. He specifically noted that there are "myriad forms of involvements of government with religion" that do not violate the Establishment Clause.[19]

In the 1983 case of *Marsh v. Chambers*, Chief Justice Burger made sweeping historical arguments in an opinion upholding the constitutionality of legislative chaplains and prayer.[20] Drawing from a wide range of documents, actions, and founders, Burger demonstrated that legislative chaplains and prayer were widespread in the founding era.[21] He emphasized that the men who drafted and approved the First Amendment agreed to hire legislative chaplains and approved of legislative prayer.[22] Important as well, in his opinion, was that the Nation and States

---

[16] Hall, "Jeffersonian Walls and Madisonian Lines," 580. Jurisprudential liberals favor individuals or groups over the State in Free Exercise cases, and oppose government support of religion in Establishment Clause ones. Conservatives hold the opposite positions. These definitions are compatible with those used in Lee Epstein, Jeffrey Segal, Harold Spaeth, and Thomas Walker, *The Supreme Court Compendium: Data, Decisions, and Developments* 3rd (Washington, D.C.: CQ Press, 2003), 597-99.

[17] *Id.*, 563-613.

[18] 374 U.S. 203, 294-95 (1963).

[19] *Id.*, 295.

[20] 463 U.S. 783 (1983).

[21] *Id.*, 786-95.

[22] *Id.*, 787-88.

had a long tradition of engaging in these practices. As such, they are "deeply embedded in the history and tradition of this country."[23]

The following year, Chief Justice Burger wrote the majority opinion in a case involving a nativity scene on public property. He found it to be constitutional, reasoning that "[t]here is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789."[24] Particularly relevant for the case currently being litigated, he noted that the "very chamber in which oral arguments on this case were heard is decorated with a notable and permanent -- not seasonal -- symbol of religion: Moses with the Ten Commandments."[25]

In the 1989 case of *County of Allegheny v. ACLU*, Justice Blackmun's majority opinion found one holiday display on public property to be constitutional and another to be unconstitutional.[26] In an opinion concurring in part and dissenting in part, Justice Anthony Kennedy observed that:

> Our cases disclose two limiting principles: government may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it, in fact, "establishes a [state] religion or religious faith, or tends to do so." *Lynch v. Donnelly*, 465 U.S. at 678.[27]

With respect to religious displays on public property, he concluded that:

> [T]he principles of the Establishment Clause and our Nation's historic traditions of diversity and pluralism allow communities to make reasonable judgments respecting the accommodation or acknowledgement of holidays with both cultural and religious aspects. No constitutional violation occurs when they do so by displaying a symbol of the holiday's religious origins.[28]

---

[23] *Id.,* 786. To support this proposition, Burger quoted his majority opinion in *Walz v. Tax Commissioner*: "It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence, and indeed predates it. Yet an unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside." 397 U.S. 664, 678 (1970).

[24] *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

[25] *Id.*, 677.

[26] 492 U.S. 573 (1989).

[27] *Id.*, 659.

[28] *Id.,* 679. In his opinion, Kennedy explained that it is the principles embraced by the founders that are determinative. Therefore, the fact that "displays commemorating religious holidays were not commonplace in 1791" does not entail that such displays are inconsistent with the values underlying the Establishment Clause. *Id.*, 669.

The significance of history for contemporary Religion Clause jurisprudence is illustrated well by the Ten Commandment cases of *Van Orden v. Perry*,[29] and *McCreary County v. ACLU of Kentucky*.[30] Authors of seven of the ten opinions in these cases collectively made sixty-two distinct appeals to the founders and founding era history. They also discussed the relevance of practices since that time.[31]

In *Van Orden*, five justices agreed that a granite monument commemorating the Ten Commandments on the Texas State House grounds did not violate the Establishment Clause. However, in *McCreary* five justices declared that paper copies of the Ten Commandments posted in a county courthouse to be unconstitutional. Justice Breyer cast the deciding vote in both cases. In addition to historical arguments, justices considered factors such as the context of both displays.[32] In voting to uphold the Ten Commandments monument, Breyer emphasized that declaring it to be unconstitutional would "exhibit a hostility towards religion that has no place in our Establishment Clause traditions."[33] The Texas monument, it is worth noting, contains the text of the Ten Commandments that would be posted in Texas schools.[34]

In *Town of Greece v. Galloway*, 572 U.S. 565 (2014), justices considered the constitutionality of a city council's practice of opening its meetings with prayer. In his majority opinion, Kennedy observed that the "Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures."[35] Drawing heavily from founding era practices, and practices since that time, he concluded that opening a city council meeting with prayer is constitutional. The United States Court of Appeals for the Eighth Circuit has stated that *Greece v. Galloway* provides "an unequivocal directive" that "'the Establishment Clause *must* be interpreted by reference to historical practices and understanding.'"[36]

Concurring opinions by Justices Alito and Thomas, like Justice Kagan's dissenting opinion, all made historical arguments to support their respective conclusions. It is noteworthy that Justice Kagan specifically noted that she agreed with the majority that the issue is "whether the prayer practice in the Town of Greece fits within the tradition long followed in Congress and

---

[29] 125 S.Ct. 2854 (2005).

[30] 125 S.Ct. 2722 (2005).

[31] Hall, "Jeffersonian Walls and Madisonian Lines," 600.

[32] See especially *Van Orden v. Perry*, 545 U.S. 677, 700-705 (2005) (Breyer, J., concurring).

[33] *Id.*, 704 (Breyer, J., concurring). Like Justice Kennedy in *County of Allegheny*, Justice Thomas emphasized that framers of the Establishment Clause primarily intended to prevent coercion in matters of faith. Accordingly, he would have upheld both displays because neither was coercive. *Id.*, 692-98 (Thomas, J. concurring).

[34] Compare the image of the Texas monument available here: http://www.eaglesmonuments.com/states/Texas.html (accessed June 28, 2019) to the text required by S.B. 10.

[35] 572 U.S. 565, 577 (2014).

[36] *New Doe Child #1 v. United States*, 901 F.3d 1015, 1020 (2018) (internal quotation marks omitted and emphasis added).

the state legislatures."[37] She, along with Justices Ginsburg, Kagan, and Breyer, interpreted this history differently than the majority, but it bears emphasizing that no justice rejected the proposition that history plays a critical role in helping justices resolve such cases.

In *American Legion v. American Humanist Association*, 588 U.S. 29 (2019), the justices considered the constitutionality of an "immense Latin cross [that] stands on a traffic island at the center of a busy three-way intersection in Bladensburg, Maryland."[38] By a vote of 7-2, they held that it did not violate the First Amendment. Justice Alito, in his opinion, noted that in recent Establishment Clause cases, justices have not relied upon the *Lemon* Test, but have instead "taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance."[39] He pointed to both *Marsh* and *Galloway* as cases where justices relied on founding era history *and* American traditions. He concluded that where "categories of monuments, symbols, and practices with a longstanding history follow in that tradition, they are likewise constitutional."[40] The Bladensburg Cross, in the Court's estimation, fits this category.[41]

*American Legion v. American Humanist Association* generated six opinions, none of which denied the importance of history for helping justices decide Establishment Clause cases. Of particular note, Justice Neil Gorsuch, in his concurring opinion, contended that monuments need not be ancient to be constitutional. He asked, for instance, "about the Star of David monument erected in South Carolina in 2001 to commemorate victims of the Holocaust, or the cross that marines placed in California in 2004 to honor their comrades who fell during the War on Terror?"[42] It is clear that he believes both monuments are as constitutional as the Bladensburg Cross.[43]

Justice Ginsburg, writing for herself and Justice Sotomayor, dissented from the Court's decision, but not its use of history. Indeed, she referenced three different founders and founding documents to buttress her opinion.[44] Particularly relevant to Ginsburg was her view that "the Latin cross has been the 'defining symbol' of Christianity."[45]

There have been significant fluctuations in the Supreme Court's holdings on the Establishment Clause over the years, but they are a product of a "history of religious establishment relied on by the Court" that was "radically incomplete and often misleading."[46]

---

[37] 572 U.S. 565, 622 (2014) (Kagan, J. dissenting).
[38] *American Legion v. American Humanist Association*, 88 U.S. 29, 89 (2019).
[39] *Id.* 32.
[40] *Id.*, 32-33.
[41] *Id.*
[42] *Id.*, 86.
[43] *Id.*
[44] *Id.*, 89-105.
[45] *Id.*, 94.
[46] Nathan S. Chapman & Michael W. McConnell, Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience, 5–6 (2023); Mark David Hall, Did America Have a Christian Founding?: Separating Modern Myth from Historical Truth, 21-120 (2019).

The Court's distortions resulted from reliance on the flawed analytical test articulated in *Lemon v. Kurtzman*.[47] This test often led to judicial hostility toward religious images, language, or practices in the public square.[48] An excellent example of this is *Stone v. Graham* (1981), where the majority relied on the Lemon Test to declare unconstitutional a Kentucky law requiring copies of the Ten Commandments to be posted in the state's public school classrooms.

