IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RABBI MARA NATHAN,                    §
on behalf of herself  and on behalf of §
her minor child, M.N., et al.,        §
Plaintiffs,                           §
                                      §    No. 5:25-cv-00756
v.                                    §
                                      §
ALAMO HEIGHTS INDEPENDENT             §
SCHOOL DISTRICT, et al.,              §
Defendants.                           §

**MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF OF JON R.
MEADOR IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

Jon R. Meador moves this Court for leave to file the accompanying amicus curiae brief to aid the Court in resolving this case. Amicus retired from the Office of the Attorney General of Texas but continues to practice law in Illinois, has taught taught Constitutional Law as an adjunct at Lincoln College, and is a scholar of early American religious history. More importantly, as a convert to Judaism from Catholicism, he is extremely concerned with the country's theocratic trend. As a practicing Jew, the undersigned can say there is nothing in the text, history, or tradition that supports S.B. 10's assertion that the laws set out therein are the "Ten Commandments." As the attached brief explains, the plain text of the Torah says otherwise. Jews know this, and the State of Texas has no right to say otherwise. Make Texas cite the Torah portions supporting the proposition that S.B. 10 contains "The Ten Commandments." Additionally, as a constitutional scholar, the undersigned can say that the plain text of the Constitution and the First Amendment erect a Wall of

Separation of Church and State. There is an absolute bar against providing public support and taxpayer dollars to promote any religion.

The undersigned respectfully moves this Court to allow the filing of the attached brief that takes a Biblical and grammatical approach to the issues at bar. There can be no harm to any party if the Court were to consider arguments grounded in primary sources like the Bible, the Constitution, the First Amendment, dictionaries, legislative history, and comments from the Founders responsible for drafting the First Amendment.

If this Court denies the request to file the attached brief, it should, at a minimum, make the parties give specific citations to the Bible and to the dictionary and legislative history for support of their arguments on the meaning of the Bible, the Constitution, and the First Amendment. These issues must be raised and argued in the district court before they get to the Fifth Circuit and the Supreme Court as both bodies will receive several hundred amici briefs. This Court has an opportunity to determine in the first instance the meaning of the Constitution, First Amendment, and Bible. The undersigned believes our understanding of the Constitution, First, Amendment, and the Bible should dictate their meaning. Once the case is on appeal, the Fifth Circuit and the Supreme Court will construct interpretations consistent with their political and religious beliefs but inconsistent with the primary sources. The Court should at least consider an interpretation grounded in primary sources.

DATED this October 30, 2025.

Respectfully submitted,

/s/Jon R. Meador
Counsel for Amicus Curiae
Admitted: Western District of Texas,
September 7, 2006

915 N. Broadway
Salem, IL 62881
jonrmeador@gmail.com
512-395-4425

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2025, I electronically filed the foregoing Motion for Leave to File Brief of Amicus Curiae Texas Values using the CM/ECF system. Counsel for all parties to the case are registered users and will be served by the CM/ECF system.

/s/ Jon R. Meador
Counsel for Amicus Curiae

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RABBI MARA NATHAN,                      §
on behalf of herself  and on behalf of  §
her minor child, M.N., et al.,          §
Plaintiffs,                             §
                                        §      No. 5:25-cv-00756
v.                                      §
                                        §
ALAMO HEIGHTS INDEPENDENT               §
SCHOOL DISTRICT, et al.,                §
Defendants.                             §

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RABBI MARA NATHAN,                      §
on behalf of herself  and on behalf of  §
her minor child, M.N., et al.,          §
Plaintiffs,                             §
                                        §        No. 5:25-cv-00756
v.                                      §
                                        §
ALAMO HEIGHTS INDEPENDENT               §
SCHOOL DISTRICT, et al.,                §
Defendants.                             §

**AMICI CURIAE BRIEF OF JON R. MEADOR IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Contents……………………………………………………..…..i

Index of Authorities…………………………………………………….……ii

Interest of *Amicus Curiae*……………………………………………..……...1

Introduction……………………………………………..…...……………....1

Argument……………………………………………………………....…..3

    A.  The plain text of the Constitution and Establishment Clause
        Erect a Wall of Separation of Church and State……………………………3