As early as 1993, Justice Scalia could count five justices who seemed to repudiate *Lemon*, but it was not formally disavowed by the Court until *Kennedy v. Bremerton School District* (2022).[49] Here, justices clearly rejected *Lemon* and its "endorsement test offshoot" in favor of "[a]n analysis focused on original meaning and history."[50] *Kennedy* left no doubt that the Establishment Clause, Free Exercise Clause, and Free Speech Clause "have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others."[51]

### 7. Original Understanding of the Establishment Clause

In *Everson*, both Justice Black and Justice Rutledge were correct to insist that the Establishment Clause should be interpreted in light of the founders' views, but they erred by primarily focusing on select texts by Thomas Jefferson and James Madison and concluding that the First Amendment requires the strict separation of church and state.[52] America's founders understood the Establishment Clause to prohibit the creation of a national church and, more generally, coercion in matters of faith, but they did not believe that it required a religion-free public square.

### a. A Wall of Separation?

In 1802, Thomas Jefferson wrote to the Danbury Baptist Association suggesting that the First Amendment created a "wall of separation between Church & State."[53] The letter was first referenced by the Supreme Court in the Free Exercise Clause case of *Reynolds v. United States*, 98 U.S. 145 (1879), but lay dormant with respect to the Supreme Court's Establishment Clause jurisprudence until *Everson*.[54]

---

[47] 403 U.S. 602 (1971).

[48] *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 494–96 (2020) (Thomas, J., concurring); CHAPMAN & MCCONNELL, AGREEING TO DISAGREE, 3–5, 188.

[49] *Lamb's Chapel v. Center Moriches Union Free School Dist*., 508 U.S. 384, 398 (1993); 597 U.S. 507 (2022).

[50] 597 U.S. 507 (2022), at 534–36.

[51] *Id.*, 533.

[52] HALL, DID AMERICA HAVE A CHRISTIAN FOUNDING?, 57–120 (2019); Mark David Hall, *Madison's Memorial and Remonstrance, Jefferson's Statute for Religious Liberty, and the Creation of the First Amendment*," 3 AMERICAN POLITICAL THOUGHT 32–63 (Spring 2014); Mark David Hall, *Jeffersonian Walls and Madisonian Lines,* at 563–61.

[53] DANIEL L. DREISBACH & MARK DAVID HALL, SACRED RIGHTS OF CONSCIENCE, 528 (2009).

[54] *Id.*, 533–34.

As appealing as the wall metaphor is to contemporary activists, it obscures far more than it illuminates. Jefferson did not help draft or ratify the First Amendment, so it is not clear why his understanding of it should be privileged. As well, the letter was a profoundly political document, not a principled statement of Jefferson's constitutional views. Indeed, the metaphor did not originate with Jefferson, and he used it only once in his life.[55] And in his public life, he did not act as if there was a wall of separation between church and state—certainly not one that prohibited any recognition of religion in the public square.

In 1776, the Continental Congress appointed Benjamin Franklin, John Adams, and Thomas Jefferson to a committee to begin the process of creating a national seal. Jefferson proposed that the Nation adopt one with the images of:

> Pharaoh sitting in an open chariot, a crown on his head & a sword in his hand, passing through the divided waters of the Red Sea in pursuit of the Israelites: rays from a pillar of fire in the cloud, expressive of the divine presence & command, reaching to Moses who stands on the shore &, extending his hand over the sea, causes it to overwhelm Pharaoh.[56]

His motto for the new Nation would have been: "Rebellion to tyrants is obedience to God."[57] Jefferson "later suggested it as an alternative motto for the Great Seal of Virginia, and he later added it to his personal seal."[58]

---

[55] DANIEL L. DREISBACH, THOMAS JEFFERSON AND THE WALL OF SEPARATION BETWEEN CHURCH AND STATE, 21–22 (2002).

[56] DREISBACH & MARK DAVID HALL, SACRED RIGHTS OF CONSCIENCE, 229.

[57] Id.

[58] DEREK H. DAVIS, RELIGION AND THE CONTINENTAL CONGRESS, 1774 – 1789: CONTRIBUTIONS TO ORIGINAL INTENT, 138 (2000).



Jefferson's proposed national seal was drawn by Benjamin J. Lossing and originally published in the July 1856 issue of Harpers' *New Monthly Magazine*.

Note that Jefferson thought it appropriate to portray a miraculous event involving the prophet Moses *on the national seal*. According to Exodus 19–20, it was Moses who received the Ten Commandments from God on Mount Sinai. It thus seems unlikely that Jefferson would have a principled objection to a state erecting a monument commemorating the Ten Commandments on public property or putting posters of them in public school classrooms.

As governor of Virginia, Jefferson encouraged "the good people of this commonwealth" to set apart a day for "public and solemn thanksgiving and prayer to Almighty God" and urged "ministers of religion to meet their respective societies . . . to assist them in their prayers, edify

them with their discourses, and generally to perform the sacred duties of their function, proper for the occasion."[59] He also drafted bills stipulating when the governor could appoint "days of public fasting and humiliation, or thanksgiving."[60]

Unlike Washington, Adams, and Madison, Jefferson did not issue formal calls for prayer when he was president of the United States. Yet in more than one speech he invited his audiences to pray. For instance, Jefferson closed his second inaugural address by asking his listeners to "join with me in supplications, that he [the "Being in whose hands we are, who led our forefathers, as Israel of old"] will enlighten the minds of your servants . . ."[61]

Remarkably, for someone supposedly committed to a "wall of separation between church and state," in 1803 Jefferson sent a treaty concerning the Kaskaskia Indians to the Senate for approval. The third article in the treaty stipulated that:

> *whereas*, the greater part of the said tribe have been baptized and received into the Catholic church to which they are much attached, the United States will give annually for seven years one hundred dollars towards the support of a priest of that religion, who will engage to perform for the said tribe the duties of his office and also to instruct as many of their children as possible in the rudiments of literature. And the United States will further give the sum of three hundred dollars to assist the said tribe in the erection of a church.[62]

According to James Hutson, when he was president, Jefferson regularly worshipped in the Capitol and, in addition, "made executive-branch buildings—the Treasury and the War Office—available for church services."[63] After he "retired from the presidency, he resumed his earlier habit of worshiping in the Albemarle County Courthouse."[64]

Jefferson's private letters make it clear that he was not an orthodox Christian, and his public arguments and actions demonstrate that he favored a stricter separation between church and state than virtually any other founder. Yet even Jefferson, at least in his actions, did not attempt to remove religion from the public square. And what Jefferson did not completely exclude, most founders embraced.

## b. The First Federal Congress and George Washington

When the first federal Congress met in 1789, one of its first acts was to agree to appoint and pay congressional chaplains. Shortly after doing so, it reauthorized the Northwest Ordinance,

---

[59] See DREISBACH, THOMAS JEFFERSON, 138–39.

[60] DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 251–52.

[61] *Id.*, 530

[62] *Id.*, 476.

[63] James Hutson, *Thomas Jefferson's Letter to the Danbury Baptists: A Controversy Rejoined*, THE WILLIAM AND MARY QUARTERLY, 56 (Oct. 1999).

[64] *Id.*, 788.

which holds that "Religion, Morality, and knowledge being necessary to good government and the happiness of mankind, Schools and the means of education shall forever be encouraged."[65]

Significantly, on the day after the House approved the final wording of the Bill of Rights, Elias Boudinot, later president of the American Bible Society, proposed that Congress ask the President to recommend a day of public thanksgiving and prayer. In response to objections that these practices mimicked European customs and that such calls were properly issued by States, founding father Roger Sherman "justified the practice of thanksgiving, on any signal event, not only as a laudable one in itself, but as warranted by a number of precedents in holy writ: for instance, the solemn thanksgivings and rejoicings which took place in the time of Solomon, after the building of the temple, was a case in point. This example, he thought, worthy of Christian imitation on the present occasion; and he would agree with the gentleman who moved the resolution."[66]

The House approved the motion and appointed Boudinot, Sherman, and Peter Silvester of New York to a committee to consult Senators about the matter. The Senate concurred with the House, and Congress requested that President Washington issue his famous and theologically robust 1789 Thanksgiving Proclamation.[67] The text of his proclamation is worth quoting at some length:

> Whereas it is the duty of all Nations to acknowledge the providence of Almighty God, to obey his will, to be grateful for his benefits, and humbly to implore His protection and favor--and whereas both Houses of Congress have by their joint Committee requested me to recommend to the People of the United States a day of public thanksgiving and prayer to be observed by acknowledging with grateful hearts the many signal favors of Almighty God especially by affording them an opportunity peaceably to establish a form of government for their safety and happiness.
>
> I do recommend . . . the People of these States to the service of that great and glorious Being, who is the beneficent Author of all the good that was, that is, or that will be . . .
>
> And also that we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations and beseech Him to pardon our national and other transgressions, to enable us all, whether in public or private stations, to perform our several and relative duties properly and punctually; to render our national government a blessing to all the People . . .[68]

---

[65] DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 471–73, 238.

[66] DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 1789–1791 11: 1500–1501 (Linda Grant De Pauw et al. eds., 1972).

[67] DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 453–54; see also *Van Orden v. Perry*, 545 U.S. 677, 686–87 (2005).

[68] DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 453-54.

Similar proclamations were routinely issued by the Continental and Confederation Congresses and Presidents Washington, Adams, and Madison.

The founding and early national eras reveal almost no support for the proposition that America's founders desired to build a "high and impregnable" wall of separation between church and state.[69] To be sure, many founders had concluded that nation and even states should not have official, established churches, and they were against government coercion in matters of faith. But none understood the Establishment Clause to prohibit civic officials from incorporating religious language or symbols into public buildings and monuments.