    B.  S.B. 10 contradicts the Bible……………………………………….12

    C.  The Overruling of *Lemon* Is Fatal to S.B. 10………………………….14

Conclusion………………………………………………………...…16

Certificate of Service……………………………………………………….17

Certificate of Compliance with Style Requirements………………………………17

# INDEX OF AUTHORITIES

## SUPREME COURT CASES

*Board of Education v. Allen*, 392 U.S. 236, 243 (1968)……………………………..…17

*Lemon v. Kurtzman*, 403 U.S. 602 (1980)………………………………………4, 5, 17, 18

*Stone v. Graham*, 449 U.S. 39 (1980)……………………………………..…… 4, 5, 17, 18

## PRIMARY SOURCES

Johnson, Samuel, A Dictionary of the English Language 1773……………..………10, 11

Journal of the House of Representatives of the United States ……………..……11, 12

Journal of the First Session of the Senate of the United States of America 1789

Oxford Old English Dictionary……………………………………..………..……………10-11

The Debates and Proceedings in the Congress of the United States …………………6

The Debates and Proceedings in the Congress of the United States,

      42 vols (Gales and Seaton, 1834-1856)…………………………………………8

The Federalist Papers, No. 84………………………………………………………10

United State Constitution, Art. II, sec. 1………………………………………..……6

United States Constitution, Art. VI………………………………………………6

Webster, Noah. American Dictionary of the English Language ………..……...10, 11

## SECONDARY SOURCES

Joseph Story, Commentaries on the Constitution………………………………………10

3 William and Mary Q. 534 (1946)……………………………………………………14

**INTEREST OF AMICUS CURIAE**

Amicus is a practicing attorney, who taught Constitutional Law as an adjunct at Lincoln College, and is a scholar of early American religious history. More importantly, as a convert to Judaism from Catholicism, he is extremely concerned with the country's theocratic trend. As will be set out below, the text, history, and tradition verify that the Founders erected a wall of separation of church and state. Additionally, there is nothing in the text, history, or tradition that supports S.B. 10's assertion that the laws set out therein are the "Ten Commandments." No party appears to be making the arguments the undersigned is making. If the overruling of *Lemon* means the Supreme Court will one day address the "plain" meaning of the Constitution, First Amendment, and the Torah, then this Court should take a ground up approach to interpreting them all. All one needs is a dictionary, the legislative and Biblical history, and the comments of people and prophets responsible for drafting the Constitution, First Amendment, and "The Ten Commandments" to understand their plain meaning.

**INTRODUCTION**

Wrecking the Wall of Separation of Church and State, a constitutional doctrine that is clearly and unambiguously set out in the Constitution and stated in the First Amendment, has long been the goal of Christian Nationalists. With the purported death of *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), it is imperative that this Court undertake what appears to be an issue of first impression, namely, a word-by-word and line-by-line interpretation of not only the religious clauses in the

Constitution and the First Amendment but the Biblical clauses enshrining "The Ten Commandments." As for the Constitution and First Amendment, as James Madison and Roger Sherman argued the very first day Congress met to draft amendments to the Constitution, the government does not have the power "to make religious establishments," a rule carried over from the Constitutional Convention. Senate Bill 10 (S.B. 10) is *void ab initio* because the Texas Legislature lacks the authority to pass any law on religion. Next, S.B. 10 is also un-Biblical. S.B. 10 does not set out "The Ten Commandments." It sets out what has been generally called "The Decalogue" or the ten words. Moses shattered the tablets at the foot of Mt. Sinai. Because something had to go in the Ark of the Covenant, the Eternal gave Moses a second set of tablets that He specifically called "The Ten Commandments." The two sets are different. "Thou shalt not kill," for example, is not in "The Ten Commandments." Last, as for the viability of the holding in *Stone*, the overruling of "the *Lemon* test," the test the *Stone* Court applied, is fatal to Texas' claim that the posting of "The Ten Commandments" is now constitutional. That "The Ten Commandments" were secular was the only possible basis for its constitutionality. Now that there is no secular test and the display must be measured against the Constitution and First Amendment, Texas must lose. S.B. 10, like "The Decalogue," should be once again shattered at the foot of Mt. Sinai and the Constitution.