The historical understanding of the Establishment Clause does not require the sort of separation between church and state that requires religion to be scrubbed from the public square. Moreover, American national, state, and local governments have long hired military and legislative chaplains, opened legislative and judicial sessions with prayer, and issued calls for prayer and fasting. And there is a long history and tradition of governments permitting religious images and language on public property. It is to this tradition that I now turn.

## 8. History, Tradition, and the Ten Commandments

In my expert report for the State of Arkansas in the case of *Donna Cave v. John Thurston*, I documented a long history and tradition of local, state, and the national government permitting religious displays, images, and language on public property. Included in this report were literally hundreds of examples of crosses, biblical language, Stars of David, and Ten Commandment monuments/displays on public property.[70] Rather than reiterate this information here, the following two sections focus more narrowly on why the Ten Commandments are displayed on public property and how they have been used in American schools from the early colonies to the present day.

### a. Ten Commandments as a Source of Law

In his expert report, Professor Green spends a great deal of space arguing that the Commandments are not a source for three of the nation's key founding documents or "the American Legal System."[71] Yet the Commandments are clearly *a* source of American law, as Green himself recognized in an earlier law review article where he wrote that "[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition . . . of which the American legal system is part."[72]

---

[69] *Everson v. Board of Education*, 18.

[70] Mark David Hall, Expert report in *Donna Cave v. John Thurston,* Nov. 6, 2019. See also HALL AND PICCIOTTI-BAYER, "Ten Commandments in the Public Square and Public Schools."

[71] Steven Green, *Expert Report in Rabbi Mara Nathan v. Alamo Heights Independent School District*, Civil Action No. 5: 25-cv-00756 (07/02/2025) (hereinafter: Green, Texas Report), 13.

[72] Steven Green, *The Fount of Everything Just and Right?: The Ten Commandments as a Source of American Law*, 13 THE JOURNAL OF LAW AND RELIGION 525 (2000).

Numerous scholars, civic leaders, and jurists have recognized that the Commandments are a source of Western and American law. For instance, Judge John T. Noonan, Jr., wrote that the Ten Commandments "have been the most influential law code in history"[73] Similarly, Stephen Botein observed in *Early American Law and Society* "the ideal polity of early Puritan New England was thought to comprehend divine intentions as revealed through Mosaic law."[74] In a 2009 study, John A. Eidsmoe identified roughly 1,000 judicial citations to the Ten Commandments in American court opinions, citations that continued well into the twentieth century.[75]

American civic leaders and scholars have long contended that the Ten Commandments had an important influence on the development of Western and American law. For instance, John Quincy Adams wrote to his son that:

> The law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes adapted to that time only, and to the particular circumstances of the nation to whom it was given; but many others were of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws.[76]

Similarly, in 1997, the House of Representatives recognized that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization" and "the Ten Commandments set forth a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society."[77] As such, the House resolved that "(1) the Ten Commandments are a declaration of fundamental principles that are the cornerstones of a fair and just society; and (2) the public display, including display in government offices and courthouses, of the Ten Commandments should be permitted."[78]

In the 2003 case of *Books v. City of Elkhart*, Judge Daniel Manion observed that the Ten Commandments "served as a foundation for the formation of both English Common Law and the Napoleonic Code, which together laid the foundation for American jurisprudence."[79]

---

[73] JOHN T. NOONAN, THE BELIEVER AND THE POWERS THAT ARE: CASES, HISTORY, AND OTHER DATA BEARING ON THE RELATION OF RELIGION AND GOVERNMENT 4 (1987).
[74] STEPHEN BOTEIN, EARLY AMERICAN LAW AND SOCIETY 25 (1982); *see* also John W. Welch, Biblical Law in America: Historical Perspectives and Potentials for Reform, BYU L. REV. 611-42 (2002).
[75] Eidsmoe, "The Use of the Ten Commandments in American Courts," 3 Liberty U. L. Rev. (2009), 15-16. This figure is based on a series of Lexis computer searches, but Eidsmoe also quotes from and cites dozens of cases where jurists utilize one or more of the Ten Commandments in substantive ways. Many of these cases are from the twentieth century.
[76] DREISBACH, READING THE BIBLE WITH THE FOUNDING FATHERS, 46 (2016).
[77] H.R. Con. Res. 31, 105th Cong. (1997).
[78] *Id.*
[79] Books v. City of Elkhart, 235 F.3d 292, 312 (7th Cir. 2000).

More recently, Justice Alito wrote in *American Legion v. American Humanist Association* (2019) that

> [f]or believing Jews and Christians, the Ten Commandments are the word of God handed down to Moses on Mount Sinai, but the image of the Ten Commandments has also been used to convey other meanings. They have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital.[80]

During oral argument for that case, the American Humanist Association's attorney, Monica Miller, observed that the Ten Commandments can have "some sort of dual secular meaning"; they are "basically shorthand for law itself."[81] The Office of the Curator of the United States Supreme agrees, explaining the Ten Commandments' historic role as a condensed symbol of law:

> Throughout the history of western art, tablets have been used to signify the Law. This tradition is closely associated with Moses, the Hebrew lawgiver, who, according to the Book of Exodus, descended from Mount Sinai with two stone tablets inscribed with the Ten Commandments. Over time, the use of two tablets has become a symbol for the commandments, and more generally, ancient laws.[82]

The influence of the Ten Commandments on American law is particularly evident with respect to legislation concerning the requirement to "Remember the sabbath day, to keep it holy" (Exodus 20:8). Colonial and State legislatures regularly prohibited work on Sunday. Indeed, 49 of 50 states retained such statutes as late as 1961 when they were found to be constitutionally permissible in *McGowan v. Maryland*.[83]

Professor Green contends that the Constitution does not "incorporate into its text any commandment,"[84] but he neglects to note that the Constitutional Convention met every day of

---

[80] Am. Legion v. Am. Humanist Ass'n, 588 U.S. 29, 53 (2019). Even the separationist Justice John Paul Stevens, who dissented in *Van Orden v. Perry*, observed in *County of Allegheny v. ACLU* that "a carving of Moses holding the Ten Commandments, if that is the only adornment on a courtroom wall, conveys an equivocal message, perhaps of respect for Judaism, for religion in general, or for law." Cnty. of Allegheny v. ACLU, 492 U.S. 573, 652 (1989) (Stevens, J., concurring in part).

[81] Transcript of Oral Argument, available at: https://www.supremecourt.gov/oral_arguments/ argument_transcripts/2018/17-1717_7l48.pdf, 55 (accessed July 8, 2019).
at 55.

[82] Off. of Curator, *Symbols of Law*, SCOTUS (last updated Sept. 28, 2015),
https://www.supremecourt.gov/about/SymbolsofLawInfoSheet%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_Final.pdf.

[83] 366 U.S. 420, 420-543 (1961).

[84] Green, Texas Report, 17.

the week except Sunday and that the delegates assumed that Congress would not conduct business on Sunday:

> If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a law, in like Manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a law.[85]

In short, there can be no doubt that the Third or Fourth Commandment, depending on the numbering scheme (discussed below), was a source of a great deal of legislation and a constitutional provision. More broadly, it is evident that the Ten Commandments are a source of Western and American law.

### b. History and Tradition of Displaying the Ten Commandments on Public Property

In the mid-twentieth century, E.J. Ruegemer, a Minnesota judge, became concerned with what he perceived to be the rise of juvenile delinquency in the United States. He believed that "if troubled youths were exposed to one of mankind's earliest and long-lasting codes of conduct, those youths might be less inclined to break the law."[86] He formed a committee "consisting of fellow judges, lawyers, various city officials, and clergy of several faiths" to develop a "version of the Ten Commandments which was not identifiable to any particular religious group."[87] He eventually partnered with Cecil B. DeMille and the Fraternal Order of Eagles to help place granite monuments inscribed with the Ten Commandments throughout the United States.[88] Many of these monuments were placed on public property, in one case on the Texas State House grounds. In *Van Orden v. Perry* (2005), the United States Supreme Court determined that "the display of a monument inscribed with the Ten Commandments on the Texas State House grounds" does not violate the Establishment Clause.[89]

---

[85] Article I, Section 7, Clause 2 of the United States Constitution.

[86] Declaration of Judge E.J. Ruegemer at 2, Card v. City of Everett, (W.D. Wash. 2003) (No. 2:03-cv-0285). *Card v. City of Everett* involved an Establishment Clause challenge to a monument of the Ten Commandments donated to the City of Everett, Washington, by the local chapter of the Fraternal Order of Eagles. The United States Court of Appeals for the Ninth Circuit eventually found it to be constitutionally permissible in *Card v. City of Everett*. *See generally* 520 F.3d 1009 (9th Cir. 2008). The text of the monument is virtually identical to the monument on the Texas State House grounds and that which would be used in Texas classrooms.

[87] Declaration of Judge E.J. Ruegemer, 3. The United States Court of Appeals for the Eighth Circuit agreed that a monument with the text of the Ten Commandments that would be used in Louisiana contains "a nonsectarian version of the Ten Commandments." *ACLU Neb. Found.*, 419 F.3d at 773. *See also* Brief of the Fraternal Order of Eagles as Amicus Curiae Supporting Respondents at 5–9, Van Orden v. Perry, 545 U.S. 677 (2005) (No. 03-1500), 2005 WL 263789.