## ARGUMENT

**A. The plain text of the Constitution and Establishment Clause Erect a Wall of Separation of Church and State.**

The historical record is clear: the Framers carved religion out of the Constitution and authored a godless, secular document denying the government "power over religion." This is the fact that Texas schoolchildren should hear.

Beginning with the Constitution, Article VI (hereinafter, the "The No-Religious Test Clause") eliminates religious oaths and tests of office generally. Article II, Section 1, the presidential oath of office, omits the phrase "so help me god." A requirement to swear an oath ending in "so help me god" would obviously violate the No-Religious Test Clause. In defense of the godless, secular Constitution, soon-to-be Associate Justice James Iredell, voicing the belief that religion was excised from governmental power, reminded "the least conversant in the history of mankind" of the "utmost cruelties," intolerance, persecution, divisiveness, and the "wars of the most implacable and bloody nature" exercised in the name of religion. Jonathan Elliot, ed., *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, (Philadelphia, 1941), IV:903-04. "Is there any power given to Congress in matters of religion." *See id*. at 904. In language mirroring the Establishment Clause, Iredell added, "If any future Congress should pass an act concerning the religion of the country, it would be an act which they are *not authorized to pass* by the Constitution, and which the people would not obey." *See id* (emphasis added). As political issues are to courts, religious issues are to legislatures. Religion can never be the engine of civic policy.

James Wilson agreed. As all federalists, Wilson argued against the drafting of a Bill of Rights because the power of government was limited to those powers enumerated in the Constitution. *See id.* II:436. Providing a Bill of Rights, he said, would leave the impression that the rights not listed were not protected: "A bill of rights annexed to a constitution is *an enumeration of the powers* reserved. If we attempt an enumeration, everything that which is not enumerated is presumed given." *See id.* (emphasis in orig.). "[A]n imperfect enumeration would throw all implied power into the scale of the government, and the rights of the people would be rendered incomplete." *See id.* Wilson contested the idea that we needed a bill of rights to protect the "rights of conscience." *See id.* at 455. "I ask the honorable gentleman, what part of this system puts it in the power of Congress to attack those rights. When there is no power to attack, it is idle to prepare the means of defence." *Id.*

Alexander Hamilton thought the same thing respecting press liberty: "For why declare that things shall not be done which there is no power to do? Why, for instance, should it be said that the liberty of the press shall not be restrained, when no power is given by which restrictions may be imposed?" Jacob E. Cooke, ed., *The Federalist*, (Middletown, Conn. 1961), no.84. Religion, like all the other rights listed in the First Amendment, can never be the engine of civic policy.

The foundational Constitutional idea that the government had "no power over the subject" appeared during the proceedings on the Bill of Rights. On Saturday, August 15, 1789, the House of Representatives began discussing the religious clauses. It was on this day that James Madison proposed the following addition to Section 9

4

of Article 1 of the Constitution to be inserted between paragraphs two and three: that "no religion shall be established by law." *See* The Debates and Proceedings in the Congress of the United States, 42 vols (Gales and Seaton, 1834-1856) 1:757 (hereinafter "Annals"). Roger Sherman moved to dismiss Madison's proposal saying he "thought the amendment altogether unnecessary, inasmuch as Congress had no authority whatever delegated to them by the constitution *to make religious establishments*." *Id*. (emphasis added to dispel belief that Framers feared only one national establishment).