[88] Declaration of Judge E.J. Ruegemer, 3–5. DeMille was only involved in the early stages of what has been referred to as the Eagles' Ten Commandment Project. SUE A. HOFFMAN, IN SEARCH OF GOD AND THE TEN COMMANDMENTS: ONE PERSON'S JOURNEY TO PRESERVE A SMALL PART OF AMERICA'S GOD-GIVEN VALUES AND FREEDOMS 76-79 (2014).

[89] Van Orden v. Perry, 545 U.S. 677, 681 (2005).

Judge Ruegemer estimated that "there are probably about 140-150 granite monuments of the Ten Commandments from the Eagles located throughout the country."[90] In my expert report for the state of Arkansas, I documented 106 such monuments that may be found on public property as of 2019.[91]

When the United States Supreme Court upheld the constitutionality of the monument in Texas, Chief Justice William Rehnquist observed that "acknowledgements of the role played by the Ten Commandments in our Nation's heritage are common throughout America."[92] To illustrate this point, he noted that:

> We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.

> Similar acknowledgments can be seen throughout a visitor's tour of our Nation's Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress' Jefferson Building since 1897. And the Jefferson Building's Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice, a statue entitled "The Spirit of Law" has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently featured in the Chamber of the United States House of Representatives.[93]

An exhaustive study of national, state, and municipal government buildings throughout the Nation would discover many additional displays of the Ten Commandments.[94] For instance, it would uncover:

---

[90] Declaration of Judge E.J. Ruegemer, 4-5.

[91] Dr. Mark David Hall Expert Report at 46, Cave v. Thurston, No. 4: 18-cv-00342 (E.D. Ark. Mar. 6, 2023).

[92] Van Orden, 688.

[93] Id., 688–89.

[94] In his dissenting opinion in Van Orden, Justice Stevens noted that the Eagles donated "over a hundred largely identical monoliths [of the Ten Commandments], *and . . . over a thousand paper*

a. a plaque containing the full text of the Ten Commandments in Alabama's State Capitol,[95]

b. framed copy the Commandments in Georgia's State Capitol,[96]

c. a mural of Moses with the Ten Commandments in the Rumford District Court courtroom in Rumford, Maine,[97]

d. a mural of Moses receiving the Ten Commandments in the Capitol Courtroom in Saint Paul, Minnesota,[98]

e. a mural of Moses holding the Ten Commandments at the Queens Supreme Court Building, New York,[99]

*replicas*, distributed to state and local governments throughout the Nation over the course of several decades" (emphasis added). *Id.*, 713 (Stevens, J., dissenting). An amicus brief by the United States in *Van Orden v. Perry* contains an appendix that lists at least one display of the Ten Commandments on public property in forty-one states. Brief for the United States as Amicus Curiae Supporting Respondents at *1A-*7A, Van Orden v. Perry, 545 U.S. 677 (2005) (No. 03-1500) 2005 WL 263790 [hereinafter Amicus Brief of the United States]. An organization called Ten Commandments Georgia claims to have placed a parchment copy of the Ten Commandments (along with eight other documents) in 46 public facilities in the State. TEN COMMANDMENTS GA, http://www.tencommandmentsga.org/success/countyDisplays.cfm (last visited Mar. 1, 2025). Finally, Sue Hoffman writes that in 1954 alone "the Youth Guidance Commission [of the Eagles] saw the distribution of over 18,000 prints of the Ten Commandments, which were placed in Eagle homes, many state capitols, and in county and local government offices." IN SEARCH OF GOD AND THE TEN COMMANDMENTS 34 (2014).

[95] John Sharp, *Ten Commandments Amendment Overwhelmingly Approved*, AL.com (Nov. 7, 2018, 1:28 PM), https://www.al.com/politics/2018/11/ten-commandments-amendment-cruising-to-overwhelming-passage.html (last visited Feb. 27, 2025).

[96] TEN COMMANDMENTS GA, http://tencommandmentsga.org/downloads/PlacingHistoricalDisplays.pdf (last visited Feb. 27, 2025).

[97] Matthew Daigle, *Art, Courts and the Legacy of Harry Cochrane*, SUN J. (Mar. 10, 2019), https://www.sunjournal.com/2019/03/10/art-courts-and-the-legacy-of-monmouths-harry-cochrane/.

[98] See John La Farge, *The Moral and Divine Law: Moses Receives the Law on Mount Sinai; Color Study for Mural, Supreme Court Room, Minnesota State Capitol, Saint Paul*, THE MET, https://www.metmuseum.org/art/collection/search/11378 (last visited Apr. 7, 2025).

[99] *Queens Supreme Court*, FORGOTTEN N.Y. (Nov. 13, 2015), https://forgotten-ny.com/2015/11/queens-supreme-court-jamaica/ (last visited Feb. 27, 2025).

f. a mural of Moses carving the Ten Commandments at the State Supreme Court building in Harrisburg, Pennsylvania,[100]

g. a mural of Moses holding the Ten Commandments in the Supreme Court Room, City-County Building, Pittsburg, Pennsylvania, and[101]

h. "[t]he main reading room of the Library of Congress [which] includes a painting of a woman praying, with the Ten Commandments by her side."[102]

Note that many of these displays are in or around legislative buildings and court houses. This is because the Ten Commandments are seen as an important source of Western and American law. The examples listed above are more than sufficient to show that erecting monuments or displays of the Ten Commandments on public property is a practice that is "deeply embedded in the history and tradition of this country."[103]

## c. Ten Commandments and American Education

In addition to putting posters, monuments, and inscriptions of the Ten Commandments in public spaces, there is a long history and tradition of teaching about the Ten Commandments in American schools. In H.B. 71, Louisiana requires that the Ten Commandments be displayed with a "context statement" that notes that the Commandments have long been a prominent part of American public education and are included in textbooks such as *The New England Primer*, *McGuffey's Readers*, and *The American Spelling Book*.[104]

Louisiana's claim respecting the role of the Ten Commandments in public schools has been challenged, and for good reason.[105] K-12 schools run by governments did not really exist until the 1820s. However, colonies like Massachusetts Bay required parents to ensure that their children and apprentices learn how to read and have "knowledge of the Capital laws."[106] These laws were replete with references to biblical laws and included citations to the Hebrew Scriptures. Citations are not to the Ten Commandments because the Commandments do not contain penalties for violating them. Instead, citations are to texts that stipulate punishment for violating some commandments. But there is substantial overlap between the capital laws and the

---

[100] Anna Marie Jehorek, *Touring the Pennsylvania State Capitol in Harrisburg*, Pull Over & Let Me Out, https://pulloverandletmeout.com/historical-travel/touring-the-pennsylvania-state-capitol-in-harrisburg/ (last visited February 27, 2025).
[101] Albert M. Tannler, *Architecture Feature: Edward Trumbull in Pittsburgh*, Pittsburgh Hist. & Landmarks Found. (Oct. 2, 2017, 9:54 AM), https://phlf.org/architecture-feature-edward-trumbull-pittsburgh/.
[102] Amicus Brief of the United States, 11.
[103] Marsh v. Chambers, 463 U.S. 783, 786 (1986).
[104] La. Stat. Ann. § 17:2124(B)(3) (2024).
[105] *See generally* Expert Report of Steven K. Green at 6, 22-26, 24, Roake v. Brumley, No. 3:24-cv-00517 (M.D. La. Aug. 26, 2024) (hereinafter Green Report).
[106] Dreisbach & Hall, Sacred Rights of Conscience, 94.

Ten Commandments. For instance, Exodus 20: 2-5, which contains either the first or the first and second commandments (depending on the religious tradition) reads:

> I am the LORD thy God, which have brought thee out of the land of Egypt, out of the house of bondage. Thou shalt have no other gods before me. Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth. Thou shalt not bow down thyself to them, nor serve them: for I the LORD thy God am a jealous God, visiting the iniquity of the fathers upon the children unto the third and fourth generation of them that hate me;

Whereas the first capital law reads:

> If any man after legall conviction, shall have or worship any other God, but the Lord God, he shall be put to death. Deut. 13. 6, &c. and 17. 2 &c. Exodus 22. 20.2.

Both texts make it clear that God's people must worship no God other than the God of Abraham, Isaac, and Jacob. The framers of the capital laws cited passages in Deuteronomy and Exodus 22 because these passages make it clear that the penalty for worshipping other gods is death.[107]

Overlap between the Ten Commandments and the capital laws is extensive. It includes:

| Ten Commandments | Addressed by Capital Law |
| --- | --- |
| I AM the LORD thy God. | |
| Thou shalt have no other gods before me. | 1 |
| Thou shalt not make to thyself any graven images. | |
| Thou shalt not take the Name of the Lord thy God in vain. | 3 |
| Remember the Sabbath day, to keep it holy. | |
| Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee. | 13, 14 |
| Thou shalt not kill. | 4, 5, 6 |
| Thou shalt not commit adultery. | 9 |
| Thou shalt not steal. | 10 |
| Thou shalt not bear false witness against thy neighbor. | 11 |
| Thou shalt not covet thy neighbor's house. | |
| Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.[108] | |

---

[107] On the relationship between the Ten Commandments and the commandments with punishments (called the Covenant Code by scholars), see MICHAEL COOGAN, THE TEN COMMANDMENTS: A SHORT HISTORY OF AN ANCIENT TEXT 43–44 (2014).