When Madison introduced language to protect the freedom of speech, the press, the right to assemble, and to petition the government for redress, Massachusetts Representative Theodore Sedgwick objected fearing "it would tend to make them appear trifling in the eyes of their constituents." Annals 1:759. That people can assemble and speak "is a self-evident, unalienable right which the people possess; it is certainly a thing that never would be called in question; it is derogatory to the dignity of the House to descent to such minutiae[.]" *Id*. In response to the explanation that the people who drafted the language did so to secure inherent rights, Sedgwick replied:

> [I]f the committee were governed by that general principle, they might have gone into a very lengthy enumeration of rights: they might have declared that a man should have a right to wear his hat if he pleased, that he might get up when he pleased, and go to bed when he thought proper; but he would ask the gentleman whether he thought it necessary to enter these trifles in a declaration of rights, in a Government where none of them were intended to be infringed.

Annals 1:759-760. That seems to say it all: legislative bodies have no power over religion, when to go to bed or remove your hat.

We can say with one hundred percent certainty that Madison was not suggesting that Congressional power was limited to the establishment of just one, national religion. First, none of the Framers or Founders said Congress cannot "establish a national religion" as long as it "establishes them all." As noted above, Sherman clarified that Congress had no power "to make religious establishments." Plural: no religious establishments. Madison's proposal was written in the passive voice: "no religion shall be established by law." Who cannot make religious establishments? Peter Sylvester knew that absent a speaker the language would have had "a tendency to abolish religion altogether." *See* Annals 1:757. Madison's proposal would have tended toward abolishing religion everywhere, federal and state. That Madison might want to "abolish religion altogether" comes as no surprise to any Madisonian scholar, as he was no fan of religion, but given the objection, Madison offered to amend the language by adding the word "national" before the word "religion," thus, limiting the complete abolitionist goal to Congress and leaving states to do as they pleased including establishing or criminalizing religions. This addition matched Madison's initial draft: "nor shall any national religion be established." Annals 1:451-452. Rewording Madison's proposal in the active voice, the recommended amendment would have read, "Congress shall establish no religion by law." While it may appear obvious to every reader, "no" means "no law" and "none."

Congress was prohibited from making *any* religious establishment. Legislative bodies have no power over the subject.

Madison said this very thing in 1785 two years before the Constitutional Convention: "Religion is wholly exempt from [the] cognizance" of "Civil Society. [I]f Religion is exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body." *See Memorial and Remonstrance against Religious Assessments*, II Writings of Madison, at 187. "Religion can never be the engine of civic policy." *Id.*

Joseph Story agreed. The objective of the No-Religious Test Clause was "to cut off for ever *every pretense of any alliance* between church and state in the national government." Joseph Story, Commentaries on the Constitution 3, §1841 (1833) (emphasis added). Article VI did not bar only an alliance between church and state but "every pretense" of one. Story noted that the Establishment Clause had the same objective: "The real object of the amendment was, not to countenance, much less to advance Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent *any* national ecclesiastical establishment, which should give to a hierarchy the exclusive patronage of the national government." *See id.* §1871 (emphasis added); *id.* §1873. Given the "dangers from ecclesiastical ambition, the bigotry of spiritual pride, and the intolerance of sects . . . it was deemed advisable to exclude from the national government *all power to act upon the subject*." *Id.* (emphasis added).

If that were not enough, the full legislative history of the First Amendment seals the deal. This is the legislative history of the First Amendment:

The first version of the amendment came out of the House on August 15, 1789: "Congress shall make no laws touching religion, or infringing the rights of conscience." Annals 1: 759. It amended the language on August 21, 1789 to read: "Congress shall make no law establishing religion, or to prevent the free exercise thereof, or to infringe the rights of conscience." Annals 1: 795-796. The version that was sent to the Senate on August 24, 1789 was changed to: "Congress shall make no law establishing religion, or prohibiting the free exercise thereof, nor shall the rights of conscience be infringed." Journal of the House of Representatives of the United States (Gales and Seaton, 1826), 1:82. (hereinafter "House Journal").[1]

The draft leaving the House was presented to the Senate on August 24, 1789, the House's "Article the Third": "Congress shall make no law establishing religion, or prohibiting the free exercise thereof, nor shall the rights of conscience be infringed." Journal of the First Session of the Senate of the United States of America 1789, 104 (hereinafter "Senate Journal").[2] On September 3, 1789, the Senate went about amending the House language by striking "Religion or prohibiting the free Exercise thereof," and inserting, "One Religious Sect or Society in preference to others," Senate Journal 116. The amendment now read: "Congress shall make no law establishing One Religious Sect or Society in preference to others, nor shall the rights of conscience