[108] The text of the Ten Commandments is that used on the Texas Ten Commandment monument and that would be used in the state's public school classrooms. *See* DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 93-94.

The Hebrew Scripture does not stipulate that violations of each the Ten Commandments is punishable by death. But the Puritans understood breaking seven of the Commandments to be punishable in this way. Therefore, anyone learning Massachusetts Bay's capital laws—as children were required to do as a matter of law—would learn about most of the Commandments. (That violation of some of the Commandments was not punishable by death did not mean they weren't punishable. For instance, a 1650 Massachusetts law stipulated: "Whosoever shall prophane the Lord's Day by doing any servill worke or any such like abuses shall forfeite for every such default 10/. or be whipped.").[109]

In addition to requiring parents to teach their children the capital laws, the colony required masters of families to "catechize their children and servants in the grounds & principles of Religion."[110] Other colonies had similar laws.[111]

Professor Green is correct that "[e]ducation at the time of the Founding occurred in private academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers."[112] Although schools were rarely run by governments, at least in New England education was required by them. Teachers or tutors often utilized editions of *The New England Primer* that included the Ten Commandments. The 1727, 1777, and 1842 editions of the *Primer*, for instance, included the entire Westminster Shorter Catechism, which

---

[109] 2 JOSEPH BARLOW FELT, THE ECCLESIASTICAL HISTORY OF NEW ENGLAND 26 (Bos., Congregational Libr. Ass'n 1862).

[110] DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 93-94.

[111] For instance, Connecticut had capital laws very similar to Massachusetts's, including the biblical citations. THE CODE OF 1650, BEING A COMPILATION OF THE EARLIEST LAWS AND ORDERS OF THE GENERAL COURT OF CONNECTICUT: ALSO, THE CONSTITUTION, OR CIVIL COMPACT, ENTERED INTO AND ADOPTED BY THE TOWNS OF WINDSOR, HARTFORD, AND WETHERSFIELD IN 1638-39 30-33 (Hartford, Silas Andrus 1822). THE ARTICLES, LAWS, AND ORDERS, DIVINE, POLITIC AND MARTIAL FOR THE COLONY OF VIRGINIA (1612) were likewise informed by the Old Testament, but biblical citations were not included in the text of these laws. They held, for instance, that "no man blaspheme God's holy name upon paine of death . . . ." and "no man or woman shall dare to violate or breake the Sabboth . . . ." (referencing the Protestant Third and Fourth Commandments). DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 84-85. Even Quaker Pennsylvania enforced the Protestant Third Commandment with a 1682 law that punished individuals who "shall speak loosely and profanely of almighty God, Christ Jesus, the Holy Spirit, or the scriptures of truth . . ." DONALD LUTZ, COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 289 (1998). This law was slightly revised in 1700, and in 1824 the Pennsylvania Supreme Court upheld a conviction for blasphemy based on it. *See generally* Updegraph v. Commonwealth, 11 Serg. & Rawle 394 (Pa. 1824); DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 561-70.

[112] Green Report, 18; for a similar claim see Green, Texas Report, 19.

contains 40 questions (41-81) concerning the Ten Commandments.[113] Literally millions of Americans learned to read using various editions of *The New-England Primer*—more than two million copies of this reader were printed in the eighteenth century alone.[114] Charles Heartman estimates that between 1680 and 1830 more than 6.5 million copies of the *Primer* were printed.[115] In spite of its name, the text was used throughout America.[116]

So, whether indirectly through study of the capital laws or directly through required catechesis, Massachusetts law required that children study the Ten Commandments. Laws in Massachusetts and in some other colonies required that children be educated but did not stipulate which texts must be used. But *The New England Primer* was widely used and, as we have seen, the Ten Commandments feature prominently in that text. Although other states were not as prescriptive regarding education as those in New England, it seems reasonable to conclude that children throughout the Nation were taught about the Ten Commandments in "private academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers."[117]

Ministers and others admonished the teaching of the Ten Commandments and educators included them in schoolbooks. For example, Cotton Mather, in a pamphlet entitled *The A, B, C. of religion. Lessons relating to the fear of God, fitted unto the youngest & lowest capacities,* observed that

> there are many special Cautions in the Word of God, which may be bro't unto People of the *Lowest Capacity;* and it will be found, that their *Conscience* will agree to them; & so it will be found the *Lessons* will not be above them. All

---

[113] WESTMINSTER ASSEMBLY, THE NEW-ENGLAND PRIMER, ENLARGED. FOR THE MORE EASY ATTAINING THE TRUE READING OF ENGLISH. : TO WHICH IS ADDED, THE ASSEMBLY OF DIVINES CATECHISM (BOS., 1727); WESTMINSTER ASSEMBLY, THE NEW ENGLAND PRIMER IMPROVED: FOR THE MORE EASY ATTAINING THE TRUE READING OF ENGLISH: TO WHICH IS ADDED THE ASSEMBLY OF DIVINES, AND MR. COTTON'S CATECHISM (BOS., 1777); S.A. HOWLAND, THE NEW ENGLAND PRIMER : CONTAINING THE ASSEMBLY'S CATECHISM, THE ACCOUNT OF THE BURNING OF JOHN ROGERS, A DIALOGUE BETWEEN CHRIST, A YOUTH, AND THE DEVIL, AND VARIOUS OTHER USEFUL AND INSTRUCTIVE MATTER 38-47 (Worcester, 1842). The 1777 version was republished in 1844 as *The New England Primer Improved: for the more easy attaining the true reading of English: to which is added the Assembly of Divines, and Mr. Cotton's Catechism*. (rprt. 1844) (1777); G. & C. Merriam reprint, 1844). Charles Heartman estimates that there were three hundred issues of the *Primer. See* CHARLES HEARTMAN, THE NEW ENGLAND PRIMER PRINTED IN AMERICA PRIOR TO 1830: A BIBLIOGRAPHICAL CHECKLIST 10 (1915). I could not consult them all and so instead examined three editions published more than one hundred years apart—including an edition available after states started creating public schools.
[114] HEARTMAN, THE NEW ENGLAND PRIMER, 65.
[115] *Id.*, 11.
[116] Stephanie Schnorbus argues persuasively that at least through 1790 the New England Primer "remained secure in Calvinist orthodoxy." Stephanie Schnorbus, *Calvin and Locke: Dueling Epistemologies in "The New England Primer,"* 1720–90, 8 EARLY AM. STUD. 250, 287 (2010).
[117] Green Report, 18.

the *Ten Commandments* are such Things; They are Calculated for the Lowest Capacity. Our *Children* may betimes learn the Ten *Commandments;* What is Forbidden and What is *Required* in the *Ten Commandments* (emphasis and capitalization in original).[118]

In a separate pamphlet, he insisted that "Negro-servants" must be taught them as well:

THE TEN COMMANDMENTS, are a very Material Part of the *Instruction* to be bestow'd upon the *Negroes.* As soon as may be, they should be told, That the Great GOD Spoke from Heaven, *Ten Commandments.* And that all Believers on JESUS CHRIST, must Labour to *Keep* those *Commandments,* and be Troubled and Asham'd, and beg Pardon for the Sake of JESUS CHRIST, if they break them (capitalization and spelling in original).[119]

Following this admonition, Mather included a twenty-question catechism that could be used to teach "Negro-servants" the Commandments.[120]

In a 1737 sermon that was later printed as a pamphlet, the Reverend John Barnard encouraged parents to teach children "the Way of God in Truth; and teach them to pray, and allow them Time to go alone, and read the Word of God, and pray to Him; and cause them to learn the Creed, the Ten Commandments, and the Lord's Prayer."[121]

The anonymously penned *An introduction to the reading of the Holy Bible: particularly adapted for the use of schools*, originally published in Europe, was reprinted in Philadelphia in 1795.[122] It contains a 42 catechist questions that may be used to teach school children the Commandments.[123] By contrast, the 1787 text *Miscellanies, moral and instructive, in prose and verse; collected from various authors, for the use of schools, and improvement of young persons of both sexes* contained a ten line poem to help children learn them.[124] James Janeway's *A Token for Children* contains a hymn entitled "The Consent of the Believer unto the Ten Commandments" intended to help children learn portions of the Ten Commandments.[125]

---

[118] COTTON MATHER, THE A, B, C. OF RELIGION. LESSONS RELATING TO THE FEAR OF GOD, FITTED UNTO THE YOUNGEST & LOWEST CAPACITIES. AND CHILDREN SUITABLY INSTRUCTED IN THE MAXIMS OF RELIGION 10-11 (BOS., 1713).

[119] COTTON MATHER, THE NEGRO CHRISTIANIZED: AN ESSAY TO EXCITE AND ASSIST THAT GOOD WORK, THE INSTRUCTION OF NEGRO-SERVANTS IN CHRISTIANITY 40 (BOS., 1706).

[120] *Id.,* 40-42.

[121] JOHN BARNARD, A CALL TO PARENTS, AND CHILDREN 23 (BOS., 1737).