---

[1] https://catalog.hathitrust.org/Record/002137422 (last visited October 19, 2025).
[2] https://archive.org/details/journalfirstses00senagoog/page/n122/mode/2up (last visited October 19, 2025).

be infringed." Not done, the Senate came back to the original House draft but struck "nor shall the rights of conscience be infringed." Senate Journal 117. Now the draft read: "Congress shall make no law establishing religion, or to prevent the free exercise thereof." Senate Journal 117. Not done again, the Senate on September 9, 1789 changed the House language to: "Congress shall make no law establishing articles of faith or a mode of worship, or prohibiting the free exercise of religion, or abridging the freedom of speech, or the press, or the right of the people peaceably to assemble, and petition the Government for the redress of grievances." Senate Journal 129. The Senate notified the House on September 21, 1789, that it wanted to conference on the language of the third proposal and asked to do so with James Madison, Roger Sherman, and John Vining. Senate Journal 141-142.

This new House committee resumed drafting the amendment on September 21, 1789. Annals 1:940. The agreed-to, final version read: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." House Journal 121; Senate Journal 145.

The legislative history of the Establishment Clause proves Congressional intent to build a wall of separation between church and state. The various drafts involved prohibitions against law "touching" on or "establishing" "religion" generally, to "One Religious Sect or Society in preference to others" specifically to "articles of faith or a mode of worship" even more specifically. In the final draft, Congress stopped

identifying that which cannot be touched or established and added the verb "respect," in the present participle form, "respecting," and retained the verb "establish" but changed it to a noun, "establishment." Now, every legislative act "looking to" or "looking toward" or "giving legal recognition to" a "religious establishment" was prohibited.

This plain-text interpretation of the Establishment Clause enshrined the foundational principle that religion can never be the engine of civic policy. Traditionally, governments endorsed, financed, identified with religions and also criminalized and regulated them. The Establishment Clause addresses the first concern and erects a Wall of Separation of Church and State: "Congress shall make no law respecting an establishment of Religion." Amend I. The subject of that sentence is "Congress," and the predicate is "shall make." The word "no" is an adjective modifying the direct object "law." The word "respecting" is a present participle with the root verb "respect." The word "respect" means "to regard, to have regard to," "to have relation to," and "to look toward," or "to refer or relate to, to deal or be concerned with." Johnson, Samuel, A Dictionary of the English Language, 1773, Edited by Beth, Rapp Young, Jack Lynch, William Dorner, Amy Larner Giroux, Carmen Faye Mathes, and Abigail Moreshead. 2021. (hereinafter "Johnson"); Webster, Noah. American Dictionary of the English Language (hereinafter, "Webster"); Oxford English Dictionary (hereinafter, "OED").[3] As a participle,

---

[3] These dictionaries are available online at https://johnsonsdictionaryonline.com/ and https://webstersdictionary1828.com/Dictionary and https://www.oed.com (by subscription).

"respecting" means "regarding, relating to, looking to, looking toward, with respect to, with reference to, as regards." Johnson; Webster, OED.

"No law respecting" has the meaning consistent with the purpose of the First Amendment generally. It simply means that Congress can pass no law regarding, relating to, looking to, looking toward doing something. Congress *has no power* over some subject. What subject?

The word "establishment" is the noun form of the verb "establish," which means "to settle firmly, to fix unalterably," "to settle in any privilege or possession, to confirm," "to fix or settle in an opinion," "to formalize in law," "to give legal recognition to." Webster; Johnson; OED.

The words "respect," "respecting," "establish" and "establishment" are used hundreds of times in the Federalist Papers.[4] The word "respecting" and the phrase "with respect to" are commonly followed by some noun like "a military establishment" or "a state establishment." The word "establishment" is always used to denote an institution or a governmental entity that is set up or being set up by law. The military and states now have legal recognition.