[122] *See generally* AN INTRODUCTION TO THE READING OF THE HOLY BIBLE: PARTICULARLY ADAPTED FOR THE USE OF SCHOOLS (PHILA., 1795).

[123] *Id.,* 52-66.

[124] *See* MISCELLANIES, MORAL AND INSTRUCTIVE, IN PROSE AND VERSE; COLLECTED FROM VARIOUS AUTHORS, FOR THE USE OF SCHOOLS, AND IMPROVEMENT OF YOUNG PERSONS OF BOTH SEXES (PHILA, 1787).

[125] JAMES JANEWAY, A TOKEN FOR CHILDREN 31 (BOS., 1700).

Until the twentieth century, the federal government had little to do with K-12 education; except when it came to Native Americans. The federal government routinely partnered with Christian missionaries to run and teach in schools for Native American children.[126] Again, it would be shocking if they did not teach the Ten Commandments—not just as a matter of history, but as religious truth.

When states finally got involved in running public schools, they certainly had textbooks that included or taught about the Ten Commandments at their disposal. As we have seen, *The New England Primer* included 40 questions about them as late as its 1845 edition. They were listed in *McGuffey's Eclectic Reader* (1840)[127] and biblical passages (including portions of the Ten Commandments) are often quoted, paraphrased, and described without citations in Noah Webster's *The American Spelling Book* (1825).[128] Here are two examples from Webster's spelling book involving the Ten Commandments: "Sunday is the Sabbath, or the day of rest, and called the Lord's day, being devoted to religious duties"[129] and "Art thou a son or daughter? Be grateful to thy father, for he gave thee life; and to thy mother, for she sustained thee . . . Honor their grey hairs . . ."[130] The same is true for Stephen Byerly's *new American spelling-book: calculated for the use of schools in the United States* (1822), e.g., "Children obey your parents, and give them honor, that your days may be long in the land."[131] All ten commandments are listed in Samuel T. Worcester's *The American primary spelling-book* (1833).[132]

Horace Mann of Massachusetts, sometimes called the father of the public school system, favored reading the Bible in public schools.[133] He wrote that a nonsectarian public school "earnestly inculcates all Christian morals; it founds its morals on the basis of religion; it

---

[126] *See generally* Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause*, 96 NOTRE DAME L. REV. 677 (2020); see also HENRY WARNER BOWDEN, AMERICAN INDIANS AND CHRISTIAN MISSIONS 191-221 (1981).

[127] WILLIAM H. MCGUFFEY, MCGUFFEY'S ECLECTIC READER 216-17 (W.B. Smith & Co., Cin., 1840).

[128] NOAH WEBSTER, THE AMERICAN SPELLING BOOK 43-46, 49-51, 57, 62, 64, 72-73, 81-82, 103-04, 157-68 (Cushing & Jewett, Balt., 1825); *see also* ALBERT PICKET, AMERICAN SCHOOL CLASS-BOOK NO. 1: THE JUVENILE SPELLING-BOOK 193-97 (Daniel D. Smith, N.Y., 1819); RICHARD WIGGINS, THE NORTH AMERICAN SPELLING-BOOK, OR, PRONUNCIATION SIMPLIFIED : ON A NEW PLAN : BEING AN EASY, GRADUAL AND COMPLETE GUIDE TO SPELLING AND PRONUNCIATION, ACCORDING TO THE BEST USAGES : PRINCIPALLY UPON THE AUTHORITY OF WALKER 11, 13, 21-22, 59, 68, 115, 118, 142-44 (Samuel Wood & Sons, N.Y., 1821). Not everything on these pages comes from the Bible, but many of the passages clearly do.

[129] WEBSTER, THE AMERICAN SPELLING BOOK, 57.

[130] *Id.*, 82.

[131] STEPHEN BYERLY, NEW AMERICAN SPELLING-BOOK: CALCULATED FOR THE USE OF SCHOOLS IN THE UNITED STATES 127 (McCarthy & Davis, Phila., 1822); *see also id.,* 10-11, 16, 30-31, 40, 50, 76, 92-94, 96-98, 116-17.

[132] SAMUEL T. WORCESTER, THE AMERICAN PRIMARY SPELLING-BOOK 105 (Lily, Wait, Colman & Holden, Bos., 1833).

[133] ROBERT B. DOWNS, HORACE MANN: CHAMPION OF PUBLIC SCHOOLS (1974).

welcomes the religion of the Bible; and, in receiving the Bible, it allows it to do what it is allowed by no other system—to speak for itself."[134] He undoubtedly thought this was a neutral way of teaching the Bible, but to Roman Catholics it was a very Protestant way of teaching religion. So, too, was the common practice of using the King James Version of the Bible rather than the Douay version favored by Catholics. When Catholics objected to funding what they considered to be Protestant schools and asked for a share of state funds or that the Douay Bible be read to their children, they were accused of being "sectarian." On more than one occasion, such requests were met with violence.[135]

Protestant insistence on utilizing the King James Version of the Bible in public schools led to conflicts well into the twentieth century.[136] Some states voluntarily removed Bible teaching and religious exercises from public schools, but the point remains that there is a long history and tradition of reading and teaching about the Bible in American schools—from the early colonies to the 1960s.

Jenna Weissmann Joselit, in her study of the Ten Commandments in America, observes that "[e]ver since the mid-nineteenth century, they [Americans] saw to it that the Ten Commandments were just about everywhere: in houses of worship and private homes, on the street, *in school*, in the subway, and even on the interstate" (emphasis added).[137] She later notes that, "whether taught at home or at school, the Ten Commandments were once a central feature of the moral education of American children. Students committed them to memory, declaimed them from the stage, and even put them to song."[138]

Even as the Supreme Court declared devotional exercises in public schools to be unconstitutional, the justices made it clear that, "[t]he holding of the Court today plainly does not foreclose teaching about the Holy Scriptures or about the differences between religious sects in classes in literature or history."[139] If it is constitutional to teach about Ten Commandments in public schools, surely it is permissible to place copies of this important text in public school classrooms.

Louisiana inaccurately claimed that "[t]he Ten Commandments were a prominent part of American public education for almost three centuries."[140] Public schools, especially K-12 public schools, really didn't exist until the 1820s. However, the state could have accurately claimed that

---

[134] *Quoted in* STEVEN K. GREEN, THE SECOND DISESTABLISHMENT: CHURCH AND STATE IN NINETEENTH-CENTURY AMERICA 262 (2010) (emphasis in original).

[135] *See* MARK DAVID HALL, PROCLAIM LIBERTY THROUGHOUT ALL THE LAND: HOW CHRISTIANITY HAS ADVANCED FREEDOM AND EQUALITY FOR ALL AMERICANS 117-40 (2023).

[136] *See, e.g.*, *id.*,132-33.

[137] JENNA WEISSMANN JOSELIT, SET IN STONE: AMERICA'S EMBRACE OF THE TEN COMMANDMENTS 2 (2017).

[138] *Id.*, 63.

[139] Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 300 (1963) (Brennan, J., concurring); *see also id.*, 225; McCollum v. Bd. of Educ., 333 US 203, 235-36 (1948) (Jackson, J., concurring).

[140] LA. STAT. ANN. § 17:2124(B)(3)(2024).

"[t]he Ten Commandments were a prominent part of American education for almost three centuries." Most education in the seventeenth, eighteenth, and early nineteenth centuries was profoundly religious, and as we have seen study of the Ten Commandments (either directly or indirectly) was sometimes required by as a matter of law. Even if it was not, students utilizing texts like *The New England Primer*, *McGuffey's Readers*, and *The American Spelling Book* would have been exposed to them. Bible reading was prominent in public schools from their origin until the Supreme Court declared the practice to be unconstitutional in 1963. Even after this decision, the Court made it clear that public schools could teach about "the Holy Scriptures."[141]

### d. What about *Relatively* Recent Practices

According to the complaint in this case, there "is no longstanding historical practice or tradition of prominently and permanently displaying any version of the Ten Commandments in public-school classrooms."[142] Similarly Professor Green claims that "there is no longstanding, widespread history of permanently displaying the Ten Commandments in public school classrooms."[143] These assertions may be correct; I write "may be" because I am unaware of any source that documents displays (religious or otherwise) in the Nation's public school classrooms over the last two hundred years. Yet the Supreme Court has never said that in order for a practice to be constitutional that there has to be a longstanding and widespread history of governments engaging in it. In some cases, there *is* a longstanding and unbroken history and tradition of practice such opening legislative sessions with prayer, having military chaplains, and gubernatorial/presidential Thanksgiving Day proclamations.[144] But the Court has found some practices of *relatively* recent origin to be constitutionally permissible.

For instance, Christmas wasn't widely celebrated in America until the 1820s and 1830s[145] and, according to Penne Restad, it was celebrated primarily "as a home and church festival" until the twentieth century when "became increasingly a public occasion."[146] Citizens of "New York erected a community Christmas tree in 1912, purported to be the first ever in the country" and "President Coolidge lit the first 'National Christmas Tree'" on the White House lawn in 1923.[147] I am unaware of governments placing Nativity scenes on public property (or permitting them to

---

[141] *Abington*, 374 U.S. at 300.

[142] Complaint for Declaratory and Injunctive Relief in *Rabbi Mara Nathan v. Alamo Heights Independent School District*, Civil Action No. 5: 25-cv-00756 (07/02/2025), 2 (hereinafter Texas Complaint), 61.