"Law" means "rule of action, a decree, edict, statute, or custom, publickly established as a rule of justice, judicial process, an established and constant mode or process, a fixed correspondence of cause and effect." Johnson; Webster; OED. As the definition suggests, the act of passing a law advancing, promoting, funding,

---

[4] The Federalist Papers are available in searchable form online. *See* *https://ia800509.us.archive.org/14/items/TheFederalistPapers_201607/The%20Federalist%20Papers.pdf* (last visited Sept. 6, 2025).

endorsing, identifying with religion is an "establishment." A religion or religion is "established" when it is the engine of civic policy, i.e., when it is the subject of legislation. As Story correctly points out, the Establishment Clause prevents "every pretence of an alliance between church and state." James Madison agreed. "The Constitution of the U. S. forbids *everything like* an establishment of a national religion." 3 William and Mary Q. (1946) 534, 551, 558 (emphasis added). There is no difference between saying the Establishment Clause prevents "every pretence of an alliance between church and state" or that it "forbids everything like an establishment" and that it erects a "wall of separation between church and state." The phrase "no law respecting" clearly erects a wall and the phrase "an establishment of religion" tells us what it walls off: any legal recognition of religion, i.e., religion can never be the engine of civic policy.

S.B. 10 is especially devilish because the Texas legislature is "establishing god's law," the wrong set, of course, *see infra*, but not only is it looking to or looking toward establishing religion, it is giving legal recognition to what it incorrectly thinks is god's "Top Ten Laws."

In short, Texas is barred from looking to or taking any step toward setting up, putting into place, erecting any religious monument. Where religion is the basis for legislation of any kind, that legislation is *void ab initio*.

**B. S.B. 10 contradicts the Bible.**

The Texas Legislature has put this Court in a position the Framers hoped to avoid: Biblical interpretation. The Court's effort should be easy, however, since the

plain text of the Bible clearly sets out "The Ten Commandments," in Exodus 34, which S.B. 10 ignores.

The source of S.B. 10 is Exodus, chapter 20, verses 1-14. These laws are never called "The Ten Commandments." None of the Respondents will call them "The Ten Commandments." They are known as "The Decalogue," and these first laws, inscribed on two tablets, front and back, were destroyed. Ex. 31:18, 32:19; Deut. 9:15-17. If the tablets were destroyed, what is in the Ark of the Covenant? "The Lord said to Moses: 'Carve two tablets of stone *like the first*, and I will inscribe upon the tablets the words that were on the first tablets, which you shattered.'" Ex. 34:1 (emphasis added). Humankind gets a replacement set of tablets "like the first." This Court need only compare the two sets to determine whether S.B. 10 reflects "The Decalogue" or "The Ten Commandments." *Compare* Ex. 20: 1-14 *with* Ex. 34:10-26, 28. Are they the same? This second set of tablets is specifically called "The Ten Commandments." Ex. 34:28. Unfortunately, because the Texas Legislature has placed this Court in the position of interpreting the Bible, it *must* decide whether the words on the second tablets were on the first tablets. They clearly are not. While there are other references the Eternal's sacred laws, *see* Deut. 4:13-14, Deut. 5:6-21, Deut. 27:1-26, none of the Respondents if asked to would ever be able to prove to this Court that "Thou shalt not kill" is in "The Ten Commandments." *See* Ex. 34. More importantly, "The Decalogue" cannot "also be known as The Ten Commandments" because we possess a set of laws specifically called "The Ten Commandments" and they are different from

13

the laws set out in "The Decalogue." "The Decalogue" and "The Ten Commandments" are not synonymous.

If the point of the legislation is to educate children, then Texas should be honest and provide "The Ten Commandments" as set out in Exodus 34. If the point of the legislation is to educate children on the role the Bible has had on Western Civilization, then Texas does in fact achieve that goal by showing children how we have historically misunderstood the Bible. Is that the message Texas should be telling schoolchildren? Texas should not be able to lie to Texas schoolchildren more than they already do now.

Texas is barred from displaying any religious symbols in schools – even the right ones.