[143] Green, Texas Report, 35-36.

[144] Marsh v. Chambers, 463 U.S. 783, 795 (1983); Town of Greece v. Galloway, 572 U.S. 565, 584 (2014).

[145] There were celebrations of sorts before the 1820s, but these were unlike anything we associate with Christmas today, e.g., Christmas trees, presents to children, and Santa Clause. *See* Penne L. Restad, Christmas in America: A History (1995); Stephen Nissenbaum, The Battle for Christmas (1996); David Bruce Forbes, Christmas: A Candid History (2007).

[146] Restad, CHRISTMAS, 156.

[147] *Id.*

be placed on public property) until the mid-twentieth century. Nevertheless, in *Lynch v. Donnelly* the Supreme Court found such displays to be constitutionally permissible.[148]

A few years later in *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter* 492 US 573 (1989), Justices found a stand-alone Nativity scene inside a courthouse to be unconstitutional but upheld an outdoor Chanukah menorah, that stood next to a Christmas tree and a sign, to be constitutional.[149] The presence of other displays (or lack thereof) featured heavily in some Justices' reasoning, but I wish to emphasize that Chanukah menorah displays on public land are of very recent origin. Indeed, in his concurring opinion in this case, Justice Anthony Kennedy specifically observed the fact that "displays commemorating religious holidays were not commonplace in 1791" does not entail that such displays are inconsistent with the values underlying the Establishment Clause.[150]

In Section 8, I document that there is a long history and tradition of erecting (or permitting to be erected) monuments of the Ten Commandments on public land. Yet many of my examples, and those documented in my earlier expert report for Arkansas,[151] were not created until the mid-twentieth century, and no one has claimed that governments were routinely erecting such symbols on public land in the eighteenth and nineteenth centuries. Nevertheless, the United States Supreme Court has found such monuments to be constitutionally permissible. As well, there is even less of a history of erecting monuments containing non-Christian religious images and language on public land. It is almost impossible to think the United States Supreme Court would find a Holocaust memorial that contains a Star of David to violate the Establishment Clause because there is not a long and unbroken history of governments erecting Stars of David on public property in the United States.[152]

The key question is not whether there is a long history and tradition of putting the Ten Commandments in public classrooms, but (1) "does the original understanding of the Establishment Clause require religion to be scrubbed from the public square?" (I argued in Section 7 that it does not) and then (2) "is there a long history and tradition of practices such as including religious language and images in public places." I argue in this section that there is. There does not have to be a long history and tradition of placing particular religious images and language in public places, thus nativity scenes, Chanukah menorahs, and posters of the Ten Commandments on public property are constitutionally permissible.

## 9. Favoritism and Coercion

Separationist organizations have argued that Texas's Ten Commandments law violates both the Establishment and Free Exercise Clauses because they involve favoring Protestantism over other faith traditions and placing posters of the Ten Commandments in public

---

[148] Lynch v. Donnelly, 465 U.S. 668 (1984).

[149] Cnty. of Allegheny v. ACLU Greater Pittsburg Chapter, 492 U.S. 573, 578-79 (1989).

[150] *Id.,* 669 (Kennedy, J., concurring).

[151] Mark David Hall, expert report in *Donna Cave et al. v. John Thurston* No. 4: 18-cv-00342-KGB and *Anne Orsi et al. v. John Thurston* No. 4: 18-cv-343-KGB (2019).

[152] HALL, PROCLAIM LIBERTY THROUGHOUT ALL THE LAND, 141-63 (2023).

school classrooms is coercive.[153] The federal district court judge in the Louisiana case uncritically agreed that the version of the Commandments used in that state was Protestant and so favored that tradition over others.[154] In this section, I show that the text of the Ten Commandments utilized by Texas and other states does not favor one religious tradition over others. I also contend that passive displays of the Ten Commandments in public schools cannot be considered "coercive" in any meaningful understanding of that word.

### a. A Protestant Version of the Ten Commandments?

As noted earlier, Minnesota Judge E. J. Ruegemer initially attempted to create a "version of the Ten Commandments which was not identifiable to any particular religious group."[155] The committee he formed to do so did not do a good job. After the first monuments were erected "people who were not Catholic or Lutheran were quick to point out that the numbering sequence was inconsistent with their religious background."[156] Although English translations of the original Hebrew text differ in the placement of textual pauses and thought-breaks, there is little disagreement among Jewish and Christian traditions as to the overall substance of the Ten Commandments.[157]

In response to these complaints, the Eagles altered the way in which the Commandments were presented to overcome "any possible objection to the version of the Ten Commandments."[158] The most significant change involved removing the numbers before each commandment. Most post-1958 Ten Commandments monuments include this version of the text—including the monument at issue in *Van Orden v. Perry*[159] and the text that would be included on posters in Texas (hereinafter "Texas text"), Louisiana, and Arkansas. Indeed, Louisiana House Bill 71 requires the text used in classrooms to be "identical" to the text upheld in *Van Orden*. La. R.S. § 17:2124(A)(6). S.B. 10 requires the same language and presentation:

"The Ten Commandments
I am the Lord thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.

---

[153] Texas Complaint, 59-63.

[154] Roake, 756 F. Supp. 3d at 130.

[155] *Card v. City of Everett,* 520 F.3d 1009, 1012 (9th Cir. 2008).

[156] SUE A. HOFFMAN, IN SEARCH OF GOD AND THE TEN COMMANDMENTS: ONE PERSON'S JOURNEY TO PRESERVE A SMALL PART OF AMERICA'S GOD-GIVEN VALUES AND FREEDOMS, 71 (self-published, 2014).

[157] See BRUCE METZGER AND MICHAEL COOGAN, EDS., THE OXFORD COMPANION TO THE BIBLE (New York: Oxford University Press, 1993): "The contents of the Ten Commandments are, however, the same for all of the religious communities, despite the differences in their enumeration" (736).

[158] *Id.,* 73.

[159] 545 U.S. 677 (2005).

Honor thy father and thy mother, that thy days may be long upon the land
which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his
maidservant, nor his cattle, nor anything that is thy neighbor's."[160]

Because the lines of this text are not numbered, it is possible to read them with thought-breaks in different places. For instance, a Jewish citizen may read the line, "Remember the Sabbath day, to keep it holy," as the Fourth Commandment, while a Protestant might read it as the Third Commandment. Similarly, one could understand the phrase "Thou shalt not take the name of the Lord thy God in vain" to be either the Second or the Third Commandment.

Presentations of the Ten Commandments are usually drawn from Exodus 20: 1-17, but in no display of which I am aware are these verses copied verbatim. The King James Version (1611) of them contains 343 words, the Catholic Douay-Reims Version (1899) contains 347 words, and the Jewish Publication Society Version (1917) contains 430 words, whereas the Texas text contains 121 words. Obviously, many passages were removed. Compare, for instance:

The King James's version of Exodus 20:1-3:

And God spake all these words, saying, **I am the LORD thy God**, which have brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt have no other gods before me**.

With the Catholic Douay-Rheims's American version:

And the Lord spoke all these words: **I am the Lord thy God**, who brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt not have strange gods before me**.

With the Jewish Publication Society's version:

And God spoke all these words, saying: **I am the LORD thy God**, who brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt have no other gods before Me** (Exodus 20:1–3).

With the Texas text, which condenses these verses as follows:

I AM the LORD thy God
Thou shalt have no other gods before me

---

[160] S.B. 10: https://legiscan.com/TX/text/SB10/id/3247430/Texas-2025-SB10-Enrolled.html.

Note that the text adopted by Texas is very similar to the bolded phrases from each edition above.

In his testimony in the Louisiana case, Professor Steven K. Green contended that one can tell that the Louisiana text is taken from the King James Version (KJV) of the Bible because it "uses the words 'Thou,' which we don't use very often these days unless you're reading from the King James Bible."[161] But note that all three versions quoted above use the word "Thou." There are minor differences in the English translations of Exodus 20:1-3, but it is not clear that the committee used language from the King James Bible; certainly, the use of "Thou" offers no proof that they did.[162]

To support his case that the Texas version of the Ten Commandments is Protestant, Professor Green contends it contains the prohibition on making "graven images" but that "*most* Catholic translations omit the prohibition regarding making 'graven images'" (emphasis added)."[163] Green gives no example of a Catholic edition that does not include this prohibition, and the Catholic Douay-Rheims version referenced above contains it: "Thou shalt not make to thyself a graven thing . . ." (EX 20:4). Professor Green may be unaware of this fact as he relies on an article by Professor Paul Finkelman to support his claim rather than comparing English versions of Exodus 20 that would have been readily available to drafters of the text in question in the 1950s.[164] Interestingly, Professor Finkelman characterizes the presentation of the Texas Ten Commandments monument as "Lutheran" rather than "Protestant," as Green claims.[165] Lutherans are Protestants, but they list the Commandments with the same numbering system as Catholics. Professor Green does not address his disagreement with Professor Finkelman even as he relies on him as an authority on other matters.[166]

The Douay-Rheims version quoted above is not an outlier. Every English translation of the Bible approved by the Catholic Church that I consulted includes some version of the command in question. For instance, the Jerusalem Bible (1966): "You shall not make yourself a carved image . . ."; the New Catholic Bible (2019): "You shall not make idols or any image of things that are in the heavens above . . . "; The New American Bible (NABRE) (2011): "You

---

[161] ROA. 2391 (Green Testimony at 67).