## C. The Overruling of *Lemon* Is Fatal to S.B. 10.

The overruling of the *Lemon* Test is fatal to Texas' claim that posting of "The Ten Commandments" is constitutional. In *Lemon*, the Court held that a statute is unconstitutional unless it meets these three criteria: (1) a "secular legislative purpose," (2) that neither advanced nor inhibited religion, and (3) that would not "foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1980) (citing, *inter alia*, *Board of Education v. Allen*, 392 U.S. 236, 243 (1968)). The Supreme Court in *Stone* applied the *Lemon* test in finding the display unconstitutional because it failed the secular-purpose test. *See Stone v. Graham*, 449 U.S. at 42-43. Kentucky claimed the display of "The Decalogue," what we know cannot "also be known as The Ten Commandments," was secular, even

historical. *See Stone*, 449 U.S. at 41-42. At the bottom of the display, was this disclaimer: "'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.'" *See id.* at 41. With no support beyond its own *ipse dixit*, the Kentucky legislature characterized the display as "secular," a conclusion adopted by the lower court; therefore, the display passed the first prong of the *Lemon* Test. *See id.* at 42. The Court disagreed: "The pre-eminent purpose for posting The Ten Commandments on schoolroom walls is plainly religious in nature." *Id.* at 42. "[N]o legislative recitation of a supposed secular purpose can blind us to that fact." *Id.*

With the elimination of the *Lemon* test, and more specifically, the test for secularity, Texas is toast. The Constitutional rule as plainly set out in the Constitution and First Amendment is "Religion can never be the engine of civic policy." S.B. 10 is clearly a legislative act driven by religion. That it might be "historical" is just another attempt to show that it passes *Lemon*'s first prong. The Court is not to apply *Lemon*. That "The Decalogue" and "The Ten Commandments" are religious icons and the subject of legislation violates both the Constitution and the First Amendment.

Additionally, what could be more of an *ipse dixit* conclusion than the assertion that "The Ten Commandments" was adopted as the "fundamental legal code of Western Civilization and the Common Law"? As the *Stone* Court pointed out, the first four laws of "The Decalogue" are religious. *See id.* at 41-43. "The [real] Ten Commandments" are wholly religious. *See* Ex. 34:10-26. There is absolutely *no*

*evidence* that "The Decalogue" or "The Ten Commandments" were the bases of Western Civilization. The statement is completely conclusory. The Founders, on the other hand, drafted a godless, secular Constitution. They carved religion out of the document on purpose. The Constitution is the belt and the Establishment Clause is the suspenders.

Furthermore, neither "The Decalogue" nor "The Ten Commandments" are "historical." That the Puritans founded Jamestown in 1607 is a historical fact. That the Pilgrims founded Plymouth Colony in 1620 is a historical fact. That "The Decalogue" and "The Ten Commandments" were in a book that existed before those dates does not mean they formed the historical bases of Western Culture. Surely, anyone who would claim that these mitzvot are the foundation of Western Civilization and the Common Law would need to prove it. Could anyone do it in less than ten volumes? Respondents cannot in any amount of briefing.

## CONCLUSION

Posting of "The Decalogue" and calling it "The Ten Commandments" is a lie. If the "educational function" Texas seeks to achieve is to lie, then S.B. 10 is perfect. This Court should not countenance that goal. The Constitution and the First Amendment are unambiguous: Religion can never be the engine of civic policy.


Respectfully submitted,

/s/Jon R. Meador
Counsel for Amicus Curiae
Admitted: Western District of Texas,
September 7, 2006

16

915 N. Broadway
Salem, IL 62881
jonrmeador@gmail.com
512-395-4425

**CERTIFICATES OF SERVICE**
**FOR DOCUMENTS FILED USING CM/ECF**

I hereby certify that on October 29, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District, San Antonio Division by using the CM/ECF system. Counsel for all parties to the case are registered users and will be served by the CM/ECF system.

/s/Jon R. Meador
Jon R. Meador

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,**
**TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

This Brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 4,090 words total.

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Century Schoolbook, 12-point type.

<u>/s/Jon R. Meador</u>
Jon R. Meador