[162] Paul Finkelman, *The Ten Commandments on Courthouse Laws and Elsewhere*, 73 FORDHAM LAW REVIEW 1493 (2005) similarly asserts that the language in the Texas monument is from the King James Version but, like Green, he does not consider Catholic and Jewish translations of the Bible that contain language very similar to the KJV that were available to those who created the text used for the Texas monument and elsewhere. He completely ignores the Catholic Douay-Rheims edition quoted above and uses The Jewish Publication Society's 1985 translation rather than the 1917 one available in the 1950s (1495).

[163] Green, Texas Report, 30.

[164] *Id.*

[165] Finkelman, *The Ten Commandments on Courthouse Laws and Elsewhere*, 1486, 1493; ROA. 875 (Green Report at 26-27); Green, Texas Report, 7.

[166] Professor Green cites Professor Finkelman eleven times in his Texas report. Both professors argue that Ten Commandment monuments on public property are unconstitutional.

shall not make for yourself an idol or a likeness of anything . . . " (EX 20:4). To be sure, these editions do not include the words "graven images," but the equivalent idea is communicated.

The 1921 edition of *A Catechism of Christian Doctrine: Prepared and Enjoined by Order of the Third Plenary Council of Baltimore, No. 3*—the classic American Catholic catechism, originally approved in 1885 and which remained the default catechism for American Catholics until the 1994 English translation of *The Catholic Catechism*, begins Exodus 20:4 with the requirement that "thou shall not make to thyself a graven image."[167] The 1994 English translation of the Catholic Catechism contains virtually identical language: "You shall not make for yourself a graven image."[168] Both catechisms explain that Catholics have, since at least the Second Council of Nicaea (787),[169] understood the First Commandment to prohibit, in the words of the 1921 catechism, "images if they are made to be adored as gods," but that it "does not forbid the making of them to put us in mind of Jesus Christ, His Blessed Mother, and the saints."[170]

As additional evidence of the text's favoritism, Professor Green argues that S.B. 10's command that reads "Thou shalt not kill" is Protestant whereas the Jewish version reads "You shall not murder." To support this characterization, Professor Green cites two secondary sources, including his "colleague" Professor Finkelman.[171] He might have instead consulted primary sources such as *Catechism For Younger Children: Designed as a Familiar Exposition of the Jewish Religion*, a catechism for Jewish children written by Isaac Leeser and first published Philadelphia in 1839. Question 62 of the catechism asks, "What is the Sixth Commandment?" The answer is" "Thou shall not kill."[172] The answer is identical in the 3rd edition of this work, which was published in 1856.[173] Leeser's *The Twenty-Four Books of the Holy Scriptures: Carefully Translated According to the Massoretic Text After the Best Jewish Authorities* contains the same translation.[174]

The distinction between killing and murdering is hardly one made only by Jewish scholars/translators. The *English Standard Version* of the Bible, translated by mostly Protestant scholars and published by Crossway in 2001, renders this commandment as "You shall not

---

[167] *A Catechism of Christian Doctrine: Prepared and Enjoined by Order of the Third Plenary Council of Baltimore, No. 3* (New York: Benziger Brothers, 1921), 254.
[168] *Catechism of the Catholic Church* (New York: Doubleday, 1995), 551, 573. See also John A. Hardon, S.J., *The Catholic Catechism: A Contemporary Catechism of the Teachings of the Catholic Church* (New York: Doubleday, 1975), 296-99.
[169] Hardon, *Catechism*, 296-99.
[170] *A Catechism of Christian Doctrine*, 273.
[171] ROA. 875 (Green Report at 28); Green, Texas Report, 30. Green calls Finkelman a "colleague" in the first report but not the second one.
[172] *Catechism For Younger Children: Designed as a Familiar Exposition of the Jewish Religion* (Philadelphia, 1839), 108.
[173] Isaac Lesser, *Catechism for Jewish Children: Designed as a Religious Manual for House and School*, 3rd (Philadelphia, 1856), 87.
[174] Isaac Leeser, *The Twenty-Four Books of the Holy Scriptures: Carefully Translated According to the Massoretic Text After the Best Jewish Authorities* (Cincinnati, 1852), 106.

murder."[175] Indeed, most (but not all) Christians understand the commandment to prohibit the taking, in the words of the 1921 Catholic catechism, "the life of an innocent person," but not a life "in self-defense," "a just war," or a "lawful execution of a criminal."[176]

The federal district court judge adjudicating the Louisiana Ten Commandments case uncritically accepted Professor Green's assertion that the Louisiana law "mandates a particular, Protestant version of the Ten Commandments that does not comport with Catholic or Jewish faiths."[177] This is inaccurate. The version of the Ten Commandments, like that on the Texas Statehouse grounds and in S.B. 10, is a non-sectarian version not readily identifiable to any particular religious group. Indeed, the United States Court of Appeals for the Eighth Circuit found that a monument with this text in question contains "a nonsectarian version of the Ten Commandments."[178]

### b. Coercion

Both the Establishment and Free Exercise Clauses prohibit government coercion in matters of faith. But the Supreme Court did not always understand this to be the case. In *Minersville School District v. Gobitis* (1940),[179] justices upheld a Pennsylvania law requiring school children to salute and pledge allegiance to the American flag even though they had religious objections to doing so. Justice Felix Frankfurter acknowledged in his majority opinion that the children's freedom of conscience was violated, but he concluded that the state's interest overrides this concern.[180]

Fortunately, three years later the Supreme Court reversed this decision. Like Pennsylvania, West Virginia required school children to salute and pledge allegiance to the American flag, and the state punished students and parents who refused to do so for religious reasons.[181] In *West Virginia v. Barnette,* Justice Robert H. Jackson famously wrote:

If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other

---

[175] *English Standard Version* (Wheaton: Crossway, 2001).

[176] *A Catechism of Christian Doctrine*, 287.

[177] Roake v. Brumley, No. 24-517-JWD-SDJ, 2024 WL 4746342, at *49 (M.D. La. Nov. 12, 2024).

[178] *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 773 (2005)*; see also* Brief of the Fraternal Order of Eagles as *amicus curiae* in Support of Respondents. *Van Orden*, 2005 WL 263789, 2005 U.S. S. Ct. Briefs LEXIS 134 (Supreme Court of the United States January 31, 2005), 5–9. With the demise of the endorsement test, it is not clear that displaying a sectarian version of the Commandments in public schools would be unconstitutional. But it is not necessary to reach this question in the present case.

[179] 310 US 586 (1940).

[180] *Id.*, 591-600. STEVEN WALDMAN, SACRED LIBERTY: AMERICA'S LONG, BLOODY, AND ONGOING STRUGGLE FOR RELIGIOUS FREEDOM 163-176 (2019).

[181] 319 US 624, 629.

matters of opinion, or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.[182]

In other words, West Virginia may not require children to act against their religious convictions, convictions directly informed by biblical admonitions found in the Ten Commandments: "Thou shalt not make unto thee any graven image, or any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth; thou shalt not bow down thyself to them nor serve them" (Exodus 20: 4-5).[183]

These two cases illustrate the difference between coercion and exposure. Requiring children to say words and act in a manner that violates their consciences in matters of faith is prohibited by both the Establishment and Free Exercise Clauses. But note that *West Virginia v. Barnette* did not prohibit states from generally requiring public school children salute and pledge allegiance to the American flag. Indeed, most states still have laws requiring public school students to engage in these actions if they do not have religious or conscientious objections to doing so.[184] *Barnette* and these state laws prohibit coercion, not exposure, a distinction reinforced by all of the justices' opinions in *Mahmoud v. Taylor* (2025).[185]

## 10. Conclusion

The United States Supreme Court has insisted that the Establishment Clause must be understood in light of its generating history as supplemented by history and tradition. There is virtually no evidence that the founders understood this clause to require the strict separation of church and state, and there is a long history and tradition of including religious images and language in public spaces. Even more specifically, the Ten Commandments have long been held to be a source of American law, they are often displayed in and around public buildings, and since the earliest colonial settlements they have been a prominent part of American education.

It is possible to portray the Ten Commandments in ways that are Jewish, Catholic/Lutheran, or Protestant. But the presentation and text in this case is not readily identifiable with any one religious tradition. And it is a stretch to claim that passive displays of the Commandments are coercive in any meaningful sense to the word.

---

[182] *Id.,* 642.

[183] *Id.* 629.

[184] RICHARD J. ELLIS, TO THE FLAG: THE UNLIKELY HISTORY OF THE PLEDGE OF ALLEGIANCE, 121-222 (2005). According to Brad Dress, in 2022 forty-seven states required students to recite the pledge of allegiance (with exemptions for students with conscientious objections). See Dress, "Here is a breakdown of laws in 47 states that require reciting the Pledge of Allegiance," *The Hill* (04/02/22) available here: https://thehill.com/homenews/3256719-47-states-require-the-pledge-of-allegiance-be-recited-in-schools-here-is-a-breakdown-of-each-states-laws/. See, for example, N.J. Stat. § 18A:36-3 and MCA 20-7-133.

[185] Available at: https://www.supremecourt.gov/opinions/24pdf/24-297_4f14.pdf.